EXHIBIT B

```
1        IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF FLORIDA
2                 OCALA DIVISION

3            Case No. 5:16-mj-1016-PRL

4                  March 23, 2016
                  Ocala, Florida
5

6    UNITED STATES OF AMERICA,

7         Plaintiff,

8    vs.

9    DAVID PIRK and
     TIMOTHY ENIX,
10
          Defendants.
11
     _____/
12

13

14

15    TRANSCRIPT OF DIGITALLY-RECORDED DETENTION HEARING
        BEFORE THE HONORABLE PHILIP R. LAMMENS,
16           UNITED STATES MAGISTRATE JUDGE

17

18

19

20   Appearances of Counsel:

21        For the Government:     Mr. Robert Edward Bodnar, Jr.

22        For Defendant Pirk:     Mr. David Anthony Wilson
          For Defendant Enix:     Mr. David Gerhardt Mengers
23

24

25   Transcribed by:    Dennis Miracle, Court Reporter
```

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

P R O C E E D I N G S

THE COURT:  All right.  The next case is 5:16-mj-1016, the United States versus David Pirk and Timothy Enix.

This is a case, as I said yesterday, out of the Western District of New York on a Superseding -- Second Superseding Indictment.  The case number for that is 15-cr-142-W.

The government is represented by Mr. Bodnar.  Who joins you at counsel table, Mr. Bodnar?

MR. BODNAR:  Your Honor, this is Special Agent Dave Brown with the FBI out of Daytona.

THE COURT:  Mr. Pirk is present and joined today at counsel table by Mr. Wilson who I appointed.  How are you, Mr. Wilson?

MR. WILSON:  Very well, sir.  Thank you, Judge.

THE COURT:  Have you had an opportunity to meet with Mr. Pirk, or do you need time to do that?

MR. WILSON:  No, sir.  I did meet with him earlier today.

THE COURT:  All right.  Mr. Pirk, your attorney that I appointed yesterday was with the Office of the Federal Public Defender, but it appears that a co-defendant in the case was also appointed an attorney out of the Office of the Federal Public Defender, and so that office

1    couldn't represent both defendants.  That's why you have a

2    different attorney today.  Do you understand that?

3            DEFENDANT PIRK:  Yes.

4            THE COURT:  Mr. Enix is here as well, and he's

5    joined at counsel table by Mr. Mengers.

6            The government sought detention of both

7    defendants.  Mr. Pirk and Mr. Enix, both charged in Counts

8    1 and 2, face a maximum term of imprisonment of life.

9            They are also both charged in Counts 45 and 46.

10   Count 45 carries a maximum term of imprisonment of

11   20 years, and Count 46 carries a maximum term of

12   imprisonment of life.

13           And Mr. Pirk is charged in Counts 19 through 22

14   also and faces a maximum term of imprisonment of life or

15   the death penalty.

16           Is the defense, Mr. Wilson, prepared to have a

17   bond hearing?

18           MR. WILSON:  We are prepared, Your Honor.

19           THE COURT:  Mr. Mengers?

20           MR. MENGERS:  Yes, sir.

21           THE COURT:  All right.  I'll begin, then, with the

22   government, Mr. Bodnar.

23           MR. BODNAR:  Yes, Your Honor.

24           Your Honor, if it please the Court, I'd like to

25   proceed by way of proffer.  I may also call Special Agent

1　Dave Brown for a brief bit of testimony during the course

2　of the proffer.

3　　　　THE COURT:  All right.

4　　　　MR. BODNAR:  Your Honor, several of the charges

5　against the two defendants in this case in the Second

6　Superseding Indictment carry presumptions of detention as

7　noted by the Court.

8　　　　With regard to Mr. Pirk, those are Count 2, Count

9　21, Count 22, Count 45 and Count 46.

10　　　　With regard to Mr. Enix, there are three different

11　counts that have a presumption of detention, and those are

12　Count 2, Count 45 and Count 46.

13　　　　The penalties that are involved particularly with

14　the firearm offenses under Section 924(c) involve a

15　substantial consecutive sentence that must be served by

16　both men if they are convicted of those offenses.

17　　　　For instance, Mr. Pirk faces the possibility of a

18　death sentence based on the 924(j) qualifier and at a

19　minimum on the two other 924(c) offenses that do not

20　involve a death, 30 years consecutive in prison on those

21　gun charges.  He is presently 65 years of age according to

22　the Pretrial Services report.

23　　　　Mr. Enix faces on the presumption charges alone a

24　consecutive mandatory minimum sentence of 30 years.  He is

25　56 years of age according to his Pretrial Services report.

1    The consecutive minimum mandatories and the life

2  sentences that they call for provide ample reason in this

3  case for both of the defendants to flee this jurisdiction,

4  to flee the jurisdiction of the Court in New York, and I

5  submit would make them a risk of flight in this matter.

6    But a grand jury here has already found there is

7  probable cause on a number of additional charges, including

8  a RICO conspiracy, which is Count 1 of the Second

9  Superseding Indictment, and that pertains to both of the

10  defendants in this case.

11    That conspiracy involves activity that affects

12  commerce to commit certain specified unlawful acts.  And as

13  I described yesterday during the hearing, they are

14  described on pages 10 and 11 of the Second Superseding

15  Indictment.  The activity includes murder, robbery,

16  kidnapping, drug distribution, obstruction of justice,

17  witness tampering and firearms possession.

18    And as described in the Second Superseding

19  Indictment, both men were officers or are officers in what

20  is termed a one percent motorcycle club, essentially

21  referring to the one percent of motorcycle riders who are

22  involved in unlawful activity as opposed to lawful

23  activities.

24    The conspiracy as described in the Second

25  Superseding Indictment extends over many years and covers a

1  very large geographic area.

2       Mr. Pirk is identified in the Second Superseding

3  Indictment as being a national president of the

4  organization that is responsible for the acts that are

5  described in the Indictment.

6       Mr. Enix is described as a regional president

7  involving two separate states:  Florida and Tennessee.

8       The Indictment itself describes how this club has

9  access to firearms.  That is on page 6 of the Indictment.

10 And the overt acts committed as a part of this conspiracy

11 are numerous, but there are several that directly involve

12 these defendants and are disturbing in and of themselves.

13      If I could point out some of those, on page 20

14 there's overt act number 33 in which both of these

15 defendants, Mr. Pirk and Mr. Enix, were part of a meeting

16 in which they agreed that they would retrieve colors

17 associated with their motorcycle club from a rival group by

18 any means necessary, and those means included murder and

19 kidnapping.

20      Overt act number 57, which is described on page

21 24, where Mr. Pirk orders the killing of two victims that

22 are described in the Indictment which, in fact, later

23 transpired.

24      Overt act number 62 which describes video evidence

25 of the meeting in which this murder was discussed being

1     destroyed to prevent its discovery by law enforcement.

2          Overt act number 87, both defendants were

3     maintaining a drug residence for the specific purpose of

4     distributing cocaine and marijuana.

5          The conspiracy itself is punishable by life

6     imprisonment, and both of the men, given its objectives,

7     are facing here a crime of violence based on what is

8     described in the Indictment.

9          Life sentences would have to be served in this

10    case, or at least as to Count 1, before any of the

11    punishments I described earlier with the gun charges would

12    have to be imposed.  Again, they face significant sentences

13    in this case.

14         In addition, Mr. Pirk has two additional charges.

15    Those include two counts of murder in aid of racketeering

16    and the associated gun counts that go with them under

17    Section 924(c) and 924(j) for which he could receive the

18    death penalty.

19         Certainly a death sentence is indicative of the

20    danger to the community posed by Mr. Pirk and is reason

21    enough to flee prosecution.  And there are four counts in

22    which he faces a potential death sentence in this case.

23         There was a comment that was made yesterday that

24    Mr. Pirk had left his residence when the FBI initially

25    tried to contact him and that he voluntarily returned and

1    surrendered himself to the FBI.  That is true.

2         But I must point out for the Court's knowledge

3    that Mr. Pirk could not have known what the charges were

4    against him at that time because the Indictment itself was

5    sealed, and the agents were not at liberty to describe the

6    specific charges or the punishments that he was facing,

7    only that there was a warrant for his arrest from New York.

8         Mr. Pirk has a criminal record.  The Pretrial

9    Services report describes that.  It is old; I acknowledge

10   that.  But it dates back to 1974 with convictions or at

11   least charges for obstruction, escape and resisting arrest.

12   In 1975 a conspiracy offense.  In 1991 a reckless driving

13   with probation which he violated and ultimately was

14   unsuccessfully terminated from supervision.  And 1994,

15   leaving the scene of an accident.  He also is in possession

16   of a United States passport.

17        Both Mr. Pirk and Mr. Enix at the time of their

18   arrest at their residences had firearms.  There is nothing

19   that prohibited them from having those firearms, but I

20   wanted the Court to be aware that they, in fact, were in

21   possession of firearms, and certainly returning to those

22   residences would not be appropriate with weapons present.

23        If I could at this juncture, Your Honor, I'd like

24   to call Special Agent Dave Brown to talk about two

25   different things.  There was a previous interview that he

1    conducted with both defendants -- I have turned over his

2    report to defense counsel in this case regarding that prior

3    interview -- and also some postings on a Facebook account

4    that belonged to Mr. Enix, which I believe are relevant to

5    the issue of detention in this case.

6         THE COURT:  All right.

7         MR. BODNAR:  Special Agent Brown, if you'd take

8    the witness stand.

9         THE CLERK:  Raise your right hand.

10        Do you solemnly swear that the testimony you will

11   give before this Court will be the truth, the whole truth,

12   and nothing but the truth, so help you God?

13        THE WITNESS:  I do.

14        THE CLERK:  Please have a seat.  And state your

15   full name for the record.

16        THE WITNESS:  My name is David Brown.

17        MR. BODNAR:  May it please the Court.

18                        DAVID BROWN,

19            being duly sworn, testified as follows:

20                   DIRECT EXAMINATION

21   BY MR. BODNAR:

22   Q.    Mr. Brown, if you would, would you please describe

23   your current employment.

24   A.    I'm a Special Agent with the FBI out of Jacksonville

25   Division specifically at the Daytona Beach resident agency.

1    Q.     How long have you worked for the FBI?

2    A.     Almost 17 years now.

3    Q.     Tell us a little bit about your duties and

4    responsibilities working for the FBI.

5    A.     I've worked a variety of crimes as a case agent.  I

6    bring those cases to the prosecutors in Orlando, also here

7    in Ocala as well as Jacksonville.  We cover four different

8    counties there.

9    Q.     Mr. Brown, as a part of your duties with the FBI were

10   you assigned to help in the investigation and ultimately

11   the arrest of the two defendants here in court today, that

12   is, Mr. Enix and Mr. Pirk?

13   A.     Yes, I was.

14   Q.     Were you present yesterday when they were arrested or

15   at least when Mr. Pirk was arrested?

16   A.     Yes, I was present for that arrest.

17   Q.     Okay.  Have you had prior contact with both of these

18   men?

19   A.     Yes, I did.

20   Q.     What was the reason for the prior contact?  Can you

21   explain that to the Court, please.

22   A.     I can.  Buffalo Division had requested that I assist

23   them with an interview.  And on December 11th of 2014 I

24   interviewed both David Pirk and Tim Enix at the residence

25   of Mr. Pirk.

1  Q.    Was that in relation to the same investigation that

2  led to the Second Superseding Indictment in this case?

3  A.    Yes, it is.

4  Q.    Tell us a little bit about the circumstances of the

5  interview.  Did you explain why you were there?  Did they

6  agree to talk to you, things like that?

7  A.    They did.  Mr. Pirk was hesitant at first but advised

8  me that he needed to have another witness present from the

9  Kingsmen Motorcycle Club in order to speak with law

10  enforcement.  So we arranged for a meeting to take place at

11  his residence.

12        Myself and Allison Samuels, one of the other agents

13  from our office, met with Mr. Pirk and Mr. Enix, and we met

14  in the RV located at Mr. Pirk's residence there.

15  Q.    During the course of your meeting with these two men

16  can you describe, please, for the Court, was there any

17  discussion regarding a Mr. Jenkins?

18  A.    Yes, there was.

19  Q.    What was the nature of that discussion, or what was

20  the reason for it?

21  A.    Both Mr. Pirk and Mr. Enix had advised that they knew

22  fairly well why I was there and what questions I might want

23  to ask them.  It related to Andre Jenkins who was a

24  Kingsmen member.  His club name, I believe, was Little

25  Bear, and so they referred to him as such.

1      They shared with me that he was -- they were

2  interested in hearing some more of the details that were

3  coming from New York.  Specifically they mentioned that

4  Kingsmen members do not kill other Kingsmen members, that

5  they would have preferred law enforcement not get involved;

6  that the Kingsmen Motorcycle Club would have handled the --

7  handled Mr. Jenkins on their own.

8  Q.    What was it that Mr. Jenkins had done that caused an

9  interest and caused you to have to go interview these men,

10  do you know?

11  A.    Mr. Jenkins had executed two other Kingsmen

12  Motorcycle Club members behind the North Tonawanda Club

13  House.

14  Q.    If I understand, then, their response to you, they

15  essentially said they would have preferred for law

16  enforcement not to be involved, that their motorcycle club

17  could have handled this themselves; is that correct?

18  A.    That's correct.

19  Q.    Let me ask you about a different topic for a second.

20  Do you know whether or not Mr. Enix has a Facebook account?

21  A.    Yes, I do.

22  Q.    How do you know about that, sir?

23  A.    Buffalo Division had shared information with me that

24  they had obtained through a Facebook -- either a search

25  warrant or request from Facebook.

1    Q.    Were they able to verify this, in fact, was

2    Mr. Enix's account?

3    A.    Yes, they were.

4    Q.    How were they able to that, do you know?

5    A.    They were able to through a review of the pages

6    the -- first of all, the name was Blaze.  And during the

7    interview with Mr. Enix, he advised me that his club name

8    was Blaze as he was a former firefighter.

9          And then it says Blaze Kingsmen MC, and many of the

10   members were wishing Blaze a happy birthday to him on -- on

11   this Facebook page.

12   Q.    To your knowledge, was that, in fact, the date of his

13   birthday, do you know?

14   A.    Yes, it was.

15   Q.    Okay.  Of the Facebook postings -- have you been able

16   to review any of those, by the way?

17   A.    Yes, I have.

18   Q.    Of the Facebook postings that you have reviewed, are

19   there any that you are aware of that relate directly to the

20   issue of danger to the community or risk of flight?

21   A.    Yes, there is.

22   Q.    Can you describe those for us, please.

23   A.    I can.  There is a back and forth, a dialogue between

24   Rhino KMC, which would be Kingsmen Motorcycle Club, to

25   Blaze.  Kingsmen Motorcycle Club, the comments are -- this

1    is initially from Rhino.  We need to get that Darrell

2    Rowley to stop posting club shit on Facebook.  He's out of

3    control.  From Blaze, I put him out bad this morning.  I

4    have a crew going to take care of it today and get his

5    patches.

6    Q.    Let me stop you for a second.  Are you familiar with

7    the terminology "put him out bad"?

8    A.    I am.

9    Q.    What, if anything, does that mean?

10   A.    The way motorcycle clubs work is -- is if a member --

11   a member can be put out good from a club if they do not owe

12   any other dues, if they have not owed somebody within the

13   club money, including the club, other members specifically.

14         Someone who is put out bad has either done the club

15   wrong, has misbehaved to another Kingsmen member perhaps,

16   owes money to other Kingsmen members, and so they would be

17   put out bad.

18         Being put out bad means you can never associate with

19   the club again.  The club basically turns their back on

20   that particular individual.

21         And if that particular individual was sighted again,

22   they would be treated like any other normal citizen.  They

23   could be assaulted.  They could be anything.  The Kingsmen

24   brotherhood would be no longer.

25   Q.    Okay.  Are there other postings besides the one you

1    just described to us?

2    A.    There are.  It just continues that particular

3    dialogue which would have been in February of 2015.  And

4    Blaze mentions, Okay.  Let me know if he says anything

5    else.  Rhino says, He just had another post, and I told him

6    to stop again.  Blaze writes, Don't say anything.  We're

7    going to get him.

8    Q.    Okay.  Anything else?

9    A.    No.

10   Q.    Okay.  Thank you, sir.

11            MR. BODNAR:  Your Honor, I have no further

12   questions for the witness.

13            THE COURT:  Mr. Wilson?

14            MR. WILSON:  Yes, Your Honor.  Thank you.

15                    CROSS-EXAMINATION

16   BY MR. WILSON:

17   Q.    Good afternoon, Special Agent Brown.

18   A.    Good afternoon.

19   Q.    My name is David Wilson.  I'm here on behalf of

20   Mr. Pirk today.  I'd just like to follow up with some

21   questions regarding your testimony.

22            With respect to the interview that you conducted in

23   December of 2014 of Mr. Pirk, he indicated that he knew the

24   reason for the interview.  Is that (indiscernible) what you

25   said?

1    A.     That's correct.

2    Q.     Okay.  And what was it about the reason for the

3    interview that you believed he was aware?

4    A.     He advised that he was -- he knew that we would be

5    asking questions about Little Bear, about Andre Jenkins and

6    about his involvement with the execution of two Kingsmen

7    members.

8    Q.     Okay.  So Mr. Pirk was aware of the fact that

9    Mr. Jenkins was alleged to have murdered these two

10   individuals?

11   A.     Yes.

12   Q.     Okay.  When you met with Mr. Perkins -- I'm sorry,

13   Mr. Pirk -- how would you -- now, you said that he was a

14   little, I guess, reticent to talk to you at first because

15   he had a certain protocol he had to follow; is that right?

16   A.     That's right.

17   Q.     Okay.  And -- and when you were able to accommodate

18   that protocol, what was his demeanor with you?

19   A.     He was fine.  He was cordial.

20   Q.     All right.  Did you record that interview?

21   A.     Did not.

22   Q.     Okay.  Is there a reason that you didn't record it?

23   A.     We don't by policy record every interview, and we

24   were just having a conversation with Mr. Pirk and Mr. Enix.

25   Q.     Okay.  Did you take notes during the interview?

1    A.    I believe I did.

2    Q.    Okay.  Did you have the opportunity to let Mr. Pirk

3    look at those notes to make sure that everything you took

4    down was accurate?

5    A.    No, I did not.

6    Q.    Okay.  With respect to Mr. Enix's Facebook account,

7    you related some posts that you were privy to as a result

8    of the investigation.  Did any of those posts refer to

9    Mr. Pirk?

10   A.    I would have to look at them, but I'm not -- I'm not

11   100 percent.  If I could look at them?

12   Q.    If you need to, please do.

13   A.    The posts that I do have I do not find him mentioned

14   in.  They are few.

15   Q.    Okay.  And are you aware of whether Mr. Pirk had his

16   own Facebook account?

17   A.    I'm not aware.

18   Q.    Okay.  Now, at some point afterwards -- and I'm not

19   sure the day of the arrest, but you went to Mr. -- I guess

20   the residence where Mr. Pirk had been staying to arrest

21   him, correct?

22   A.    That's correct.

23   Q.    Okay.  And my understanding is that when you arrived

24   at the residence, he wasn't there.

25   A.    That's correct.

1    Q.    Okay.  And you made contact with an individual who

2    was there by the name of --

3    A.    Patty.

4    Q.    Patty Wayland?

5    A.    Yes, I did.

6    Q.    All right.  And after you made contact with

7    Ms. Wayland, she informed you that Mr. Pirk was not there,

8    right?

9    A.    Correct.

10   Q.    And you didn't find him during the search, right?

11   A.    That's correct.

12   Q.    Okay.  At some point did Ms. Wayland call Mr. Pirk,

13   tell him you were there?

14   A.    Yes.  I asked her to.

15   Q.    Okay.  And did you speak with Mr. Pirk?

16   A.    I did.

17   Q.    Okay.  And what did you tell him?

18   A.    I told him that we had a federal warrant -- it was

19   out of the Western District of New York -- and that I would

20   like to make arrangements with him to turn himself in

21   because we, you know, would need to continue to come back

22   until we had him in custody.

23        He shared with me that he was -- he had some plans

24   that day and would it be okay if he turned himself in later

25   that day, like 5 o'clock or something, and I just advised

1   him that we needed to take care of it immediately so that

2   we could start the pretrial and the notifications and

3   things this particular day.  And he agreed.

4   Q.    Okay.  And, in fact, he did show up where you were

5   approximately -- how long did it take him to get there?

6   A.    Maybe 20 minutes or so.

7   Q.    All right.  Now, during the course of speaking with

8   him -- did -- did you interview him at that point in time?

9   A.    I did not.

10  Q.    Okay.  However, it -- did he turn over any firearms

11  to you?

12  A.    Well, when -- when we took him into custody, he

13  acknowledged that he did have a weapon on his side.

14  Q.    Okay.

15  A.    And we took the weapon off of him with no incident.

16  Q.    Okay.  And he had a permit for that, correct?

17  A.    He did.  He has a concealed weapons permit.

18  Q.    Okay.  And what happened with that firearm?

19  A.    The firearm was left at the residence.  We secured it

20  and then we locked it into -- or we left it in one of the

21  vehicles with no ammunition in it.  And I advised Patty

22  myself the condition of the weapon so that she could

23  retrieve it and keep it safe.

24  Q.    Okay.  So would it be fair to say that your -- the

25  manner with which you handled that particular situation is

1  consistent with your belief or lack of knowledge that that

2  particular firearm was not involved in any way with

3  criminal activity?

4  A.    I had no way to know that, sir.

5  Q.    I think you also stated that that interview that you

6  did in 2014 was directly related to the charges that we're

7  here for today.

8  A.    No, not necessarily.  I didn't -- I wasn't aware of

9  any charges that were pending with respect to Mr. Pirk or

10  anyone else, for that matter.  It was just to find out what

11  his -- what his knowledge was of the situation with Little

12  Bear, Andre Jenkins.

13  Q.    But the conduct about which you interviewed him

14  serves as a basis for this Indictment?

15  A.    Absolutely.

16  Q.    I think you made some statements regarding -- or

17  there were some statements made that the Kingsmen

18  Motorcycle Club is a one percent club; is that fair?

19  A.    The Kingsmen Motorcycle Club do not consider

20  themselves a one percent motorcycle club.

21  Q.    Okay.  Do you consider them a one percent motorcycle

22  club?

23  A.    Based upon activities, I would say yes.

24  Q.    Okay.  Do you know whether there was any discussion

25  or any type of process undertaken by the Kingsmen to become

1    a one percent club?

2    A.    I believe that Buffalo Division shared with me that

3    there were some meetings within the Kingsmen as to whether

4    they were going to be a true one percent club, and their

5    indication to me was that they decided not to.

6    Q.    Okay.  With the -- with respect to the specific

7    charges against Mr. Pirk, what is the totality of the

8    evidence to support the charges against him?

9    A.    I don't know.

10        MR. WILSON:  Judge, may I just have a moment?  I

11   just received the report that the agent wrote right before

12   the hearing, so I just need to glance through it real

13   quick.

14        THE COURT:  You may.

15   BY MR. WILSON:

16   Q.    When you spoke with Mr. Pirk regarding the murders of

17   the individuals in New York, is it not a fact that Mr. Pirk

18   indicated to you that there was an individual that he

19   believed may have been involved?

20   A.    That's correct.

21   Q.    Okay.  And do you know whether that individual was

22   investigated to determine whether that individual was, in

23   fact, involved in the murder?

24   A.    I believe so.  That individual was also charged in

25   this Superseding Indictment.

1    MR. WILSON:  Judge, may I have one moment, please?

2    THE COURT:  You may.

3    MR. WILSON:  Judge, I have no further questions.

4    THE COURT:  Mr. Mengers, any questions?

5    MR. MENGERS:  Yes, sir.

6                    CROSS-EXAMINATION

7    BY MR. MENGERS:

8    Q.    Good afternoon, Agent Brown.

9    A.    Good afternoon.

10    Q.    You are familiar with the Indictment that has been

11    filed?

12    A.    Yes, I am.

13    Q.    And you are aware of the investigation overall in

14    this case?

15    A.    Peripherally.  I didn't have a hand in the Buffalo

16    investigation, so I can't give specifics.

17    Q.    You are familiar with the name Phillip Caruso?

18    A.    Yes.

19    Q.    Phillip Caruso is someone who is charged as a

20    defendant in this same Indictment?

21    A.    Yes, he is.

22    Q.    He's also known as Philly?

23    A.    Yes.  I believe Mr. Enix and Mr. Pirk had both told

24    me they called him Philly Caruso.

25    Q.    All right.  You have reviewed the Indictment, have

1   you not?

2   A.    I have reviewed the Indictment itself, yes.

3   Q.    You know that in part the Indictment charges a

4   conspiracy and charges particular overt acts; is that

5   correct?

6   A.    That's correct.

7   Q.    And some of the overt acts or few, very few, actually

8   do involve Mr. Enix, correct?

9   A.    I believe that's correct.

10  Q.    All right.  Now, I want to draw your attention first

11  to the interview that you gave with -- or got from Mr. Enix

12  in -- was it December of 2014?

13  A.    December 11, 2014, yes.

14  Q.    And at the time you were conducting that interview

15  because you were asked to do that by the people in Buffalo,

16  correct --

17  A.    Correct.

18  Q.    -- because of things that had happened in Buffalo --

19  A.    Correct.

20  Q.    -- which is in New York?

21  A.    Yes.

22  Q.    Now, you talked to Mr. Enix because Mr. Enix lives in

23  Florida?

24  A.    I talked to Mr. Enix because I was asked to by

25  Buffalo Division.

1    Q.    And you found him in Florida.

2    A.    Yes.

3    Q.    And you are aware that he lives in Florida.

4    A.    Yes, I am.

5    Q.    You learned or were told at some point in time that

6    he was a regional president of certain areas.

7    A.    He told me that he was, yes.

8    Q.    Specifically Florida and Tennessee.

9    A.    Yes.

10   Q.    But he is not a regional president of Buffalo?

11   A.    That's correct.

12   Q.    That his role does not give him any direct authority

13   in Buffalo?

14   A.    That would be correct.

15   Q.    You're doing this interview in part because of

16   investigation into some killings or, I guess, one killing

17   of two people in Buffalo, correct?

18   A.    Correct.

19   Q.    There is no suggestion or allegation that Mr. Enix

20   was in Buffalo at that time.

21   A.    I'm not aware.

22   Q.    Nor was there any suggestion that Mr. Enix directed

23   that.

24   A.    I'm not aware of that either.

25   Q.    In fact, Mr. Enix did give you some suspects as to

1   who he thought as a theory might be the people involved in
2   that.
3   A.    Correct.
4   Q.    He suggested that it might be Phillip Caruso.
5   A.    Yes, he did.
6   Q.    And, in fact, he talked about how Phillip Caruso --
7   two things:  Number one, was a violent person, right?
8   A.    Yes.
9   Q.    And number two, was sort of on the outs with this
10  motorcycle club --
11  A.    That's correct.
12  Q.    -- because of his behavior?
13  A.    Correct.
14  Q.    And, in fact, he indicated this to you because he
15  felt that you should be aware that Phillip Caruso is a
16  dangerous person?
17  A.    That is correct.
18  Q.    And he specifically talked about how Phillip Caruso
19  at one point in time had put a gun to his, Timothy Enix's
20  head.
21  A.    Yes, he did share that with me.
22  Q.    And threatened to kill Mr. Enix.
23  A.    Yes.
24  Q.    Okay.  Now, as far as the overt acts in the
25  Indictment, I want to draw your attention to overt act

1    number 33.  I can show it to you if you need to, but if

2    not, I'll just go ahead and kind of summarize it and see if

3    you concur that this is what they say happened.

4           It says in January 2014 that there was a meeting of

5    four people; that was Phillip Caruso, Andre Jenkins, David

6    Pirk and Timothy Enix; is that correct?

7    A.    I can't see what you have there, but I would assume

8    so if you're reading the Indictment.

9           MR. MENGERS:  May I approach and continue the

10   cross-examination next to the officer so we can refer to

11   the same document?

12          THE COURT:  Do you have an extra copy, Mr. Bodnar?

13          MR. BODNAR:  I do, Your Honor.

14          May I approach the witness?

15          THE COURT:  You may.

16   BY MR. MENGERS:

17   Q.    Now, Mr. Bodnar has given you a copy of the

18   Indictment.  I draw your attention to page 20 and the overt

19   act listed as number 33.

20   A.    Okay.

21   Q.    All right.  According to that overt act, you had a

22   meeting of four people, correct?

23   A.    That's correct.

24   Q.    Those four people were Phillip Caruso, Andre Jenkins,

25   David Pirk and Timothy Enix.

A.      Yes.

Q.      Two of those people, according to the overt act, were
armed.

A.      Yes.

Q.      And there is no indication from that that David Pirk
and Timothy Enix were armed.

A.      Not from what is written here.

Q.      Okay.  So the two people that were armed were people
who had come down from out of state, presumably New York.
Do you think it was New York?

A.      Andre Jenkins also lived in Florida.

Q.      Okay.  What about Caruso; he's from New York?

A.      Caruso, I believe he's -- he was from New York.

Q.      All right.  The allegation does say they came down
while armed; that is, they traveled while armed.

A.      Traveled to a club house in Florida, yes.

Q.      All right.  So it is fair to infer from that that
actually Mr. -- if true, that Mr. Caruso came down armed
from New York.

A.      I can't make any assumption.  It doesn't say where
they traveled from.  It just says that they traveled to
Leesburg.

Q.      Fair enough.

        Now, it says that they agreed they would get their
KMC colors back from the Pagans by any means necessary.

1    A.    Yes.

2    Q.    All right.  It does not say whose idea that was.

3    A.    No, it does not.

4    Q.    It does not say to what extent each person agreed to

5    that.

6    A.    It does not.

7    Q.    It is consistent with Mr. Enix being present while

8    that's being said.

9    A.    Yes.

10   Q.    And in all event, the context is that at least one of

11   those people was someone who was, A, armed and, B, at some

12   point, perhaps before, perhaps after, had actually put a

13   gun to Mr. Enix's head.

14   A.    Yes.  According to Mr. Enix, yes.

15   Q.    Okay.  But as far as violent acts alleged in this

16   particular Indictment, there is no allegation in the

17   Indictment that specifies any violent acts committed by

18   Mr. Enix; is that fair to say?

19   A.    Well, as you've mentioned, I am not familiar with the

20   evidence on this particular paragraph, so I can't say who

21   agreed to what and who said what.  My only inference is

22   that they all collectively agreed.

23   Q.    All right.  But there's nothing saying specifically

24   what Mr. Enix said?

25   A.    No, sir, there's not.

1   Q.    How enthusiastic he was?

2   A.    No.

3   Q.    Whether, if he agreed, it was just acquiescence?

4   A.    I don't know.

5   Q.    But in any event, if he acquiesced, he's acquiescing

6   to the guy who at some point in time held a gun to his

7   head.

8   A.    Potentially, yes.

9   Q.    All right.  Now, as far as other overt acts involving

10  Mr. Enix -- and I now draw your attention to, I think,

11  page -- I'm going to jump ahead and not do it as the acts

12  but rather the separate charges.

13        As to Count 45 of the Indictment, you'll find that on

14  page 63.

15  A.    I have it.

16  Q.    All right.  Are you there?

17  A.    Yes.

18  Q.    All right.  That actually -- that count, in fact,

19  does include the name of Timothy Enix, correct?

20  A.    It does.

21  Q.    And it also includes the names of -- and I may be

22  incorrect on this -- about 16 people, maybe 15 other

23  people.

24  A.    Yes.

25  Q.    You can count to see if I'm guessing right in number.

1    A.      Sixteen total, it looks like.

2    Q.      All right.  And that says that they maintained a

3    place, a club house that was used illegally for drugs in a

4    certain place, right?

5    A.      That's correct.

6    Q.      So where exactly is that place?

7    A.      According to the charge, it's on East Eagle Street,

8    Buffalo, New York.

9    Q.      Now, as I understand it correctly, Mr. Enix is a

10   regional president of Tennessee?

11   A.      And Florida.

12   Q.      And neither one of those places is in Buffalo,

13   New York.

14   A.      They are not.

15   Q.      All right.  Turning, then, to the next count, which,

16   again, is the same 16 people -- is that correct?

17   A.      Yes, it is.

18   Q.      All right.  And that says, again, these 16 people

19   were involved in somehow having guns in furtherance of a

20   drug conspiracy.  And where did that supposedly happen?

21   A.      It doesn't state a particular location.

22   Q.      Does it not talk about it being in Buffalo, New York?

23   A.      Not that I see.

24   Q.      All right.  So tell me -- did I say Count 44 or 45?

25   A.      You said 46.

1   Q.    All right.  Then let me go back a step.  I apologize.
2   Forty-five.
3   A.    The one we just spoke about previously?
4   Q.    I'm sorry.  I stand mistaken.  I was thinking that
5   talked about New York as well.
6         So do we know exactly where and when, according to
7   anything in the Indictment, that Mr. Enix had a gun in
8   order to -- to distribute drugs?
9   A.    The only thing that I see from reading the Indictment
10  is it says, Starting no later than the year 2006, and I do
11  not see any specific location.
12  Q.    So sometime -- and that's up until the time of the
13  Indictment; that it starts in 2006 and goes until the time
14  of the Indictment, right?
15  A.    Yes.
16  Q.    So sometime in a ten-or-11-year period in a place
17  unknown, in a manner unknown, supposedly he is one of
18  several people who had a gun in furtherance of drugs, but
19  we don't have any idea what's the basis for saying he did
20  that?
21  A.    I do not.
22  Q.    All right.  And that is the summary of what the
23  allegations are against -- specifically in this Indictment
24  that he did:  Sometime in a ten-year period -- we don't
25  know when; we don't know how -- he supposedly had guns in

1    furtherance of drugs.

2         Number two, he along with 15 other people somehow ran

3    a place up in Buffalo while he had jurisdiction in Florida

4    and Tennessee.

5         And number three, he was present at a meeting in

6    which someone said they're going to get some colors back by

7    any means necessary.  We don't know who said what.  We know

8    one of the people was the guy who held a gun to his head.

9    Is that pretty much fair?

10   A.    Unfortunately, that's all the information I have.

11   Right.

12   Q.    All right.  Just a couple things just to clean up.

13   You went out and interviewed these people.  I assume you

14   got some background information before you interviewed

15   them?

16   A.    Well, I did on Mr. Pirk.  I didn't know Mr. Enix

17   until that day --

18   Q.    All right.

19   A.    -- that we did the interview.

20   Q.    Were you aware or did you subsequently become aware

21   that Mr. Enix had no prior criminal record?

22   A.    Prior to the arrest I would have -- I would have run

23   his criminal history, yes.

24   Q.    And he, in fact, has no prior criminal record?

25   A.    No.

1    Q.    All right.  Thank you.

2              MR. MENGERS:  No further questions.

3              THE COURT:  Any redirect?

4              MR. BODNAR:  No redirect, Your Honor.

5              THE COURT:  You may step down.

6              THE WITNESS:  Thank you, sir.

7              MR. BODNAR:  Your Honor, I have just a few last

8    comments.  The bottom line in this case is that both of the

9    men that are here before the Court are facing extremely

10   serious charges with extremely serious penalties as a

11   result of that.

12             The prison sentences themselves are very lengthy.

13   Both men have 30-year consecutive sentences that they will

14   be facing on firearms counts.  Other charges involve life

15   imprisonment as to both of the men.

16             And then lastly, Mr. Pirk has four counts that

17   specifically have death as a potential penalty that could

18   be involved.  They are capital offenses.

19             I would submit to the Court that, based on that

20   information, both of these men are risks of flight, dangers

21   to the community.  The presumptions do apply in this case.

22   I would ask the Court to detain them on that basis.

23             THE COURT:  Thank you, Mr. Bodnar.

24             MR. BODNAR:  Yes, sir.

25             THE COURT:  Mr. Wilson?

1          MR. WILSON:  Judge, we'd call Patty Wayland.

2          THE COURT:  All right.

3          THE CLERK:  Raise your right hand.

4          Do you solemnly swear that the testimony you will

5   give before this Court will be the truth, the whole truth,

6   and nothing but the truth, so help you God?

7          THE WITNESS:  (Inaudible).

8          THE CLERK:  Please have a seat.

9          And if you would, state your full name for the

10  record, spelling your last name.

11          THE WITNESS:  Patty K. Wayland, W-A-Y-L-A-N-D.

12                    PATTY K. WAYLAND,

13            being duly sworn, testified as follows:

14                  DIRECT EXAMINATION

15  BY MR. WILSON:

16  Q.    Ms. Wayland, do you know David Pirk?

17  A.    Yes, I do.

18  Q.    How do you know David Pirk?

19  A.    He's my significant other.

20  Q.    Okay.  How long have you known him for?

21  A.    Twenty-five, twenty-six years.

22  Q.    Okay.  Ms. Wayland, where do you live?

23  A.    I live in Eustis.

24  Q.    Do you work?

25  A.    No.  I'm retired.

1    Q.    Okay.  From where are you retired?

2    A.    Spaulding Fibre, a fabrication place.

3    Q.    Could you describe the house you live in.

4    A.    I have a single-wide mobile home, two-bedroom.

5    Q.    Who lives in that house with you?

6    A.    Me and the girls.  That's the dogs.

7    Q.    How long have you lived there?

8    A.    Since '97.  Oh, no, wait a minute.  '03.  I can't

9    even think.

10   Q.    That's okay.  Take your time.

11   A.    '03.

12   Q.    So --

13   A.    About 15 years.

14   Q.    Okay.  Do you own that mobile home?

15   A.    Yes.

16   Q.    That mobile home is on land, obviously.  Do you own

17   the land?

18   A.    Yes.

19   Q.    Okay.  How much acreage do you have?

20   A.    A little under an acre.

21   Q.    Okay.  Do you have a phone?

22   A.    Yes.

23   Q.    Okay.  Is it -- it's a landline telephone?

24   A.    Yes, sir.

25   Q.    Okay.  And does that landline phone have any special

1   features, call waiting or anything like that?

2   A.    Yes.

3   Q.    Okay.  Can that call waiting be disconnected --

4   A.    Yes.

5   Q.    -- if necessary?

6         If the Judge were to allow Mr. Pirk to be released,

7   would you be willing to act as a third-party custodian?

8         I'm going to go over quickly what that, in fact,

9   entails.  A third-party custodian is an individual who is,

10  in essence, required to supervise, for lack of a better

11  term, a person who is on federal bond.

12        And as part of their responsibilities, they are to

13  notify the federal authorities in the event that the

14  individual that they're looking over violates any of the

15  rules or conditions that the Judge imposes upon that

16  person.  Do you understand that?

17  A.    Yes, sir.

18  Q.    Okay.  And in the event that the person that is being

19  supervised does, in fact, violate these conditions, when

20  the person who supervises them notifies the federal

21  authorities, that individual who is being supervised very

22  well should or could be taken into custody.  Is that fair?

23  A.    Yes.

24  Q.    Do you know that?

25  A.    Yes, sir.

1   Q.    Okay.  And if the person being supervised does not or

2   doesn't -- does violate the terms and conditions of the

3   release and the person supervising them, the third-party

4   custodian, does not notify the authorities, the third-party

5   custodian could be potentially in trouble with the federal

6   government.  Do you understand that?

7   A.    Yes, sir.

8   Q.    Okay.  If the Court were to allow Mr. Pirk to be

9   released, would you be willing to act in the capacity of a

10  third-party custodian for Mr. Pirk?

11  A.    Yes, sir.

12  Q.    Okay.  Have you ever been in trouble before?  Have

13  you been arrested?

14  A.    No.

15  Q.    Now, you indicated that you are a significant other

16  to Mr. Pirk.  I assume you're, in essence, in a

17  relationship with him.

18  A.    Yes.

19  Q.    And you do love Mr. Pirk?

20  A.    Yes.

21  Q.    Okay.  Would that cause you to look the other way or

22  not abide by the responsibilities of being a third-party

23  custodian if he were to violate the conditions imposed upon

24  him by the Court?

25  A.    No, sir.

1    Q.    Were you present when the FBI came to, I assume, your

2    residence to arrest Mr. Pirk?

3    A.    Yes, I was.

4    Q.    Okay.  What happened at that point?

5    A.    Well, they were pounding on everything and, you know,

6    I came out and hands up and -- you know, and then they went

7    through the house.  And they were going in one way, and

8    they were pounding the front door in the other way, and

9    then they found out he wasn't there.

10   Q.    Okay.  And you called Mr. Pirk on the phone and told

11   him?

12   A.    Yes.

13   Q.    Okay.  And were you requested to give the phone to

14   the agent so the agent could talk to Mr. Pirk?

15   A.    Yes.

16   Q.    Okay.  Were you present during that conversation?

17   A.    Yes.

18   Q.    And did you hear the agent tell Mr. Pirk that there

19   was a warrant for his arrest?

20   A.    Yes.

21   Q.    Okay.  Approximately how long did it take Mr. Pirk to

22   get back to the house?

23   A.    Fifteen, twenty minutes.

24   Q.    All right.  Do you know how long Mr. Pirk has lived

25   in Florida?

1    A.    Oh, longer than I have.

2    Q.    Okay.  Do you know whether Mr. Pirk has a passport?

3    A.    Yes, I do.

4    Q.    Okay.  Do you know where that passport is?

5    A.    Yes, I do.

6    Q.    Do you have access to it?

7    A.    Yes.

8    Q.    Would you be able and willing to retrieve that

9    passport and turn it over to the clerk of court or the

10   court system if that is a condition that's required of

11   Mr. Pirk for release?

12   A.    Yes, sir.

13   Q.    Okay.  Now, my understanding, based upon some

14   testimony earlier, is that there is -- that Mr. Pirk had a

15   firearm with him when he was speaking with the FBI agents

16   and was arrested?

17   A.    Yes.

18   Q.    Okay.  And do you know where that firearm is now?

19   A.    Yes, I do.

20   Q.    Where is it?

21   A.    In the house.

22   Q.    Okay.  And do you have a place that you can -- or a

23   third party, another person, who could take possession of

24   that firearm in the event that Mr. Pirk is released to your

25   custody?

1    A.    Yes, sir.

2    Q.    You're not a member of the Kingsmen Motorcycle Club,

3    are you?

4    A.    (Inaudible).

5              MR. WILSON:  I have no further questions,

6    Your Honor.

7              MR. BODNAR:  No questions.

8              THE COURT:  You may step down.

9              Any other witnesses, Mr. Wilson?

10             MR. WILSON:  No, Your Honor.  Nothing further.

11             THE COURT:  Mr. Mengers?

12             MR. MENGERS:  Melinda Enix.

13             THE CLERK:  Raise your right hand.

14             Do you solemnly swear that the testimony you will

15   give before this Court will be the truth, the whole truth,

16   and nothing but the truth, so help you God?

17             THE WITNESS:  (Inaudible).

18             THE CLERK:  Please have a seat.  And state your

19   full name for the record, please.

20             THE WITNESS:  Melinda K. Enix.

21                    MELINDA K. ENIX,

22             being duly sworn, testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. MENGERS:

25   Q.    Good afternoon, Ms. Enix.

| | | |
|---|---|---|
| 1 | A. | Hello. |
| 2 | Q. | Do you know Timothy Enix? |
| 3 | A. | Yes. |
| 4 | Q. | How do you know Timothy Enix? |
| 5 | A. | He's my husband. |
| 6 | Q. | How long have you been together with him as a couple? |
| 7 | A. | Nineteen years. |
| 8 | Q. | And how long have you been married? |
| 9 | A. | Almost 16.  Almost 16. |
| 10 | Q. | Sixteen years? |
| 11 | A. | Yes. |
| 12 | Q. | And do you have children together and/or children |
| 13 | | that you've raised together? |
| 14 | A. | We have five boys. |
| 15 | Q. | All right.  And how many are Mr. Enix's biologically? |
| 16 | A. | He has three boys; I have two. |
| 17 | Q. | All right.  And what kind of a father has he been to |
| 18 | | these children? |
| 19 | A. | Awesome. |
| 20 | Q. | Do you own a home? |
| 21 | A. | Yes. |
| 22 | Q. | How long have you owned the home? |
| 23 | A. | Since 2006. |
| 24 | Q. | All right.  Does Mr. Enix help support you in the |
| 25 | | home? |

1    A.    Yes.  He does everything.

2    Q.    All right.  And does he own the home as well?

3    A.    Yes.

4    Q.    All right.  What is the address of that place?

5    A.    4530 Marsh Harbor Drive in Tavares.

6    Q.    All right.  And how long have you all lived there?

7    A.    Since 2007.

8    Q.    Since 2007.  So around nine years?

9    A.    Yeah, almost nine years.

10   Q.    All right.  Is Mr. Enix employed?

11   A.    Yes.

12   Q.    How is he employed?

13   A.    He's an accountant.

14   Q.    And for whom does he work?

15   A.    For his brother.

16   Q.    And does the brother have a business in accounting?

17   A.    Yes.  He owns the company.

18   Q.    And what's the name of that company?

19   A.    Enix & Associates.

20   Q.    And how long has he been working helping out his

21   brother?

22   A.    Since last year.  I don't remember.

23   Q.    All right.  Does your husband drink?

24   A.    No.

25   Q.    Does he use drugs?

1  A.      No.

2  Q.      The -- has he ever had any criminal record that

3  you're aware of?

4  A.      None.  Never.

5  Q.      (Indiscernible) he's never failed to appear in court

6  because he's never had to appear in court --

7  A.      No.

8  Q.      -- is that right?

9  A.      Right.

10  Q.      All right.  You heard the questions about a custodian

11  if he is released.

12  A.      Yes, I will.

13  Q.      And you and I did discuss that a little bit before

14  court.

15  A.      Yes.

16  Q.      Would you be willing to fulfill the role of custodian

17  which, in essence, would ensure that if he doesn't follow

18  all rules placed on him that you'll report that?

19  A.      Yes.

20  Q.      All right.  Does he have a passport?

21  A.      No.

22  Q.      All right.  Is there anything about him that would

23  suggest in any way that he is a risk of not attending his

24  court appearances up in New York?

25  A.      No.

Q.    All right.

          MR. MENGERS:  I tender the witness.

          MR. BODNAR:  No questions.

          THE COURT:  You may step down, ma'am.

          MR. MENGERS:  I have no further evidence to
present.

          THE COURT:  All right.

          Argument, Mr. Wilson?

          MR. WILSON:  Yes, Judge.

          Judge, with respect to the Bail Reform Act as it
applies in this case, we recognize that this is what is
referred to as a presumption case and the government has so
much -- has indicated that.

          However, the presumption is subject to rebuttal.
What that does is that does not place upon the defendant
the burden of persuasion; it simply places upon the
defendant the burden of production, the burden to produce
evidence, any evidence to show that that person is not, in
fact, a risk of flight -- I'm sorry -- a substantial risk
of flight which requires a finding by the Court of a
preponderance that they do pose a substantial risk of
flight, not just a risk of flight, but a substantial risk.

          We believe that we have met the burden of
production and produced evidence that would show that he
is, in fact, not a substantial risk of flight, that being

1    his length of time in the community, by proffering to the

2    Court a third-party custodian, by indicating that he was

3    aware that there was a warrant for his arrest and

4    immediately returned to where law enforcement was, turned

5    himself in to them.

6            Now, I recognize that they have indicated that,

7    well, there's no way he could have known that he was facing

8    such serious charges, but I think that belies the fact that

9    the allegation in the Complaint or the Indictment is that

10   Mr. Pirk ordered the murder of two other individuals.  That

11   particular incident was what he was interviewed about in

12   2014.

13           Now, it would lend itself to a reasonable

14   conclusion that if he, in fact, was involved in those two

15   murders in -- prior to 2014, that he would know that he was

16   being investigated if the FBI came to talk to him.

17           And I would suggest that, if the FBI comes to him

18   in 2016 with a warrant for his arrest, he would have some

19   idea that it could be something that stems from an

20   allegation against him involving the murder of two people.

21           I believe the facts show that he is cooperative

22   and, in fact, surrendered himself to law enforcement.  He

23   did cooperate previously by speaking with them freely.

24   There's no indication that he invoked his right to counsel

25   or that he refused to talk to them.  He, in fact, was

1   voluntarily interviewed by law enforcement in 2014.

2        The government's response is simply to tell the

3   Court, well, he's a risk of flight because he's facing the

4   death penalty.  He's a risk of flight because he's facing

5   30 years consecutive.  He's a risk of flight because he is

6   facing life in prison potentially.

7        However, I don't believe that there is evidence

8   sufficient to support that to the extent that it would

9   deprive him of his right to liberty, particularly given the

10  fact that we have produced evidence.

11       And I don't believe that the burden of persuasion

12  has been met by the government allocuting to the Court that

13  he is facing -- the potential penalties he is facing.

14       With respect to whether he poses a serious risk

15  that he'll obstruct or attempt to obstruct justice or

16  threaten, injure or intimidate a prospective witness or

17  juror, that's something that must be found by clear and

18  convincing evidence.  There has been no evidence proffered

19  to the Court by the government that he would engage if

20  released on bond in any activity of that nature.

21       So not only has the government failed to show any

22  evidence whatsoever to support such a conclusion, they have

23  certainly not produced any evidence to support that

24  conclusion by clear and convincing evidence.

25       With respect to the prior criminal record that was

1    alluded to by Mr. Bodnar as contained in the Pretrial

2    Services report, I know that Mr. Bodnar related to the

3    Court the prior charges.  I submit to the Court that

4    these -- these alleged charges or these charges and their

5    dispositions are so stale as to be irrelevant.

6         We have in 1991, in essence, 25 years ago, a

7    quarter of a century, a reckless driving charge for which

8    he failed to complete probation successfully.  There's no

9    indication as to what he did to fail to complete probation,

10   whether it's a failure to pay his fine, whether it was

11   anything else.  But certainly there's nothing in that

12   charge to suggest from 25 years ago that he poses a risk of

13   flight.

14        The other charges from 1975, I -- I find it hard

15   to believe that a criminal charge from when I was 12 years

16   old is something the Court could rely upon to determine

17   whether an individual is, in fact, a risk of flight or

18   danger to the community.

19        I think that his prior criminal record is minimal,

20   and the number of years that have elapsed between any

21   charges and these particular charges militates in his

22   favor.

23        One of the factors the Court has to consider is

24   the nature and strength of the evidence against the

25   defendant, in this case Mr. Pirk.  Now, I think it's

1   important for the Court and I hope the Court will note that

2   I asked the agent what -- what is the totality of the

3   evidence against my client?  And the response was:  I don't

4   know.

5          Judge, I'm sure that there is some evidence, but

6   unfortunately the government has not produced a witness

7   that has the ability or the knowledge to testify as to the

8   nature and strength of the evidence against Mr. Pirk.  All

9   we have before the Court is an Indictment, and an

10  Indictment is not evidence; it is merely allegations.

11         Now, I do commend the agent, his testimony.  I do

12  believe he was absolutely straightforward and didn't try to

13  elaborate as we sometimes see, but the nature of his

14  testimony is such that it does not support any conclusion

15  as to the nature, the type or the strength of evidence

16  against Mr. Pirk.  There's no indication of any testimony

17  against him, any physical evidence against him, simply the

18  allegations in the Complaint.

19         And Mr. Bodnar asks the Court to rely simply on

20  the Complaint, the nature of the charges and the potential

21  penalties to make a determination that Mr. Pirk should be

22  deprived of his liberty pending the outcome of this case.

23         Judge, we respectfully suggest to the Court that

24  there are, in fact, conditions and a combination of

25  conditions that the Court could impose upon Mr. Pirk to

1    assure his appearance when required before the Court.

2           Ms. Wayland has indicated that she is willing to

3    act as a third-party custodian.  She has no prior record.

4    She has known Mr. Pirk for many, many years.  She's

5    indicated that, in fact, he does have a passport, although

6    she has control over that passport and will, in fact,

7    surrender it if required.

8           She has the ability to have electronic monitoring

9    installed in her house, so the Court could impose upon

10   Mr. Pirk an electronic monitor, whether it's satellite,

11   GPS -- I don't know if we have any GPS in the building --

12   or simply the electronic monitoring.  However, I do believe

13   that a third-party custodian, together with electronic

14   monitoring, would be sufficient.

15          I also would indicate to the Court that I did

16   speak with Ms. Wayland about pledging her property as

17   security for Mr. Pirk's appearance in court.  And she has

18   indicated that she owns the property, and she would be

19   willing to pledge the house she lives in as security for

20   his appearance in court.  She has that much faith in the

21   fact that he will appear when required.

22          I also suggest to the Court that, while there is

23   no allegation that Mr. Pirk uses drugs or uses alcohol to

24   excess or at all, he would be willing to undergo any type

25   of substance testing that the Court would impose upon him.

1          I also suggest that a curfew is a condition that
2     the Court could impose upon Mr. Pirk to assure his
3     appearance at trial.
4          Judge, the bottom line that we believe the Court
5     should conclude is that the government has failed to
6     produce evidence sufficient to overcome their burden of
7     persuasion and that there certainly are any number of
8     conditions the Court could impose upon Mr. Pirk that would
9     assure his appearance at trial and assure the Court that he
10    would not pose any danger to the community as there has
11    been no allegation that he, in fact, does pose.
12         And respectfully, Judge, I know that this is a
13    serious case.  I know that these are potentially
14    astronomical penalties.  Nevertheless, I think that what
15    has been produced to the Court today, the evidence on the
16    record is insufficient to support a finding that he should
17    be detained pending the outcome of this case.  Thank you.
18         THE COURT:  Thank you, Mr. Wilson.
19         Mr. Mengers?
20         MR. MENGERS:  May it please the Court, counsel.
21         First off, I join in Mr. Wilson's averments as to
22    all matters of law and suggest they are equally applicable
23    or more so to Mr. Enix.
24         I draw the Court's attention to the Pretrial
25    Services report, specifically the last page.  I note that

1　　his -- in the report it indicates that his wife says that

2　　he does not drink; that he was tested for drugs, it was

3　　negative, and that, quote, the defendant appears to have

4　　significant family, residential and financial ties to the

5　　community.  At this time he does not appear to be a risk of

6　　non-appearance.  That's supported by all the evidence

7　　that's been presented.

8　　　　　　The charges overall, while very lurid and

9　　extensive, also do not seem to implicate Mr. Enix in all

10　　the most serious stuff.

11　　　　　　Because of the nature of the charge, the

12　　racketeering, there's lots of overt acts.  There's lots of

13　　overt acts about very bad things that specific people are

14　　alleged to have done.  But the only overt acts pertaining

15　　to Mr. Enix at all are, number one, that he helped run a

16　　place along with 15 other people at the other end of the

17　　country where he had no jurisdiction nor significant, if

18　　any, presence.

19　　　　　　Number two, that somehow along with several other

20　　people he had guns in furtherance of drugs but no facts

21　　supporting it.  When they talk about the facts in the other

22　　overt acts for the other individual people, his name

23　　doesn't come up.

24　　　　　　And number three, that he was present when people

25　　talk about, We're going to get our colors back by any means

1   necessary, without any indication that's any more than
2   loose talk, number one, or, number two, the extent of his
3   agreement.
4          He -- based on the evidence we have, the
5   allegations in the Indictment as it pertains to Mr. Enix,
6   he is not a danger to the community.  He has no prior
7   record.  There's no indication he ever engaged in violence
8   in this or any other case.  He has substantial ties to the
9   community.  He is not a flight risk.  And accordingly, he
10  should be released on some reasonable conditions.
11         THE COURT:  Thank you, Mr. Mengers.
12         Any new argument, Mr. Bodnar?
13         MR. BODNAR:  No, Your Honor.
14         THE COURT:  In determining whether to release a
15  defendant on bond, the Court does consider numerous
16  factors, including the nature and circumstances of the
17  offenses charged.
18         Here, the defendants are charged by way of an
19  Indictment returned by a grand jury which means, in
20  essence, evidence was presented to several individuals
21  sitting as a grand jury who heard evidence about the
22  activities alleged in the Indictment and believed there was
23  probable cause that they existed or happened.
24         Thus, the grand jury returns the Indictment.
25  While it's not evidence, it is the charging document in the

1   case, and it does set forth facts sufficient for the

2   charges against the defendants.  And the Court can rely on

3   the facts in the charging document in determining whether

4   or not to fashion a bond or hold defendants in custody.

5        Indeed, the law creates a presumption of detention

6   in cases such as this.  Of course, as Mr. Wilson points out

7   and Mr. Mengers agrees, the presumption can be overcome.

8        I would submit in this case, given the nature and

9   circumstances of the offense and -- offenses charged, that

10   the presumption isn't overcome; or even if it is, that

11   there is clear and convincing evidence that the defendants

12   pose a risk of safety to the community and that there is

13   both a preponderance of the evidence and clear and

14   convincing evidence that they would pose a risk of

15   non-appearance.

16        They each face significant mandatory minimum terms

17   of imprisonment.  They each face life.  Mr. Pirk faces a

18   sentence on several counts up to and including the death

19   sentence.

20        It is alleged that the -- that both defendants are

21   a member -- or members of a multi-state motorcycle club

22   with numerous members.  Mr. Pirk is alleged to be the

23   president of the entire organization; Mr. Enix is alleged

24   to be the president -- or regional president for Florida

25   and Tennessee.

1          The organization is accused of distribution of

2   controlled substances, maintaining premises for use and

3   distribution of controlled substances, possession, use and

4   sale of firearms, untaxed cigarettes and other criminal

5   activities, including prostitution.

6          The club is accused of preserving and protecting

7   its power through intimidation, violence, threats of

8   violence, assaults, murder and attempted murder.  Examples

9   of each are laid out in the Second Superseding Indictment.

10          On page 13 it is alleged that members and

11   associates of this enterprise committed and agreed that

12   each other -- committed and agreed that other members would

13   commit certain acts of violence, including murder,

14   attempted murder, assault with dangerous weapons, assault,

15   kidnapping and other acts of violence to protect and

16   preserve and expand the enterprise's reputation in criminal

17   operations.

18          And the members and associates of the enterprise

19   protected and agreed to protect higher-ranking members of

20   the enterprise, Mr. Pirk and Mr. Enix being two of the

21   highest-ranking members.

22          Members and associates of the enterprise agreed to

23   protect the enterprise by refusing to cooperate with law

24   enforcement and agreed that any member or associate who

25   cooperated with law enforcement would be subject to

1  assault, menacing and other acts of violence, as well as
2  removal from the enterprise.
3          Given all of that, including the arguments made by
4  the government, I will remand both Mr. Pirk and Mr. Enix to
5  the custody of the U.S. Marshals.
6          You'll be transported in due course to the Western
7  District of New York where your proceedings will continue.
8  It's likely when you get there you'll be appointed a
9  different lawyer to represent you.
10         Is there anything else, Mr. Wilson, to take up at
11 this hearing?
12         MR. WILSON:  Judge, for purposes of the record we
13 would object to the Court's conclusions and findings.
14         Secondly, Judge, as the Court knows, I wasn't here
15 yesterday.  I spoke to Ms. Mills briefly regarding
16 yesterday's proceedings, and I was unsure as to whether the
17 actual Rule 5 proceedings had been undertaken.
18         Was that removal proceeding performed and then
19 today is simply a detention hearing?
20         THE COURT:  Today was simply the detention hearing
21 in that he waived his right to an identity hearing and
22 production of the warrant.
23         MR. WILSON:  Okay.  Thank you, Judge.
24         THE COURT:  Thank you.
25         Mr. Mengers?

1        MR. MENGERS:  I similarly respectfully object to

2   the Court's conclusions.

3        THE COURT:  Mr. Bodnar?

4        MR. BODNAR:  Nothing from the United States.

5   Thank you, Your Honor.

6        THE COURT:  All right.  Thank you.  We'll be in

7   recess.

8        THE COURT SECURITY OFFICER:  All rise.

9        (Thereupon, the proceedings in this case for this

10  date were concluded at this time.)

11

12

13            C E R T I F I C A T E

14        I, Dennis Miracle, Court Reporter, do hereby certify

15  that the foregoing proceedings were transcribed by me from a

16  digital record that was produced by the United States

17  District Court for the Middle District of Florida and is a

18  true and accurate record of said proceedings to the best of

19  my ability, based on the quality of the recording.

20

21

22

23  S/Dennis Miracle                    April 1, 2016

24  _____        _____

25      Dennis Miracle                      Date

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

I N D E X

Witness:                                         Page No.

DAVID BROWN

        Direct by Mr. Bodnar                         9
        Cross by Mr. Wilson                         15
        Cross by Mr. Mengers                        22

PATTY K. WAYLAND

        Direct by Mr. Wilson                        34


MELINDA K. ENIX

        Direct by Mr. Mengers                       40

* * * * * * * *