1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5     - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA    )    15CR142
6                                 )
      vs.
7                                      Buffalo, New York
      DAVID PIRK, ANDRE JENKINS &
8     TIMOTHY ENIX,               )    February 27, 2018
                  Defendants.          8:50 a.m.
9     - - - - - - - - - - - - - X
      **TRIAL - VOLUME 6 - TESTIMONY OF D GRANVILLE, S. DIETRICH & C.**
10    **SCHULTZ**

11                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE ELIZABETH A. WOLFORD
12                    UNITED STATES DISTRICT JUDGE

13                    JAMES P. KENNEDY, JR., ESQ.
                      United States Attorney
14                    BY: JOSEPH TRIPI, ESQ.
                          BRENDAN CULLINANE, Esq.
15                    Assistant United States Attorneys
                      138 Delaware Avenue
16                    Buffalo, New York 14202

17                    MARIANNE SHELVEY, ESQ.
                      U.S. Department of Justice/Organized Crime
18                    Division
                      1301 New York Avenue, NW, Suite 700
19                    Washington, D.C. 20530

20                    WILLIAM EASTON, ESQ.
                      16 W. Main Street, Suite 243
21                    Rochester, NY 14614

22                    CHERYL MEYERS BUTH, ESQ.
                      Meyers Buth Law Group PLLC
23                    21 Princeton Place
                      Orchard Park, NY 14127
24    COURT REPORTER:  Karen J. Bush, Official Court Reporter
                      (585) 613-4312
25                    100 State Street
                      Rochester, New York 14614

637

```
 1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

 2                    CONTINUATION OF APPEARANCES

 3                    TERRENCE M. CONNORS, ESQ.
                      JAMES W. GRABLE, JR.
 4                    1000 Liberty Building,
                      Buffalo, New York 14202
 5                    Appearing on behalf of the Defendant

 6

 7                    BARRY NELSON COVERT, ESQ.
                      Lipsitz Green Scime Cambria, LLP
                      42 Delaware Avenue, Suite 300
 8                    Buffalo, NY 14202

 9                    MICHAEL S. DEAL, ESQ.
                      DeMarie & Scheonborn PC
10                    403 Main Street, Suite 615
                      Buffalo, NY 14203
11

12

13                      I N D E X

14   WITNESS FOR
     THE GOVERNMENT           DX     CX    RDX      RCX
15
     D. Granville             656    675
16                                   Easton

17   S. Dietrich             680    690   706       710
                                    Meyers Buth    Meyers Buth
18
     C. Schultz              726
19

20   EXHIBIT           RECEIVED

21   69.38             664
     69.39             669
22   69.40             671
     69.41             671
23   69.42             673
     3519.3            708
24

25
```

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2                     P R O C E E D I N G S

3                          *          *          *

4

5                THE CLERK:  United States vs. Pirk, 15CR142.  Here

6      for continuation of a jury trial.

7                THE COURT:  Give me one second here.  Morning,

8      everybody.  Note the presence of counsel, all of the

9      defendants.  We're still waiting for a juror.  I guess the

10     government didn't get a ton of sleep last night.

11               MR. TRIPI:  And I apologize for the two filings.

12               THE COURT:  That's okay.  I wasn't up when you

13     filed the first one.

14               MR. TRIPI:  I found an extra case and I felt the

15     need to file an amended.

16               THE COURT:  When is Mr. Schultz going to testify?

17               MR. TRIPI:  We can slot him third today.  We can

18     push him back throughout the course of the day, but we

19     anticipated third up.

20               THE COURT:  We can talk about it right now.

21               MR. TRIPI:  I would like to make a record if you

22     can give me like two minutes just to lay this out a little bit.

23               THE COURT:  That is absolutely fine.  I guess why

24     don't we make the record now and we'll plan to start at 9

25     o'clock.  And go ahead.

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX
 2              MR. TRIPI:  Admittedly, Judge, they say you learn
 3    something new every day.  And this has been a new one for me
 4    for sure.  I have to start out by saying that, you know, we
 5    made efforts to disclose the benefit that we believed was the
 6    phone call that Task Force Officer DePasquale made to Judge
 7    Burns' chambers.  I would note, at this point, I have to say
 8    that all happened without my office's knowledge, certainly not
 9    my knowledge.  I would not have authorized or recommended that
10    course of action had I known that it was occurring.  That said,
11    there was -- I don't believe for a moment there was any
12    malicious intent on the task force officer's part when he
13    didn't think much of it and was dealing with a witness who had
14    been providing information for three years, unpaid informant
15    with no charges hanging over their head who had voluntarily
16    been providing information about this organization.  I don't
17    think he thought it through.  And said, yeah, I'll,
18    essentially, I'll verify that you've been providing
19    information.  I don't think that task force officer thought
20    more than five minutes about the issue.  Nor do I believe that
21    even the witness, Mr. Schultz, perceived it as a benefit,
22    although putting my lawyer lens on, when I hear it, clearly it
23    needs to be disclosed and it is a benefit.  I don't think
24    either of the parties in real time believed there was some kind
25    of benefit that was happening from Mr. Schultz's perspective.
```

```
 1                USA VS. D. PIRK, A. JENKINS & T. ENIX
 2    Best I could tell, he wanted somebody to verify what he was
 3    telling the Court in an application he independently was
 4    preparing, and the task force officer, without consulting
 5    anybody, went along with it, anybody from my office, went along
 6    with it.  And I would note, this task force officer, he is
 7    essentially a New York State detective.  He is with the NFFA,
 8    and they are a New York State agency.  So his wheelhouse of
 9    skills is primarily in state law.  And so, he is probably
10    thinking of it through that lens not realizing what it's now
11    taken me a full day to sort of even try to learn that this
12    carve out is not satisfactory to satisfy the federal concern
13    that would exist.
14                So I think that is properly framing the issue in
15    terms of how this all unfolded.  As I said in both of my
16    filings, even though the first one was a little incorrect on
17    the law.
18                THE COURT:  I didn't read the first one.
19                MR. TRIPI:  Good.  Because you can throw it out.
20    But, essentially, the steps I took, I took the cases that you
21    provided us with yesterday, looked at another Supreme Court
22    case, and wasn't able to find any cases where there was a
23    prosecution on these facts.  And that is consistent with my
24    experience.  I used to do, primarily, all of the federal
25    firearms cases in the Buffalo side of the district for two
```

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX
 2    years, and my first two years in the office.  And I never had a
 3    case presented to me for prosecution -- ATF typically brings
 4    the firearm cases -- never had a case presented to me for
 5    federal prosecution where someone received the relief of civil
 6    disabilities under New York law.
 7              THE COURT:  It seems as though other jurisdictions
 8    do prosecute these, including in Vermont where there was a
 9    prosecution and there was never even a certificate of relief
10    from disabilities.
11              MR. TRIPI:  Yeah.  Again, it was news to me that
12    this was happening elsewhere.  And the Supreme Court case,
13    *Caron*, that I cited, I believe it was in Massachusetts, First
14    Circuit, that emanated and made its way to the Supreme Court.
15    It's clear that that relief, that that petitioner had been
16    granted, basically, the same relief that Mr. Schultz had been
17    granted, so it's clear.
18              THE COURT:  Let me put it this way.  I think that
19    this would be a closer question or at least it would be more
20    confusing, as Mr. Easton was indicating yesterday, citing that
21    Kings County, I think, Supreme Court case, the *People vs.*
22    *Adams*, if, in fact, the certificate of civil disabilities had
23    checked B that relieved Mr. Schultz of all disabilities.  But
24    to me, because the certificate of relief from disabilities
25    checked C and only applied to possession of a firearm, it seems
```

1          USA VS. D. PIRK, A. JENKINS & T. ENIX

2     very clear to me under federal law there is no even colorable

3     argument that he could possess firearms under federal law, at

4     least firearms that traveled in interstate commerce.

5          MR. TRIPI:  Right.  But the only point I'm trying

6     to make, Judge, is we were -- it was a blind spot from my

7     office.  I consulted with Joe Guerra, who has been the criminal

8     chief for like thirty years, and he never had this issue.

9     We've never had this case here.  So, there was no benefit from

10    the federal government because even as of 5 o'clock this

11    morning until I got an e-mail back from the ATF counsel who I

12    consulted with overnight, this was, like a said, a blind spot

13    from my office.  We had no experience ever prosecuting a case

14    like this.  And let's be honest, in the panoply of cases that

15    are unlawful firearm possessors, there is, absent extenuating

16    circumstances, the case where a person gets an order from a

17    state court judge is low on the scale of priorities.

18          THE COURT:  Let me ask you a question.  Have you

19    ever had a cooperating witness that has an agent or officer who

20    is working with him and makes a phone call for him.

21          MR. TRIPI:  I think I started the comments, had I

22    ever become aware that this potential situation was brewing, I

23    would have put a stop to it, so the answer is no.

24          THE COURT:  This, to me, is unusual.  And I guess

25    you're confirming in your experience it's unusual.

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2              MR. TRIPI:  And I went to someone with 20

3    something more years experience than me, who never had this

4    experience and we've never prosecuted a case like this.  So it

5    never would have come up.  So I think that sort of does

6    dovetail into the stronger portion, the only argument, really,

7    in terms of what do we do with the information.  The issue for

8    the trial and the Court and the jury is what is the appropriate

9    amount of impeachment on this issue.  And we think you struck

10   that balance appropriately yesterday when you're granting the

11   defense to get into the old conviction, 18 years.  The benefit

12   of the phone call.  I don't think we need to go and permit

13   inquiry as to whether or not because the witness doesn't

14   perceive any benefit from us.

15             THE COURT:  But here is -- I read your memo and I

16   understand your argument.  And I'm not questioning at all that

17   your office didn't have anything to do with -- this was an

18   agent who should have given more thought to what he did before

19   he did it.  And painted in that lens, it's perfectly

20   reasonable.  However, you have a cooperating witness who has a

21   phone call made on behalf of an agent to facilitate, assist

22   him, and that is going to be the defense argument, in obtaining

23   firearms that he is still, if he possesses them, it's illegal

24   under federal law to possess those.  And, nonetheless, you have

25   an FBI task force officer who makes a phone call on behalf of

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2    this witness to assist him in obtaining these firearms that are

3    illegal to possess under federal law and has he had any

4    representations made to him about whether or not he'll be

5    prosecuted federally?  I know he hasn't.  My point is, now

6    knowing that, number one, there is a reasonable inference that

7    the phone call by the FBI task force officer at least had some

8    influence over the granting of this certificate of relief from

9    disabilities, there is, at least, a reasonable inference that

10   it did.

11              MR. TRIPI:  I understand.

12              THE COURT:  Number two, now knowing as well that

13   it's illegal to possess these firearms under federal law if

14   they traveled in interstate commerce, notwithstanding the

15   certificate of relief from disabilities, I'm not suggesting

16   that this goes to Mr. Schultz's truthfulness under 608, nor am

17   I suggesting that it's proper to raise the alleged illegal

18   possession of firearms under 404(b), but it does seem to me

19   that this could go to bias and motive.  And I'm not as firmly

20   set in my restrictions that I was placing on defense counsel

21   yesterday in terms of the cross examination of this witness.

22              I do not want to get into a side trial on whether

23   or not Mr. Schultz is, in fact, violating federal law, and what

24   the intricacies are of the way a certificate of disabilities

25   interfaces with the 922(g), but, on the other hand, I don't

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX
2      think it's appropriate to say to the defense that they can't
3      cross examine Mr. Schultz on does he actually now have any long
4      guns?  I mean, that is a benefit that he would have gotten
5      arguably through some efforts on behalf of the FBI task force
6      officer.  And have any representations been made to him about
7      whether or not he is violating federal law by possessing those
8      firearms or has he been told anything that he won't be
9      prosecuted under federal law for possessing those firearms?  I
10     mean, you know, once we get DePasquale up here, you know, we
11     haven't gotten to that yet, but I think it's going to be fair
12     game, I would think that would be law enforcement 101 when
13     working with a cooperator, you don't make a phone call to a
14     state court judge and facilitate the witness, who has a prior
15     firearm conviction, who has had recent criminal activity,
16     getting firearms back in his hands.  I'm surprised Judge Burns
17     granted this.  It just --
18                    MR. TRIPI:  I started by saying I never had this
19     situation play out.  I've had equally not thought out how
20     things play out when you got officers and agents.  And so this,
21     I agree with you 100 percent, but, unfortunately, sometimes
22     these things do happen.
23                    THE COURT:  I guess my point is, I know we're not
24     at Schultz yet, I guess my point is I'm going to give the
25     defense attorneys some leeway.  Again, I don't want to get into

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2      a completely collateral issue over the intricacies of how the

3      certificate of relief from disabilities works with the federal

4      law.  I also don't think, as you pointed out in your memo,

5      subpoenaing Judge Burns or his law clerk, that to me, that

6      would be a 403 issue, and we would be getting very far afield.

7      But I do think it's fair game -- I mean, this case, let's face

8      it, is in large part or significant part based on cooperating

9      witnesses.  And the defense has to be able to attack their

10     credibility to the extent they can.  And to me, this is an

11     appropriate area of inquiry within reason.  So, I guess, I'm in

12     some ways, I'm hesitant to even in advance of the cross

13     examination, tell you what you can and can't do because I think

14     it's going to have to kind of depend on what the witness is

15     saying in response to the questions.  And I'm going to have to,

16     at the time the government can make objections, if it's going

17     too far afield and we're really getting into a collateral

18     issue.  But I don't think it's collateral that Schultz, who is

19     now here testifying on behalf of the government, who is now

20     able to possess firearms, or, at least he thinks he is able to

21     possess firearms, and he isn't being prosecuted federally and

22     he had a federal agent make a phone call on his behalf to get

23     the firearms.

24                    MR. TRIPI:  Okay.  We understand, Judge.  Thank

25     you.

1                  USA VS. D. PIRK, A. JENKINS & T. ENIX

2                  THE COURT:  All right.  Defense attorneys have any

3       questions about that?

4                  MS. MEYERS BUTH:  No, your Honor.

5                  MR. EASTON:  No, your Honor.  I just want to -- I

6       want the Court to know that, from our perspective, Mr. Schultz

7       was acutely aware of the disabilities of possessing a firearm

8       federally because when he was arrested on the Lockport city

9       court charges, which began this process in September of 2013,

10      he informed the agents, "the other guys took the guns, I can't

11      touch those guns because it's a felony."  He was acutely aware

12      of the benefit he would get by, eventually, getting some type

13      of device to allow him to possess firearms, which was evidently

14      was something that he really wanted to do.

15                 THE COURT:  Right.  So you can make the argument

16      that this was all planned out on his behalf and this was a

17      strategy on his part, and, you know, I don't know if you're

18      going to go that far.

19                 MR. EASTON:  Maybe not go down that avenue that

20      far, your Honor.  But the other thing that has come up as we

21      dug into this is the character and nature of the 1998 reckless

22      endangerment possession of a weapons felony, which there is no

23      way to cross examine Mr. Schultz or even Task Force Officer

24      DePasquale, without getting in the fact that a certificate of

25      relief from disabilities attaches to a felony.  We think the

```
 1                  USA VS. D. PIRK, A. JENKINS & T. ENIX
 2    nature of the felony is instrumental in the benefit that Mr.
 3    Schultz received.
 4                  THE COURT:  I said you can get into -- you can't
 5    get into the underlying facts associated with it, but you can
 6    get into whatever -- I can't recall exactly what the --
 7                  MR. TRIPI:  Reckless endangerment and weapons
 8    possession of firearms, D felonies.
 9                  MR. COVERT:  The charges.
10                  THE COURT:  Not the charges, but the conviction.
11                  MR. EASTON:  What we uncovered last night is the
12    actual circumstances is unusual.  We assumed it was gun weapons
13    possession reckless endangerment.  It was a pipe bomb and the
14    facts was Mr. Schultz was charged with throwing a pipe bomb at
15    African Americans outside of a bar.  He went to trial and lost
16    and we think that, in light of throwing a bomb at African
17    American citizens in Buffalo, that is an unusual set of facts.
18    And Schultz knows that.  And the benefit he is getting now is
19    that, in light of that conviction and in light of a subsequent
20    conviction years later involving guns again, he still gets,
21    albeit limited, a green light to possess weapons again by
22    intervention of Task Force Officer DePasquale.  We think that
23    is fair game for cross examination.  And the nature of the
24    convictions sets it apart, it's unique.  And I think the jury
25    is entitled to know that to understand the benefit that Mr.
```

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2       Schultz has, the bias he has to distort his testimony against

3       Defendants Pirk, Enix and Jenkins and in favor of other members

4       of KMC.

5              MR. TRIPI:  That is in violation of 608 and 609.

6       The underlying nature of the conviction does not relate to

7       credibility.  Apparently, they are trying to make a claim he is

8       racist and should not be believed.  We don't know the

9       circumstances beyond the fact he got convicted of reckless

10      endangerment and criminal possession of a weapon.

11             THE COURT:  What were his convictions?

12             MR. TRIPI:  Reckless endangerment and criminal

13      possession of a weapon, both D felonies under New York law from

14      1998.  Criminal possession of a weapon third and reckless

15      endangerment first.

16             THE COURT:  So two felony convictions?

17             MR. TRIPI:  He received, I think it was four

18      months in jail and five years probation.  And he was discharged

19      early from probation after 18 months.  So he apparently did

20      pretty well on probation and they cut him loose.

21             THE COURT:  Okay.  I'm not going to let you get

22      into the underlying facts associated with it.  And just so the

23      record is clear, first of all, even if the conviction was

24      within 10 years, the evidence that could come in would be the

25      nature of the conviction, in other words, in this case, the

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2      reckless endangerment and criminal possession of a weapon, both

3      D felonies, when it occurred and the sentence that was imposed

4      as a result of those convictions.  Getting into the underlying

5      nature of these allegations, first of all, the fact that it was

6      directed at an African American, I think, is, without more,

7      that somehow is biased or has a motive to testify adversely, I

8      guess it would particularly apply to Mr. Jenkins here.  If

9      there is some other good-faith basis to believe that he has

10     racist tendencies then I will certainly hear from you, but

11     getting into something that occurred about 20 years ago

12     directed to African Americans, as you described, I think could

13     be unfairly prejudicial, number one.  Number two, we would then

14     be getting into very collateral issues as to what the actual

15     facts of this conviction was, and the fact that it was a pipe

16     -- bottom line is, it is sufficient enough to bring out the

17     fact that he had a weapons charge or weapons conviction 20

18     years ago that then, nonetheless, he is granted a certificate

19     of relief from disabilities in part with the intercession or

20     intervening of the federal task force officer by a state court

21     judge, that in and of itself is sufficient, in my view, to

22     portray to the jury the fact that this was unusual that he was

23     able to get this certificate of relief from disabilities

24     notwithstanding this prior conviction.  But I'm not going to

25     let you get into the underlying facts associated with the

```
 1               USA VS. D. PIRK, A. JENKINS & T. ENIX
 2    charge or the conviction 20 years ago.
 3               Mr. Covert?
 4               MR. COVERT:  I'm not asking to get into the
 5    underlying facts as the Court just explained, but I do think
 6    it's worth making note or having him to agree that the weapon
 7    that he pled guilty to was a pipe bomb, that in and of itself.
 8               THE COURT:  Why?
 9               MR. COVERT:  It shows you how significant it is
10    that he got a certificate of relief from disabilities.
11               THE COURT:  I don't see a pipe bomb or firearm.
12    If it was an Uzi, to me, that would be more significant to me.
13    The relevance was it was a prior weapons conviction.  That is
14    my ruling.  As far as I'm concerned, I think in erring
15    significantly on the side of the defense here in terms of what
16    you're able to get into with respect to this.  I'm not going to
17    let you get into the underlying facts associated with the
18    20-year conviction.  Unless, for some reason, something comes
19    up during cross examination that somehow changes the landscape
20    that we are addressing right now.  If so, talk to me about it
21    before you just bring it up, obviously.
22               MR. EASTON:  Or direct examination as well?
23               THE COURT:  Or direct examination.  If something
24    comes up that somehow changes the landscape of what we're
25    talking about, then, you know, we can deal with it then.
```

1                 USA VS. D. PIRK, A. JENKINS & T. ENIX

2                 MR. GRABLE:  Your Honor, can I state our position

3        on behalf of Mr. Enix?

4                 THE COURT:  Yes, Mr. Grable.

5                 MR. GRABLE:  We agree with Mr. Easton.  It's our

6        position that the worse -- the underlying conviction in 1998,

7        the greater the perceived benefit by Mr. Schultz, and we don't

8        see this as a 608 or 609 issue.  We see it as an issue related

9        to his incentive as he perceives it to give information to the

10       federal government that will cause the federal government to

11       assist him in the thing that is apparently of great importance

12       to him getting his guns back.  So, to the extent, and I can see

13       where the Court would be inclined to say, why should we inject

14       the fact that it was an African American crowd that he threw

15       the bomb in, we're going to have a whole trial of whether the

16       guy is a racist.  Our intention is, if the Court were to find

17       that under 403 the racial component is not important, but the

18       fact he threw a pipe bomb into a crowd of people back in 1998,

19       and over the course of a long history, I don't think we have

20       302s for any witness more than the number of 302s we have for

21       Mr. Schultz, he was cooperating extensively, and as I read the

22       chronology of his cooperation, it reads as though he becomes

23       more and more entrenched with the federal government.  And Mr.

24       Easton is right, he is keenly aware throughout the process of

25       his cooperation beginning in 2013 that as a prior felon, he is

1             USA VS. D. PIRK, A. JENKINS & T. ENIX

2    not entitled to own guns.  Our position is that the fact of him

3    throwing a pipe bomb into a crowd makes the nature of the

4    benefit received from the government even greater than if it

5    was a simple weapons charge.

6             THE COURT:  And I'm not suggesting that you cannot

7    get into with him the fact that he thought it was going to be a

8    very difficult hurdle for him to get a certificate of relief

9    from civil disabilities, that he was aware of the fact that his

10   prior conviction was a firearm conviction, and therefore, isn't

11   it true, Mr. Schultz, that you believed that it was going to be

12   unlikely that you were going to get the certificate of relief

13   from disabilities, and isn't it true that you really wanted to

14   be able to possess?  I'm not saying that you can't inquire into

15   the fact that Mr. Schultz perceived that it was going to be

16   difficult to get the right to possess these firearms and that

17   he perceived this as a real benefit.  But getting into the

18   underlying nature of the prior criminal conviction from 20

19   years ago, as far as I'm concerned, is running afoul of 403

20   based on the information we have right now.

21             Now, if Mr. Schultz comes in and says, oh, no, I

22   thought it was going to be completely easy to get a certificate

23   of relief from disabilities, I thought this was just a matter

24   of filling out paperwork and it wasn't going to be difficult at

25   all, and, you know, I just in the past 20 years haven't gotten

```
 1                  USA VS. D. PIRK, A. JENKINS & T. ENIX
 2    around to filling out the paperwork, and, you know, I thought
 3    it was an easy peasy process, then, you know, I'll reconsider
 4    your arguments because that, to me, would not be credible and
 5    maybe then would call into question whether or not you're able
 6    to get into more of the underlying facts associated with the
 7    conviction.  But I would imagine that Schultz, if he is being
 8    credible, would say, no, I didn't think this was a slam dunk.
 9    I was aware of my prior felony conviction.  I was aware of my
10    more recent criminal conduct.  And, I mean, let's face it, he
11    was convicted 20 years ago and it wasn't until he started
12    cooperating with the federal government and had an agent that
13    was willing to make the phone call on his behalf that he then
14    applied to get the certificate of relief from civil
15    disabilities.  So I think we'll have to see what he says.  All
16    right?
17                  MR. TRIPI:  I anticipate he'll say he tried in the
18    past to get the relief and had applied, maybe not applied but
19    tried several times.  I don't know exactly the nature of it.
20                  THE COURT:  Okay.  So it's 9:15.  Let's --
21    everybody ready?  Who is our first witness?
22                  MS. SHELVEY:  Detective Granville.
23                  THE COURT:  Okay.  Let's bring in our jury.
24                  M. SHELVEY:  Is it permissible for Special Agent
25    Mango to cut open some of the exhibits so we can get to them?
```

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2      They have been sealed and remain sealed.

3                    THE COURT:  I don't have any issue.  Defense

4      counsel?

5                    MR. EASTON:  Fine with us.

6                    THE COURT:  That is fine, Ms. Shelvey.

7                    (Whereupon, the jury is escorted into the

8      courtroom.)

9                    THE COURT:  Good morning.  Nice to see you all.

10     Welcome back.  All right.  Have a seat, everybody.  Welcome

11     back.  We are ready to continue with the trial.  I'm sorry

12     we're getting a little bit of a late start this morning.  That

13     is the difference between real time and court time.  But trust

14     me, we know that your time is valuable.  So with that being

15     said, is the government ready to call its next witness?

16                   MS. SHELVEY:  Yes, your Honor.  The United States

17     calls Detective Granville.

18                   THE COURT:  Detective Granville, come on up.  I'll

19     have you step over to the left, my left to be sworn in before

20     you take the witness stand.

21     (D. Granville was called to the witness stand and sworn.)

22                   THE CLERK:  Please have a seat.  Please state and

23     spell your last name for the record.

24                   THE WITNESS:  Daniel Granville, G-r-a-n-v-i-l-l-e.

25                   THE COURT:  Sir, my name is Judge Wolford.  I have

```
 1                    D. GRANVILLE - DX BY MS. SHELVEY
 2     some instructions for you before you get started.  First of
 3     all, you're here to testify for the benefit of the ladies and
 4     gentlemen of the jury, so try and direct your answers towards
 5     them.  Only answer the questions that you're asked.  Don't
 6     volunteer information.  Don't guess.  If you don't understand
 7     the question, let the attorney know that.  Speak slowly and
 8     clearly.  Speak into the microphone so everybody can hear you
 9     and so my court reporter can take down your testimony.  And if
10     there is an objection to a question, wait until I rule on the
11     objection and then I'll let you know whether or not you can
12     answer it.  Okay?
13                    THE WITNESS:  Okay.
14                    THE COURT:  Thank you.  Go ahead, Ms. Shelvey.
15     Whenever you're ready.
16                    MS. SHELVEY:  Morning, your Honor.
17     DIRECT EXAMINATION BY MS. SHELVEY:
18         Q.  Morning, sir.  Please take a moment and introduce
19     yourself to the jury and tell me where you are employed.
20         A.  My name is Daniel Granville and I'm referred to as D.J.
21     Granville.  I'm the chief of narcotics and intelligence with
22     Erie County Sheriff's office.  Been a policeman for about 19
23     years or so, and conducting drug traffic investigations for
24     approximately 15 years.
25         Q.  And can you explain a little bit about the unit that
```

```
 1                    D. GRANVILLE - DX BY MS. SHELVEY
 2      you work in, narcotics and intelligence?
 3          A.   We have several detectives and deputies assigned to my
 4      unit.  We also have deputies assigned to agencies such as DEA,
 5      FBI, and we all collaborate together and conduct joint
 6      investigations.
 7          Q.   Thank you.  I want to direct your attention to August
 8      of 2013, did there come a time when you were called to assist
 9      Detective Graham in an investigation?
10          A.   Yes.
11          Q.   Can you describe to the members of the jury how you
12      became involved in that investigation?
13          A.   Detective Graham contacted myself and advised me that
14      he had developed a target of a drug investigation, an
15      individual by the name of Gregory Willson, a/k/a Flip, and he
16      asked me to assist him in that investigation.
17          Q.   Are you aware of why Detective Graham asked you to
18      assist?
19                    MR. DEAL:  Objection.
20                    MS. SHELVEY:  Withdraw.
21          Q.   Were you focused on a specific address?
22          A.   Yes.
23          Q.   What was the address?
24          A.   57 Humphrey Road in the City of Buffalo.
25          Q.   Is Detective Graham a narcotics investigator?
```

1                    D. GRANVILLE - DX BY MS. SHELVEY

2       A.   At that time, he was.

3       Q.   Were you his supervisor?

4       A.   No.

5       Q.   Can you describe a little bit about the day, August 9,

6    2013, please?

7       A.   On that day, we established surveillance at 57 Humphrey

8    Road.  We identified a female companion of Mr. Willson, female

9    by the name of Rebecca Vosburgh.  We observed Ms. Vosburgh

10   depart the residence in her vehicle, and we came into contact

11   with her a short time later right around the Buffalo Zoo.

12      Q.   And after you came in contact with her, did you have an

13   opportunity to have discussions with her?

14      A.   We did.

15      Q.   What was her demeanor during the discussions?

16      A.   She was very nervous, very cooperative and very nice.

17      Q.   Did you ask her whether or not she had any narcotics on

18   her person?

19                    MR. DEAL:  Object.

20                    THE COURT:  On what grounds?

21                    MR. DEAL:  Well, I suppose, at this point, it's

22   more preemptive.  She is going to ask this question and then

23   ask for her response from this witness.  It will call for

24   hearsay.

25                    THE COURT:  If we get to that, we'll deal with

```
 1                  D. GRANVILLE - DX BY MS. SHELVEY
 2    that, but go ahead, you can answer.
 3        A.   Yes.
 4        Q.   Based on that, what did you do?
 5        A.   We asked Ms. Vosburgh for consent to search her
 6    residence, which was located at, again, 57 Humphrey Road in the
 7    upstairs argument.
 8        Q.   Prior to searching her residence, did you search Ms.
 9    Vosburgh?
10        A.   Yes.
11        Q.   What, if anything, did you discover?
12        A.   I don't recall.
13        Q.   After dealing with Ms. Vosburgh on the road, you asked
14    permission to do something.  What was that?
15        A.   That is correct.  We had asked her permission to search
16    her residence.
17        Q.   Did she give permission?
18        A.   She did.
19             MR. DEAL:  Objection.
20             THE COURT:  Did she give her permission?  You're
21    objecting on hearsay grounds?
22             MR. DEAL:  Yes.
23             THE COURT:  Overruled.
24        Q.   What did you do next?
25        A.   Myself and other officers, along with Ms. Vosburgh,
```

1                    D. GRANVILLE - DX BY MS. SHELVEY

2    proceeded to her residence at 57 Humphrey Road.

3        Q.   Prior to entering the residence, did you provide Ms.

4    Vosburgh with anything -- strike that.  Was anything provided

5    to Ms. Vosburgh relative to the search of her home?

6        A.   Not by myself.

7        Q.   Can you describe entry into the home, please?

8        A.   We gained entry utilizing Ms. Vosburgh's keys.  Again,

9    she was present.  And we simply walked up the stairs and into

10   the residence and cleared it for officer safety.

11       Q.   What happened next?

12       A.   Ms. Vosburgh directed myself to a bedroom in which

13   there was a dresser area and kind of indicated in the dresser

14   there might be some narcotics and/or a weapon.

15       Q.   Based on that, what, if anything, did you do?

16       A.   I conducted a very brief search and located a .38

17   revolver.

18       Q.   Upon seeing a firearm, what did you do next?

19       A.   At that point, we stopped the search and we applied for

20   a search warrant.

21       Q.   Who wrote the search warrant?

22       A.   Myself.

23       Q.   Were you granted the search warrant?

24       A.   Yes.

25       Q.   Did you go back to the residence at 57 Humphrey?

```
 1              D. GRANVILLE - DX BY MS. SHELVEY
 2       A.   Yes.
 3       Q.   Can you describe to the members of the jury what you
 4    did next?
 5       A.   Myself and, again, other officers conducted a thorough
 6    search of the residence and we recovered quantities of
 7    contraband along with some other items.
 8       Q.   Were you personally responsible for seizing some of the
 9    items?
10       A.   Yes.
11       Q.   I'm going to show you Government's Exhibit 69.38.  Ask
12    if you can take a look at that.  And sir, looking at
13    Government's Exhibit 69.38, do you recognize it?
14       A.   Yes.
15       Q.   What do you recognize it to be?
16       A.   This is the .38 caliber revolver that I recovered on
17    that day at 57 Humphrey Road in the upstairs apartment.
18              MS. SHELVEY:  Ms. Prawel, if we can pull up 69.1.
19       Q.   And, Detective, I'll direct your attention to the
20    screen, maybe.
21              MS. SHELVEY:  I turned on the ELMO.  It's probably
22    easier to go old school.
23              THE COURT:  We had IT in here to make adjustments
24    to the jurors' screens and may have done something else.
25    Ladies and gentlemen, we did have IT look at your screens and
```

1                    D. GRANVILLE - DX BY MS. SHELVEY
2    apparently there is no technical problem.
3                    MS. SHELVEY:  This is on ELMO.  This will work for
4    now.
5                    THE COURT:  Hold on for one second.  Ladies and
6    gentlemen, so you see, we have another screen at the end of the
7    jury box.  I know for the folks sitting close to the witness
8    box, this may not be very helpful.  This is the best we can do
9    at this point.  Sandra contact Joe and have him come back up.
10                   Go ahead whenever you're ready, Ms. Shelvey.
11                   MS. SHELVEY:  Thank you.
12   Q.   I'm showing you 69.1.  Do you recognize that?
13   A.   Yes, I do.
14   Q.   And what do you recognize that to be?
15   A.   That is the same .38 caliber revolver recovered on
16   Humphrey Road.
17   Q.   And is that the picture that you have in front of you
18   in 69.38?
19   A.   Yes.
20                   MS. SHELVEY:  Your Honor, I move at this time to
21   have received 69.38.
22                   THE COURT:  Any objection?
23                   MR. EASTON:  No, not to the gun itself.  That does
24   not include the envelope or the carrying envelope with it?
25                   No objection to the contents of this, but the

1                D. GRANVILLE - DX BY MS. SHELVEY

2    actual writings and stuff on the envelope we do object to.

3                MS. SHELVEY:  I'll get a new envelope so we don't

4    have a firearm laying around.

5                THE COURT:  Okay.  Let me try and understand, Ms.

6    Shelvey, what are you proposing.

7                MR. SHELVEY:  I'm proposing to admit Government's

8    Exhibit 69.38 as this.  We're going to put it in another

9    envelope.  Counsel doesn't want it in an evidence bag, which is

10   fine.

11               MR. EASTON:  It's not the bag, there is documents

12   attached to it with all sorts of writing and we object to that.

13               THE COURT:  Are you objecting to the bag that Ms.

14   Shelvey is holding there?

15               MR. EASTON:  No, it's fine, but it came in.

16               MR. TRIPI:  Chain of custody.

17               THE COURT:  So you're not objecting to what Ms.

18   Shelvey has in her hands; the bag and the revolver, right?

19               MR. EASTON:  Correct.

20               MS. SHELVEY:  And this is an evidence sticker,

21   69.38.

22               THE COURT:  Mr. Deal, any objection?

23               MR. DEAL:  Just could I voir dire the witness?

24               THE COURT:  Sure.  Of course you can.

25   VOIR DIRE BY MR. DEAL:

664

1              D. GRANVILLE - DX BY MS. SHELVEY

2      Q.   Detective, how are you sure that this item is the exact

3   same item that you recovered?

4      A.   These photographs were taken during the day by our

5   officers and this is the exact item that we submitted.

6      Q.   Well, is there some marking?  Did you do anything to

7   ensure that the item that was recovered is going to be the same

8   item that is produced?

9      A.   Yes.  There is also a serial number depicted on the

10  firearm.

11     Q.   Okay.  And so you're confident this same item presented

12  in court is the same item from the dresser?

13     A.   Yes.

14              MR. DEAL:  I don't have any further questions on

15  that issue.  But, Judge, I would object to the admission of

16  this item and the other items that are were recovered just on

17  the basis that as relates to Mr. Jenkins, Mr. Pirk and Mr.

18  Enix.  This evidence is immaterial to the charges that they

19  were -- that they are facing here.  And it's cumulative and

20  prejudicial nature far exceeds its probative value relative to

21  these specific defendants.

22              THE COURT:  Okay.  Mr. Connors or Mr. Grable, any

23  objection?

24              MR. CONNORS:  No.

25              MR. GRABLE:  No, your Honor.

1           D. GRANVILLE - DX BY MS. SHELVEY

2           THE COURT:  Mr. Deal's objection is overruled.  Is

3    it 69.38?  Which is the firearm in the plastic bag that Ms.

4    Shelvey has in her hands will come into evidence.

5           (**Whereupon, Exhibit 69.38 was received into**

6    **evidence.**)

7           MS. SHELVEY:  May I show this to the jury, not

8    give it to them, just walk?

9           THE COURT:  It's in evidence.  You can do whatever

10   you want with it at this point within reason.

11          MS. SHELVEY:  Thank you.

12   CONTINUING DIRECT EXAMINATION BY MS. SHELVEY:

13   Q.  Detective Granville, counsel asked you how you knew it

14   was the same gun.  Can you describe to the members of the jury

15   what the process is once a piece of evidence is taken into

16   custody?

17   A.  When a piece of evidence, such as a firearm, is taken

18   into custody, it's photographed, it's handled to see if there

19   is a serial number on that weapon, it's also run through our

20   system to see if that gun has been reported stolen.  It's also

21   submitted to the Erie County Central Police Services Laboratory

22   for analysis and to determine if the gun is operable.

23   Q.  Now, I'm going to show you, first of all, Government's

24   Exhibit 69.38, and the paperwork or the envelope that is marked

25   69.38.  Do you recognize what that paperwork is?

1                    D. GRANVILLE - DX BY MS. SHELVEY

2        A.   This paperwork here?

3        Q.   Yes.

4        A.   Yes.  It's a chain of custody as it relates to this

5    firearm and also a trace summary report from the ATF.

6        Q.   And what is a chain of custody report?

7        A.   Chain of custody just shows where the weapon was

8    initially recovered and then how it's been handled since.

9        Q.   And there appears to be a number of names and

10   signatures on that paperwork, what does that depict?

11       A.   It shows several names within the FBI chain of custody

12   and shows who it went to on dates, times.

13       Q.   And now on there, you also mentioned that you also

14   record a serial number for weapons, especially guns?

15       A.   Yes.

16       Q.   And is that also documented on that paperwork?

17       A.   Yes, it is.

18       Q.   And can you read into the record the serial number for

19   the firearm?

20       A.   It's 708150.

21       Q.   And does that serial number that you just read off the

22   firearm, does that match the paperwork?

23       A.   Yes, it does.

24       Q.   Detective, at the time you seized the firearm after it

25   was removed from the drawer, what did you do with it?

1                    D. GRANVILLE - DX BY MS. SHELVEY

2        A.   It was turned over to the evidence officer at the

3    scene.

4        Q.   Is that standard operating procedure for a search

5    warrant at a scene?

6        A.   For us, yeah.

7        Q.   What happens to all of the evidence after it's taken

8    from a scene?

9        A.   It's ultimately submitted to the Erie County Central

10   Police Forensic Laboratory for analysis.

11       Q.   Sir, as it relates to Government's Exhibit 69.38, once

12   removing it from the drawer, did you have an opportunity to

13   determine whether or not it was loaded?

14       A.   Yes.

15       Q.   Can you describe the process that you went through?

16       A.   When it comes to be -- when it came to this revolver,

17   simply unlocked the barrel and the barrel showed some live

18   rounds in it.

19       Q.   Do you recall how many live rounds?

20       A.   Not at this moment.

21       Q.   I'm going to show you what's been marked Government's

22   Exhibit 69.39.  Do you recognize that?

23       A.   Yes, I do.

24       Q.   And can you tell the members of the jury what you

25   recognize that to be?

1                    D. GRANVILLE - DX BY MS. SHELVEY

2        A.   These are the live rounds that were located in the

3   firearm, one of which is a spent shell casing.

4        Q.   And at the -- first of all, how do you know those are

5   the same live rounds that came from the firearm?

6        A.   These are, again, marked with identification numbers

7   indicating these are the rounds that were recovered from the

8   weapon.

9        Q.   And you mentioned that one is a spent round?

10       A.   That's correct.

11       Q.   Are you aware, at the time -- was it a spent round when

12   you first observed it?

13       A.   No.

14       Q.   Are you aware why it's contained in that evidence as a

15   spent round now?

16       A.   Yes, the CPS lab utilized one of these submitted rounds

17   for test fire.

18       Q.   What is a test fire?

19       A.   To determine if the gun is operable.

20       Q.   And again, based on your training and experience, is

21   that something you see in these types of cases as it relates to

22   firearms?

23       A.   Yes.

24                 MS. SHELVEY:  Your Honor, I move to admit 69.39.

25                 THE COURT:  Any objection, Mr. Easton?

```
1                    D. GRANVILLE - DX BY MS. SHELVEY

2                    MR. EASTON:  No objection.

3                    THE COURT:  Mr. Deal?

4                    MR. DEAL:  I make the same objection that I asked

5        continuing objection to the evidence presented by the

6        government.

7                    THE COURT:  Is your microphone on?

8                    MR. DEAL:  Unless you prefer me to do it with each

9        item, I make the same objection.

10                   THE COURT:  Your objection is noted for the record

11       with respect to these items of evidence.  You don't have to,

12       the record is made.

13                   MR. DEAL:  Thank you.

14                   THE COURT:  In that regard -- any objection, Mr.

15       Connors?

16                   MR. CONNORS:  No, your Honor.

17                   THE COURT:  69.39 will come into evidence.

18                   MS. SHELVEY:  Thank you.

19                   (Whereupon, Exhibit 69.39 was received into

20       evidence.)

21                   THE COURT:  The objection is overruled.

22        Q.  Sir, I'll direct your attention to the screen.  You

23       made reference to the loaded -- is that -- pointing here --

24       what is contained in Government's Exhibit 69.39?

25        A.  Yes.
```

1                    D. GRANVILLE - DX BY MS. SHELVEY

2                    MS. SHELVEY:   Thank you.  And for the record, I

3      showed the witness 69.37 and the exhibit itself is 69.39.

4          Q.   Sir, I'm going to place a box of items in front of you

5      and ask you if you recognize those items in the box.  You can

6      take them out and lay them out in front of you.

7          A.   Yes, I do.

8          Q.   And I'll ask you to look at 69.40.  Sir, do you

9      recognize that?

10         A.   Yes, I do.

11         Q.   And can you describe for the members of the jury what

12     you're looking at?

13         A.    Inside this bag, there is two bags, appears to be bags

14     of cocaine.  There is a black spoon with a bunch of white

15     powder residue on it.  There is also a Subway card and a pair

16     of scissors.

17         Q.   Now, as it relates first to the cocaine.  Is there a

18     sticker on there that is 69.40?

19         A.   Yes.

20         Q.   Could you describe to the members of the jury where you

21     located that item?

22         A.   While conducting a search at 57 Humphrey Road, in the

23     same dresser area where the .38 revolver was recovered, I

24     recovered these items in that dresser.

25         Q.   I'm going to show you what's been previously marked and

```
 1                    D. GRANVILLE - DX BY MS. SHELVEY
 2    admitted as 69.6, and ask you if you recognize that photograph?
 3         A.   Yes, I do.
 4         Q.   And what do you recognize that photograph to be?
 5         A.   It's the items that I just described here in exhibit
 6    69.40.  One item I omitted, there are some clear straws located
 7    in here, also.
 8                    MS. SHELVEY:  First, I move to admit 69.40, 69.441
 9    and that's it.
10                    THE COURT:  69.40 and 69.41.
11                    MS. SHELVEY:  Yes, your Honor.  They are two
12    separate items.  However, how the lab packaged them, they are
13    contained together.
14                    THE COURT:  Mr. Easton, any objection?
15                    MR. EASTON:  May I see the envelope?
16                    THE COURT:  Sure.
17                    MR. EASTON:  No objection, your Honor.
18                    THE COURT:  Mr. Deal, other than the objection
19    that you have already made on the record, any further
20    objection?
21                    MR. DEAL:  No, your Honor.
22                    THE COURT:  Mr. Connors?
23                    MR. CONNORS:  No, your Honor.
24                    THE COURT:  69.40 and 69.41 will come into
25    evidence.
```

1          D. GRANVILLE - DX BY MS. SHELVEY

2          MS. SHELVEY:  Thank you.

3          (**Whereupon, Exhibits 69.40 and 69.41 were received**

4    **into evidence.**)

5     Q.   Now, Detective, if you can, looking at Exhibit 69.40

6    and 69.41, would you just touch the screen as to where those

7    items are located in Government's Exhibit 69.6?

8     A.   The pair of scissors are located right here.  The black

9    spoon is located here.  This is a bag of cocaine here.

10    Q.   Are you unable to see the Subway card in that picture?

11    A.   I cannot see the Subway card.

12    Q.   Not a problem.

13          THE COURT:  What do you mean a "Subway card"?

14    Like Subway the restaurant?

15          THE WITNESS:  Yes.

16          THE COURT:  Not like subway, New York City subway

17    card.

18    Q.   Detective, why did you seize a Subway card and plastic

19    spoon?

20    A.   Both of these items are commonly used to cut and

21    package cocaine.

22    Q.   I'm going to direct your attention to Government

23    Exhibit 69.42 and ask you if you recognize that item?

24    A.   I do.

25    Q.   What do you recognize that item to be?

| | | |
|---|---|---|

1                          D. GRANVILLE - DX BY MS. SHELVEY

2        A.   This is an AWS digital scale that was also recovered

3     from 57 Humphrey Road.

4        Q.   And in looking at 69.6, do you see the item there?

5        A.   I do.

6        Q.   And can you please identify where it is?

7        A.   (Witness complies.)

8        Q.   And why did you seize this item?

9        A.   It's a digital scale.  Drug dealers often utilize

10    digital scales to weigh out their drugs for sale.

11                MS. SHELVEY:  Okay.  Your Honor, I move to admit

12    69.42.

13                THE COURT:  Any objection?

14                MR. EASTON:  No, your Honor.

15                THE COURT:  Mr. Deal, other than what you stated?

16                MR. DEAL:  Not other than that.

17                THE COURT:  Mr. Connors?

18                MR. CONNORS:  No.

19                THE COURT:  69.42 will come into evidence.

20                MS. SHELVEY:  Thank you.

21                **(Whereupon, Exhibit 69.42 was received into**

22    **evidence.**)

23        Q.   Detective, there are three other items in front of you,

24    correct?

25        A.   That's correct.

```
 1                  D. GRANVILLE - DX BY MS. SHELVEY
 2      Q.   And can you describe what those items are?
 3      A.   This item here is a depicted in the picture as well,
 4  it's the cover to the AWS digital scale.
 5      Q.   And can you point to where that is in the picture,
 6  please.
 7      A.   (Witness complies.)
 8      Q.   Thank you.
 9      A.   There is also a blue ceramic plate that is depicted as
10  well.
11               MS. SHELVEY:  Your Honor, the government is not
12  asking to introduce these, just asking to point them out in the
13  photograph.
14      A.   The blue ceramic plate is here and also there say GNC
15  bottle of Inositol, which is located right here.
16      Q.   Okay.  Thank you.  Detective, was there a reason that
17  those items were seized?
18      A.   Yes.
19      Q.   And why?
20      A.   The Inositol powder is a powder commonly used by drug
21  dealers.  When they are packaging their cocaine, they'll insert
22  the substance to spread their cocaine out.
23      Q.   Now, as it relates to all of the evidence that you
24  previously talked about, Government's Exhibit 69.40, 41, 42, 38
25  and 39, did you follow the procedures that you discussed
```

1                    D. GRANVILLE - CX BY MR. EASTON

2    previously about collection of evidence?

3        A.   Yes.

4        Q.   Do you know if these items were sent to the lab?

5        A.   Yes.

6        Q.   Do you know if these items were all analyzed?

7        A.   Yes, I believe they were.

8        Q.   And after the execution of the search warrant, did you

9    have any further involvement in this case?

10       A.   No.

11                  MS. SHELVEY:  Just a moment, your Honor.

12                  THE COURT:  Sure.

13                  MS. SHELVEY:  Nothing further, your Honor.

14                  THE COURT:  Thank you, Ms. Shelvey.  Mr. Easton,

15   any cross?

16                  MR. EASTON:  Yes, your Honor.  Thank you.

17   CROSS EXAMINATION BY MR. EASTON:

18       Q.   Good morning, Detective.

19       A.   Good morning.

20       Q.   Directing your attention back to August 9th, 2013.  You

21   testified on direct examination that you initially were

22   conducting surveillance at the 57 Humphrey Street location or

23   Humphrey Road location?

24       A.   That's correct.

25       Q.   And you had contact with a Rebecca Vosburgh as she was

```
 1              D. GRANVILLE - CX BY MR. EASTON
 2   in the vicinity of 57 Humphrey Road; is that right?
 3      A.   The contact actually occurred with her a short distance
 4   away near the Buffalo Zoo.
 5      Q.   And was she in her vehicle?
 6      A.   She was.
 7      Q.   And you pulled -- she was pulled over and engaged in
 8   conversation with you and Detective Graham?
 9      A.   That's correct.
10      Q.   And during the course of that, you characterized her
11   demeanor and affect as cooperative and nice; is that correct?
12      A.   Yes.
13      Q.   And at some point, you or Detective Graham conducted a
14   search of her and she was carrying some cocaine; is that
15   correct?
16      A.   That's correct.
17      Q.   And then you went back to -- you went to 57 Humphrey
18   Road, the actual residence; is that right?
19      A.   That's correct.
20      Q.   And she let you in; is that right?
21      A.   That's correct.
22      Q.   And before you got the -- you conducted a preliminary
23   search and she directed your attention to the bedroom area; is
24   that right?
25      A.   That's correct.
```

1                D. GRANVILLE - CX BY MR. EASTON

2       Q.   And there was a drawer there.  Did she open the drawer

3   or did you just look into it and she gave you consent to look

4   in the bedroom?

5       A.   She gave us consent for the residence and she indicated

6   that if there were contraband or weapons, that is where it

7   would be located.

8       Q.   And you opened the drawer and sure enough there was a

9   weapon in the drawer; is that correct?

10      A.   That's correct.

11      Q.   And was the drawer -- did she -- the bedroom, did she

12  indicate it was her bedroom?

13      A.   I don't recall.

14      Q.   And there was women's clothing in the drawer; is that

15  correct?

16      A.   I don't recall.

17      Q.   And after you conducted that search, you applied for a

18  warrant and got a search warrant for the entire residence; is

19  that correct?

20      A.   That's correct.

21      Q.   And eventually obtained the properties or the various

22  items of property that you just testified to in direct

23  examination.  Is that right?

24      A.   That's correct.

25      Q.   You were a detective in the narcotics and intelligence

```
 1                  D. GRANVILLE - CX BY MR. EASTON
 2    unit at that time; is that right?
 3        A.   That's correct.
 4        Q.   And you're chief of it now; is that correct?
 5        A.   That's correct.
 6        Q.   And at the time, you worked -- part of your duties was
 7    you worked with DEA and FBI; is that right?
 8        A.   That's correct.
 9        Q.   And in terms of Ms. Vosburgh, did you charge her with
10    anything -- any criminal charges in connection with her
11    carrying the cocaine or the weapons possession?
12        A.   No.
13        Q.   Now, was there an agreement with her that you indicated
14    to her that you wouldn't charge her if she continued her
15    cooperation?
16        A.   No.
17        Q.   Just -- there was no discussion at all about her
18    criminal liability in terms of the cocaine she was carrying?
19        A.   No.
20        Q.   Or the weapon that was found in her bedroom?
21        A.   No.
22        Q.   Were there children in the apartment?
23        A.   At the time of the search, no.
24        Q.   But eventually you came to realize there were children
25    that resided with her at that apartment; is that correct?
```

```
 1                S. DIETRICH - DX BY MR. CULLINANE

 2      A.   That's correct.

 3      Q.   Minor children?

 4      A.   I don't recall.

 5      Q.   It school-age children?

 6      A.   Again, I don't recall.  They were children, though.

 7      Q.   All right.

 8              MR. EASTON:  Nothing further, your Honor.

 9              THE COURT:  Thank you, Mr. Easton.

10              Mr. Deal, any cross?

11              MR. DEAL:  No, your Honor.

12              THE COURT:  Mr. Connors?

13              MR. CONNORS:  No.

14              THE COURT:  Any redirect?

15              MS. SHELVEY:  No, your Honor.

16              THE COURT:  Okay.  You can step down.  Thank you.

17      All right.  Is the government ready to call its next witness?

18              MR. CULLINANE:  Yes, your Honor.  The government

19      calls Susan Dietrich.

20              THE COURT:  All right.  Let's have Ms. Dietrich

21      come on in.  Ms. Dietrich, come on in.  I'll have you step over

22      to my left and have you sworn in before you take the witness

23      stand.

24      (S. Dietrich was called to the witness stand and sworn.)

25              THE CLERK:  Please be seated.  Would you please
```

1              S. DIETRICH - DX BY MR. CULLINANE

2     state and spell your name for the record.

3              THE WITNESS:  Susan, S-u-s-a-n, Dietrich,

4     D-i-e-t-r-i-c-h.

5              THE COURT:  Ms. Dietrich, my name is Judge

6     Wolford.  Good morning.  I have some instructions for you

7     before you get started.  First of all, try and direct your

8     answers towards the ladies and gentlemen of the jury, that is

9     why you're here to testify, for their benefit.  Only answer the

10    question that you're asked.  Don't volunteer information.

11    Listen carefully to the question that the attorney asks.  If

12    you don't understand the question, let the attorney know that.

13    In addition, speak slowly, clearly, speak into the microphone

14    so everybody can hear you and so my court reporter can take

15    down your testimony.  And if there is an objection to a

16    question, you need to wait until I rule on the objection and

17    then I'll let you know whether or not you can answer it.  Do

18    you understand?

19             THE WITNESS:  Yes, I do.

20             THE COURT:  Okay.  Thank you.  You can proceed

21    whenever you're ready, Mr. Cullinane.

22             MR. CULLINANE:  Thank you, your Honor.

23    DIRECT EXAMINATION BY MR. CULLINANE:

24    Q.  Good morning.  Pardon my first question, but can you

25    please state your age?

```
 1                 S. DIETRICH - DX BY MR. CULLINANE

 2      A.    Fifty-five years old.

 3      Q.    And what city or town do you currently live in?

 4      A.    Lackawanna.

 5      Q.    Ms. Dietrich, did you complete college?

 6      A.    Yes, I did.

 7      Q.    And when did you complete college?

 8      A.    2008.

 9      Q.    And what did you major in?

10      A.    Business administration.

11      Q.    And are you currently employed?

12      A.    No, I'm not.  I'm a student.

13      Q.    Previously, were you employed?

14      A.    Yes.

15      Q.    Where did you work?

16      A.    At Black Dog's Tavern.

17      Q.    What did you do at Black Dog's Tavern?

18      A.    I was a bartender.

19      Q.    And when did you start working there?

20      A.    In 2010.

21      Q.    Until what time did you work there?

22      A.    Until 2013.

23      Q.    Ms. Dietrich, I will return to ask you some questions

24   about your employment at Black Dog's Tavern, but I first like

25   to ask you about your own drug history and your criminal
```

1                    S. DIETRICH - DX BY MR. CULLINANE

2    history.  Have you personally used drugs before?

3        A.   Yes, I have.

4        Q.   What have you used?

5        A.   I was using crack in my 40s, early 50s.  And I've tried

6    marijuana about ten times in my life.  And I did do meth for

7    about six months before I was arrested.  I was arrested in

8    2014, yes.

9        Q.   Okay.  And Ms. Dietrich, regarding that arrest in

10   October of 2017, did you enter a plea of guilty to a federal

11   narcotics charge?

12       A.   Yes, I did.

13       Q.   What was the charge?

14       A.   Intent to sell cocaine.

15       Q.   Now, at the time you entered the plea agreement, did

16   you decide to enter the plea agreement rather than going to

17   trial?

18       A.   Yes, I did.

19       Q.   And does that plea agreement contain a cooperation

20   section?

21       A.   Yes, it does.

22       Q.   What is your understanding of what the cooperation

23   section requires of you?

24       A.   It requires me to tell the truth.

25       Q.   Regarding what?

1                      S. DIETRICH - DX BY MR. CULLINANE

2        A.    Regarding this case.

3        Q.    And any other cases?

4        A.    No.

5        Q.    Well, does it require you to tell the truth about any

6    criminal conduct you're aware of?

7        A.    Yes.

8        Q.    Now, are you currently waiting to be sentenced in your

9    case?

10       A.    Yes, I am.

11       Q.    And is it your understanding that the government will

12   request the Court to lower your sentence if you provide

13   substantial assistance?

14       A.    Yes.

15       Q.    But does the Court ultimately determine your sentence?

16       A.    Yes.

17       Q.    Now, what is your understanding of what could happen if

18   you lie in court?

19       A.    I could be charged more and my plea agreement would be

20   dismissed.

21       Q.    Okay.  Ms. Dietrich, you mentioned before that you

22   worked at Black Dog's Tavern; is that correct?

23       A.    Yes.

24       Q.    Where is Black Dog's Tavern located?

25       A.    South Park in South Buffalo.

```
 1                 S. DIETRICH - DX BY MR. CULLINANE

 2      Q.   And is that within the City of Buffalo?

 3      A.   Yes.

 4      Q.   And how long did you work there, approximately?

 5      A.   About three years.

 6      Q.   Now, are you familiar with the Kingsmen Motorcycle

 7 Club?

 8      A.   Yes.

 9      Q.   How did you become familiar with the Kingsmen

10 Motorcycle Club?

11      A.   When I was working at Black Dog's, it was a Black Dog's

12 Kingsmen bar; they would come in and drink.

13      Q.   Now, when you say it was a Kingsmen bar, does that mean

14 they came in frequently?

15      A.   Yes.

16      Q.   Did they also separately have a clubhouse?

17      A.   Yes, they did.

18      Q.   Where was that?

19      A.   That was at Smith and Eagle Street in South Buffalo.

20      Q.   And how far is that from Black Dog's Tavern?

21      A.   It's less than 10 minutes.

22      Q.   Now, did you see patrons in Black Dog's Tavern wearing

23 Kingsmen clothing?

24      A.   Yes.

25      Q.   What did you see?
```

1                S. DIETRICH - DX BY MR. CULLINANE

2        A.   It was a leather jacket with on the back it said

3    "Kingsmen MC" for the motorcycle club with an emblem in the

4    middle.

5        Q.   Was it men that wore those jackets?

6        A.   Yes.

7        Q.   Did you ever see women wearing these vests?

8        A.   No.

9        Q.   While you worked at Black Dog's Tavern, did you engage

10   in illegal activity?

11       A.   Yes, I did.

12       Q.   Please describe the illegal activity that you engaged

13   in while working there?

14       A.   While I was bartending, about the last year I was

15   bartending, I met one of the regular patrons and I started

16   buying cocaine from him and selling it in the bar.

17       Q.   Who did you sell to at the bar?

18       A.   Just the patrons and I sold to the other bartenders,

19   the girls.

20       Q.   Can you name the women that you sold to?

21       A.   Meredith was one of them, Kathy, and those were the

22   barmaids.

23       Q.   And you mentioned a Meredith?

24       A.   Yes.

25       Q.   Did Meredith have any connection with to the Kingsmen

1          S. DIETRICH - DX BY MR. CULLINANE

2    Motorcycle Club?

3          A.   Meredith is Stan's old lady.

4          Q.   And who is Stan?

5          A.   He is here today.

6          Q.   Well, is Stan a Kingsmen member?

7          A.   Yes, he is a Kingsmen member.

8          Q.   Now, while there, did you observe others engage in

9    illegal conduct?

10         A.   Yes.  It was a drug infested bar and there were three

11   dealers that dealt heavily in there.  One was named -- one of

12   the names was Jimbo and he was the dealer for the Kingsmen of

13   cocaine.

14         Q.   Please describe that.

15         A.   They would come in and he would sell the cocaine very

16   obviously at the bar.

17         Q.   And you saw this?

18         A.   Yes, I saw that many a times.

19         Q.   Did you see it while you were working?

20         A.   While I was working and when I was not working.

21         Q.   So did you come to the bar sometimes as a patron?

22         A.   Yes.

23         Q.   Ms. Dietrich, while working at Black Dog Tavern, did

24   you become familiar with the Kingsmen members?

25         A.   Yes.

```
 1                  S. DIETRICH - DX BY MR. CULLINANE
 2       Q.   How did you become familiar?
 3       A.   One was named Dennis and he started to like me and
 4   wanted to go out with me.
 5       Q.   At some point, did one of the members invite you to the
 6   South Buffalo clubhouse?
 7       A.   Yes, his name was Dennis.
 8       Q.   And when did this approximately occur?
 9       A.   This was about 2012.
10       Q.   And where were you when he invited you to the
11   clubhouse?
12       A.   I was at Black Dog's working behind the bar.
13       Q.   And had you previously been to the clubhouse?
14       A.   I had never been there, I had never been there before.
15       Q.   So what happened after he invited you?
16       A.   Well, I closed the bar that day, that is how it
17   started.  They wanted to continue the party, so, you know, they
18   assured me that girls would be there and so I closed the bar
19   and I followed Dennis to the clubhouse.
20       Q.   Approximately what time did you close the bar?
21       A.   At 4 o'clock.
22       Q.   What happened after you left the bar to head to the
23   clubhouse?
24       A.   Well, I followed him and I got there and I walked in
25   and I noticed a long bar, but I noticed it was all men, mostly
```

1                     S. DIETRICH - DX BY MR. CULLINANE

2    the Kingsmen was there, but there was a couple that weren't

3    Kingsmen, also.

4        Q.  And Ms. Dietrich, did you recognize some of these men

5    to be Kingsmen members?

6        A.  Yes.

7        Q.  How is it that you recognized them to be Kingsmen

8    members?

9        A.  I knew them from Black Dog's Tavern.

10       Q.  Now, when you walked in, did you see anything of

11   interest?

12      A.  Well, there was a long bar and I saw a mirror lens of

13   cocaine and there were other drugs and there was like a bowl

14   with Lortabs and blue, there was blue.  I assumed it to be

15   Valium.  I seen Valium before.  And there was a bar with

16   liquor.

17      Q.  Did you see any other drugs on the bar?

18      A.  I saw joints rolled, marijuana.

19      Q.  Now, did you also make a detection or an observation

20   about the smell of something when you walked in?

21      A.  They were smoking when I walked in; it smelled like

22   marijuana.

23      Q.  What happened then?

24      A.  Well, I got very nervous because I realized there were

25   no girls there and they told me that there would be, so I just

1                  S. DIETRICH - DX BY MR. CULLINANE

2      was very nervous from the get go.  And, you know, we went up to

3      the bar and someone made me a drink and I just didn't even want

4      to drink it because I didn't know what would happen.  I had

5      heard that they were --

6                  MR. EASTON:  Objection, your Honor.

7                  THE COURT:  Sustained, sustained.

8                  THE WITNESS:  I'm sorry.

9                  THE COURT:  Just answer the question asked.  Maybe

10     ask her another question.

11                 MR. CULLINANE:  Thank you, your Honor.

12         Q.  Ms. Dietrich, at some point, did you decide you wanted

13     to leave the clubhouse?

14         A.  Yes.

15         Q.  Did you attempt to leave the clubhouse?

16         A.  I told Dennis, the one that I came with, that I just

17     wanted to leave, you know, and they all laughed, and, you know,

18     and I just got very scared, you know, I started crying and I

19     was screaming, "Please, just let me go.  I was scared."

20         Q.  Ms. Dietrich, so what did you do then?

21         A.  I went to the door and it had -- it's an automatic

22     lock.  I couldn't open the door so I just was very upset and a

23     couple of them surrounded me and I heard one of them say, "it's

24     just not worth it," and so one of them unlocked the door.

25         Q.  And were you able to leave at that point, Ms. Dietrich?

```
1              S. DIETRICH - CX BY MS. MEYERS BUTH

2      A.  Yes, I was able to leave at that point.

3      Q.  Now, Ms. Dietrich, given the terms of the plea

4  agreement you discussed, do you have more incentive to lie or

5  tell the truth today?

6      A.  I have more incentive to tell the truth.

7              MR. CULLINANE:  One moment, your Honor.  No

8  further questions at this time, your Honor.

9              THE COURT:  Thank you.  Ms. Meyers Buth, cross

10  examination?

11              MS. MEYERS BUTH:  Thank you, your Honor.

12  CROSS EXAMINATION BY MS. MEYERS BUTH:

13      Q.  Good morning, Ms. Dietrich.

14      A.  Good morning.

15      Q.  And my name is Cheryl Meyers Buth, and with Mr. Easton,

16  we represent David Pirk over there with the cardigan sweater.

17  Do you know him?

18      A.  Yes.

19      Q.  And have you met him before?

20      A.  Yes, I have.

21      Q.  Now, in terms of the questions that you were asked on

22  direct, you were arrested in February, February 26th, 2015.  Is

23  that right?

24      A.  Yes.

25      Q.  You were arrested at your apartment?
```

1              S. DIETRICH - CX BY MS. MEYERS BUTH

2      A.   Yes.

3      Q.   That was at 193 Roland Avenue in Lackawanna?

4      A.   Yes.

5      Q.   And the officers that arrested you were from Lackawanna

6  PD?

7      A.   Yes.

8      Q.   And also from the DEA task force?

9      A.   Yes.

10     Q.   And at the time, your boyfriend James Dunkin was living

11  there with you?

12     A.   Yes.

13     Q.   And at some point, you learned that you had sold

14  Hydrocodone pills to an informant who was working with the

15  Lackawanna police.  Is that true?

16     A.   Yes.

17     Q.   And they had gotten a search warrant for your

18  apartment?

19     A.   Yes.

20     Q.   When they came in, there were about a dozen bags of

21  methamphetamine on the table?

22     A.   I wasn't there.

23     Q.   Was there methamphetamine laying out in the open in

24  your apartment?

25              MR. CULLINANE:  Objection, 608.

```
 1                    S. DIETRICH - CX BY MS. MEYERS BUTH
 2               THE COURT:  Counsel, approach for a minute.
 3               (Whereupon, there was a sidebar discussion on the
 4     record.)
 5               THE COURT:  This is the underlying offense for
 6     which she is cooperating?
 7               MR. CULLINANE:  Absolutely underlying,
 8     cooperating, doesn't relate to her credibility at all.  We
 9     brought it out.
10               THE COURT:  But you brought it out, it's fair game
11     for cross examination.  Okay?  So I just wanted to make sure I
12     understood.
13               MS. MEYERS BUTH:  I'm not going any further.
14               MR. CULLINANE:  Okay, thanks.
15               (Whereupon, the proceeding continued.)
16               THE COURT:  Ladies and gentlemen, I overruled the
17     objection, so Ms. Meyers Buth continue whenever you're ready.
18               MS. MEYERS BUTH:  Thank you, your Honor.
19     Q.   Ms. Dietrich, you're aware that police also found about
20     11 bags of cocaine that was in your apartment?
21     A.   No, I wasn't there.  I was at Save-a-Lot when they
22     came.
23     Q.   Were there eleven bags in your purse at Save-a-Lot?
24     A.   Yes.
25     Q.   And did they find 50 bags of cocaine in your bedroom?
```

1                  S. DIETRICH - CX BY MS. MEYERS BUTH

2        A.   Yes.

3        Q.   And did they find about 74 Hydrocodone pills in your

4    nightstand?

5        A.   Yes.

6        Q.   And at the time you were arrested, you made a statement

7    to the police that you had given Mr. Dunkin all of your money

8    to get this thing started?

9        A.   No.

10       Q.   The police claim that you made a statement to that

11   effect, correct?

12       A.   Yes.

13       Q.   And are you aware that they brought a drug dog into the

14   apartment?

15       A.   Yes.

16       Q.   And they found $53,447, right?

17       A.   Yes.

18       Q.   And that was drug money, was it not?

19       A.   No.

20       Q.   Part of it was drug money, right?

21       A.   Part of it, yes.

22                  THE COURT:  You have to answer.  What did you say?

23                  THE WITNESS:  I said part of it, yes.

24       Q.   And was that amount, as far as you know, going to be

25   forfeited to the government as part of your plea?

1                    S. DIETRICH - CX BY MS. MEYERS BUTH

2        A.   Yes.

3        Q.   And the government had claimed that was all drug

4    related, that is why it was forfeitable, correct?

5        A.   Yes.

6        Q.   Now, I'm not going to go into a lot of detail, but Mr.

7    Cullinane indicated that in the past, you've used drugs, right?

8        A.   Yes.

9        Q.   And at the time you were arrested, you were in business

10   with Mr. Dunkin selling drugs, correct?

11       A.   No.

12       Q.   You weren't selling drugs?

13       A.   I wasn't in business with him.

14       Q.   He was living there?

15       A.   Yes.

16       Q.   You were selling drugs?

17       A.   Yes.

18       Q.   Okay.  And in the past, you've indicated that you used

19   crack?

20       A.   Yes.

21       Q.   And you used methamphetamine?

22       A.   Yes.

23       Q.   You were also using Lortabs without a prescription for

24   a period of time?

25       A.   Yes.

1              S. DIETRICH - CX BY MS. MEYERS BUTH

2        Q.  And you worked at Black Dog's Tavern on South Park

3    Avenue?

4        A.  Yes.

5        Q.  And you said that was from 2010 to 2013, correct?

6        A.  Yes.

7        Q.  And Black Dog's is owned by Mr. Feeger?

8        A.  Yes.

9        Q.  And it's on South Park about a block south of Choate

10   Avenue in South Buffalo, correct?

11       A.  Yes.

12       Q.  Choate, if you take it all the way up, is where Mercy

13   Hospital is, right?

14       A.  Yes.

15       Q.  Just to orient where this is -- and Mr. Feeger ended up

16   firing you, correct?

17       A.  Yes.

18       Q.  And part of the reason was because Mr. Dunkin was

19   trying to sell meth in the bar, true?

20       A.  I don't know.  That wasn't the reason he gave me.

21       Q.  And you yourself were selling cocaine in the bar?

22       A.  Yes.

23       Q.  Now, after your arrest, there came a point in time in

24   April of 2015 when you and your lawyer met with the prosecutors

25   at the U.S. Attorney's Office; is that right?

1              S. DIETRICH - CX BY MS. MEYERS BUTH

2      A.   Yes.

3      Q.   And you told them that you had been selling cocaine in

4  the bar and you gave them the name of your source of supply.

5  Do you remember that?

6      A.   Yes.

7      Q.   And the person you were getting the cocaine from was

8  not a Kingsmen, true?

9      A.   No.

10     Q.   And of all of the drugs that were in your apartment,

11 those were drugs that you had bought and you were selling,

12 correct?

13     A.   Yes.

14     Q.   That had nothing to do with the Kingsmen case?

15     A.   No.

16     Q.   Now, when you started dating Mr. Dunkin, is that about

17 the time that you started smoking meth?

18     A.   Yes.

19     Q.   So he introduced you to that?

20     A.   Yes.

21     Q.   And he was also prosecuted as a result of this

22 incident, right?

23     A.   Yes.

24     Q.   And at the time that you met with prosecutors in April

25 of 2015, you told them that your main customers were Ed and

```
 1                  S. DIETRICH - CX BY MS. MEYERS BUTH
 2    Jen, who used to come by your apartment.  Is that right?
 3         A.   Yes.
 4         Q.   And they were not Kingsmen?
 5         A.   No.
 6         Q.   And you also had a girl that you used to sell to over
 7    on North Ogden Street.  Do you remember saying that?
 8         A.   Yes.
 9         Q.   And, in fact, at the end of 2014, you and Mr. Dunkin
10    took a trip out to California, did you not, to buy meth?
11         A.   Yes.
12         Q.   He was getting it from his brother, Harvey?
13         A.   Yes.
14         Q.   That had nothing to do with the Kingsmen, did it?
15         A.   No.
16         Q.   And now in terms of Mr. Cullinane's questions about you
17    having to be truthful, when you met with the government for the
18    first time in April of 2015, you signed a letter called a
19    proffer letter that said that you would provide information to
20    the government, correct?
21         A.   Yes.
22         Q.   And nothing that you said was going to be used against
23    you as long as you were truthful, correct?
24         A.   Yes.
25         Q.   And it was very important at that first meeting that
```

```
 1                 S. DIETRICH - CX BY MS. MEYERS BUTH
 2      you tell the government everything you know about any criminal
 3      conduct, right?
 4          A.  Yes.
 5          Q.  And --
 6                    THE COURT:  Keep your voice up, Ms. Dietrich.
 7                    THE WITNESS:  Okay.
 8                    THE COURT:  Thank you.
 9          Q.  And during that first meeting, nothing about the
10      Kingsmen came up, did it?
11          A.  I can't remember that meeting.  I told them that I
12      worked at the Black Dog's.
13          Q.  But at the time, they didn't is ask you any questions
14      about the Kingsmen, correct?
15          A.  Correct.
16          Q.  Now, subsequent to that meeting in April of 2015, you
17      were then indicted federally in November of 2015.  Do you
18      remember that?
19          A.  Yes.
20          Q.  And you had to come to this courthouse and you were
21      arraigned by Judge Schroeder?
22          A.  Yes.
23          Q.  And you were charged in five counts of a seven-count
24      drug indictment; is that right?
25          A.  Yes.
```

1                    S. DIETRICH - CX BY MS. MEYERS BUTH

2      Q.   And you were also charged with maintaining a drug

3   involved premises, being your apartment was being used to

4   distribute drugs, right?

5      A.   Yes.

6      Q.   And that had nothing to do with you selling drugs at

7   the bar that related to your apartment?

8      A.   Yes.

9      Q.   And you were using that to bag up drugs and sell it?

10     A.   Yeah.

11     Q.   Yes?

12     A.   Yes.

13              THE COURT:  Ms. Dietrich, the microphone moves

14   towards you.  Move it towards your mouth there.

15              THE WITNESS:  Okay.

16     Q.   And Mr. Feeger was not charged with anything because

17   you were selling cocaine out of his bar, right?

18     A.   No.

19     Q.   Now, after you were indicted in May of 2015, you went

20   back with your lawyer to the U.S. Attorney's Office in May of

21   2016.  Do you remember going back a second time?

22     A.   Yes.

23     Q.   And this time is the very first time since your arrest

24   that the subject of the Kingsmen came up.  Do you recall that?

25     A.   Yes.

```
 1                S. DIETRICH - CX BY MS. MEYERS BUTH
 2      Q.   And did you bring it up or did the prosecutors ask you
 3   about the Kingsmen, if you recall?
 4      A.   I don't recall.
 5      Q.   But you knew from being at that meeting that the
 6   Kingsmen was a subject that they were very interested in, true?
 7      A.   Yes.
 8      Q.   And you wanted to provide them information as best you
 9   could because you were trying to get a reduced plea in your
10   case?
11      A.   I was telling the truth.
12      Q.   Okay.  I'm not saying you weren't.  But I'm saying you
13   knew that by providing them information about the Kingsmen that
14   was going to benefit you?
15      A.   Yes.
16      Q.   They were clearly interested in that topic?
17      A.   Yes.
18      Q.   Okay.  And so that's when you first told them about
19   Dennis and this incident that you described for the jury today,
20   correct?
21      A.   Yes.
22      Q.   After that incident that you described for us that
23   occurred in 2012, did you tell anybody about it?
24      A.   I told the people at the bar, the girls that I worked
25   with.
```

1                S. DIETRICH - CX BY MS. MEYERS BUTH

2      Q.   Did you tell the police?

3      A.   No.

4      Q.   And you said you had seen some drugs laid out on the

5   bar in the Kingsmen clubhouse, right?

6      A.   Yes.

7      Q.   Black Dog's Tavern is open to the public, correct?

8      A.   Yes.

9      Q.   Kingsmen clubhouse is private, true?

10     A.   True.

11     Q.   Four o'clock in the morning about eight guys sitting

12   around the bar, right?

13     A.   Yes.

14     Q.   And other than some people smoking some marijuana, you

15   mentioned that you saw a mirror with some lines of cocaine?

16     A.   Yes.

17     Q.   And you didn't see, like, in your apartment when you

18   were arrested, baggies and large quantities of drug, true?

19     A.   True.

20     Q.   And it was your impression when you were there that

21   these drugs were out, maybe, for the guys at the bar to use,

22   correct?

23     A.   Yes.

24     Q.   Okay.  And you were let in, but you were uncomfortable

25   because you were the only woman in a room full of guys that

1                    S. DIETRICH - CX BY MS. MEYERS BUTH

2       most of them you didn't know?

3       A.   I knew most of them from the bar.

4       Q.   Even the civilian, the non KMC members?

5       A.   Yes.

6       Q.   And without going into detail about that incident,

7       eventually you left, somebody let you out the door, right?

8       A.   Yes.

9       Q.   And was that the only time that you've been at any

10      Kingsmen clubhouse?

11      A.   Was the only time.

12      Q.   Do you recall when you were meeting with the government

13      that they showed you some pictures in May of 2016 of some

14      Kingsmen members?

15      A.   Yes.

16      Q.   Do you remember looking at about 129 photographs,

17      about?

18      A.   Yes.

19      Q.   Is quite a few, right?

20      A.   Yes.

21      Q.   And of all of the photographs that the government

22      showed you that day, you were able to identify five people?

23      A.   Five people.

24      Q.   Do you remember that?

25      A.   Yes.

```
 1                  S. DIETRICH - CX BY MS. MEYERS BUTH
 2       Q.   None of those photographs were of my client, David
 3   Pirk, true?
 4       A.   Yes.
 5       Q.   Okay.  He is not somebody that you identified of those
 6   five people?
 7       A.   I identified him.
 8       Q.   Okay.  Are you sure about that?
 9       A.   Yes.
10       Q.   Would something refresh your recollection?
11       A.   I don't know.
12                  MR. TRIPI:  Your Honor, we would be willing to
13   stipulate that Mr. Pirk was not one of the people identified.
14                  THE WITNESS:  Okay.  It's a long time ago and I'm
15   sorry.
16       Q.   But he is on trial and I want to make sure Ms. --
17                  THE COURT:  You can't talk over each other.
18                  Just a reminder, a stipulation is an agreement,
19   ladies and gentlemen, about the truth of the facts.  The
20   parties are agreeing that Mr. Pirk was not among the
21   photographs shown to Ms. Dietrich.
22       Q.   So, of the Kingsmen that used to come into Black Dog's,
23   once in a while there was a guy named Kazoo, right?
24       A.   Yes.
25       Q.   And he was a nice guy and you got along with him?
```

1                    S. DIETRICH - CX BY MS. MEYERS BUTH

2         A.   Yes.

3         Q.   And Mr. Feeger didn't mind if the Kingsmen would come

4    in because they were like unpaid security guards, right?

5         A.   They were a lot of trouble, they fought in the bar.

6         Q.   And so did other people, right?  It was kind of a rough

7    neighborhood, right?

8         A.   Yes.

9         Q.   South Park, in that area?

10        A.   Yes.

11        Q.   And Mr. Feeger never told you, don't let them in?

12        A.   No.

13        Q.   And just so that we're clear, Black Dog's had a lot of

14   people that used to be regulars that had nothing to do with the

15   Kingsmen, correct?

16        A.   Yes.

17        Q.   And it's in an area down from Talty's Tavern?

18        A.   Yes.

19        Q.   Talty's is kind of popular with the younger crowd in

20   South Buffalo?

21        A.   Yes.

22        Q.   And so you had a pretty good bar business at Black

23   Dog's, right?

24        A.   Yes.

25        Q.   And now when Mr. Cullinane was questioning you, he

1               S. DIETRICH - CX BY MS. MEYERS BUTH

2    asked you about a plea agreement that you entered into in

3    October of 2017?

4        A.   Yes.

5        Q.   And as a result of your cooperation with the government

6    by providing them information, they are going to dismiss some

7    of the charges that are in that indictment against you,

8    correct?

9        A.   Correct.

10       Q.   In fact, of the five counts, you're only going to have

11   to plead to one, right?

12       A.   Yes.

13       Q.   And you pled to possession with intent to distribute

14   cocaine?

15       A.   Yes.

16       Q.   And that was a benefit to you because they are

17   dismissing the other counts, correct?

18       A.   Yes.

19       Q.   That was also a benefit because you know from your

20   involvement in that case that cocaine has less penalties than

21   methamphetamine, correct?

22       A.   Yes.

23       Q.   So, right now, as you sit here, you're facing about six

24   to seven years in jail under that plea agreement, true?

25       A.   Yes.

1                 S. DIETRICH - RDX BY MR. CULLINANE

2        Q.   And you want Mr. Cullinane and his office to make a

3    positive recommendation to your sentencing judge, correct?

4        A.   Yes.

5        Q.   And you're hoping, eventually, maybe you can even avoid

6    jail time all together based on your testimony, right?

7        A.   Yes.

8                 MS. MEYERS BUTH:  Judge, can I have a second?

9                 THE COURT:  Sure.

10                MS. MEYERS BUTH:  Thank you.  That's all I have.

11   Thanks very much, Judge.

12                THE COURT:  Thanks, Ms. Meyers Buth.

13                Mr. Covert or Mr. Deal?

14                MR. COVERT:  No questions.

15                THE COURT:  Mr. Connors?

16                MR. CONNORS:  No questions.

17                THE COURT:  Any redirect?

18                MR. CULLINANE:  Yes, your Honor.  Thank you.

19   REDIRECT EXAMINATION BY MR. CULLINANE:

20       Q.   Ms. Dietrich, before today's date, did you have a

21   chance to review your plea agreement?

22       A.   Yes.

23       Q.   Ms. Dietrich, were you held accountable for the

24   methamphetamine that you were involved with?

25       A.   No.

1                S. DIETRICH - RDX BY MR. CULLINANE

2        Q.   Ms. Dietrich, were you held accountable for the cocaine

3    you were found with?

4        A.   Yes.

5        Q.   Were you held accountable for the pills that you sold?

6        A.   Yes.

7        Q.   And, in fact, the pills that were found in your

8    apartment?

9        A.   Yes.

10        Q.   And Ms. Dietrich, were you also held accountable for

11    the $53,000 that was found in your apartment?

12        A.   Yes.

13        Q.   That was related to controlled substances?

14        A.   Yes.

15        Q.   So, in fact, were you held accountable for the

16    controlled substances you are involved with?

17        A.   Yes.

18        Q.   And is that included in your plea agreement?

19        A.   Yes.

20        Q.   Okay.  Now, Ms. Dietrich, when you were asked by the

21    government about any knowledge you had about the Kingsmen, did

22    you provide answers that are consistent with your testimony

23    today?

24        A.   Yes.

25                MR. CULLINANE:  One moment, your Honor.

```
 1                S. DIETRICH - RDX BY MR. CULLINANE

 2        Q.   Ms. Dietrich, I'm going to show you what's been marked

 3   as Government's Exhibit for identification 3519.3.  I'd like

 4   you to take a look at this and let me know when you've had a

 5   chance to review it.

 6        A.   Okay.

 7        Q.   Ms. Dietrich, do you recognize this document?

 8        A.   Yes, I do.

 9        Q.   And what is this?

10        A.   This is my plea agreement.

11        Q.   And how do you know it's your plea agreement?

12        A.   Because I signed it on the back.

13        Q.   And what date did you sign it on?

14        A.   October 30th of 2017.

15        Q.   So, does this, in fact, appear to be the original plea

16   agreement that you signed?

17        A.   Yes.

18             MR. CULLINANE:  Your Honor, at this time, the

19   government offers Government Exhibit 3519.3.

20             THE COURT:  Any objection?

21             MS. MEYERS BUTH:  I don't have any objection.

22             THE COURT:  Mr. Covert?

23             MR. COVERT:  No.

24             THE COURT:  Mr. Connors?

25             MR. CONNORS:  No.
```

                    S. DIETRICH - RDX BY MR. CULLINANE

1
2                      THE COURT:  Exhibit 3519.3 will come into

3    evidence.

4                      (**Whereupon, Exhibit 3519.3 was received into**

5    **evidence.**)

6        Q.  I'll take that back and I'll place 3519.3 and it will

7    come up on the screen and read under D, I'd like to you read

8    this out loud.

9        A.  D?

10       Q.  D, please.

11       A.  The total amount of actual methamphetamine recovered in

12   the upper apartment of 193 Roland.

13                     THE COURT:  You need to go slower than that.

14                     THE WITNESS:  I'm sorry.

15       A.  The total amount of actual methamphetamine recovered in

16   the upper apartment of 193 Roland Avenue, Lackawanna, New York

17   and from the purse of Dietrich on January 8, 2015 is 96.4

18   grams.  Using the drug equivalency tables in the United States

19   Sentencing Guidelines, the amount of actual methamphetamine

20   involved in defendant's relevant conduct converts to 1928

21   kilograms of marijuana.  The defendant possessed the actual

22   methamphetamine with the intent to distribute.  The defendant

23   admits to this conduct.

24       Q.  Ms. Dietrich, based on what you just read, were you

25   held accountable for the methamphetamine?

1              S. DIETRICH - RCX BY MS. MEYERS BUTH

2      A.   Yes.

3      Q.   That you were involved with?

4      A.   Yes.

5              MR. CULLINANE:   No further questions at this time,

6      your Honor.

7              THE COURT:   Thank you.   Any further cross, Ms.

8      Meyers Buth?

9              MS. MEYERS BUTH:   Just a couple, Judge.

10     RECROSS EXAMINATION BY MS. MEYERS BUTH:

11     Q.   Ms. Dietrich, Mr. Cullinane just asked you about

12     paragraph D in your plea agreement.   That would be on page 3 of

13     the plea agreement?

14     A.   I didn't realize that.

15             THE COURT:   Wait, wait, wait.   You need to listen

16     to her question and then answer it as best you can.

17     Q.   It's okay.   I'm not trying to trick you, I just want to

18     clarify something.   So in paragraph D, you just read to us that

19     the police found 96.4 grams of methamphetamine in your Roland

20     Avenue apartment, right?

21     A.   Yes.

22     Q.   And then there was a sentence that under the drug

23     equivalency tables, that was converted to marijuana, the

24     equivalent would be 1928 kilograms of marijuana.   That is what

25     you read to us, right?

```
 1                    S. DIETRICH - RCX BY MS. MEYERS BUTH
 2          A.   Yes.
 3          Q.   And that is a lot of marijuana, right?  And you know
 4     that because you, from time to time, had smoked marijuana,
 5     right?
 6          A.   Yes.
 7          Q.   And a kilogram, one kilogram of marijuana can make how
 8     many joints?  Enough for the entire jury if we wanted?
 9                    MR. CULLINANE:  Objection, your Honor.
10                    THE COURT:  Overruled.
11          Q.   Do you know, Ms. Dietrich?
12          A.   Do I know what?
13          Q.   One kilogram of marijuana, not 1928 kilograms of
14     marijuana?
15                    MR. CULLINANE:  Objection, your Honor.
16          Q.   One kilogram, how many joints do you think you could
17     get out of that?
18          A.   I don't know.
19                    THE COURT:  Wait a minute.  There is an objection,
20     right?
21                    MR. CULLINANE:  Yes, your Honor.
22                    THE COURT:  All right.  I'm overruling the
23     objection.  Can you answer the question?
24          A.   I don't know.
25          Q.   Okay.  And Mr. Cullinane also asked you whether you
```

1            USA VS. D. PIRK, A. JENKINS & T. ENIX

2    were held accountable for all of the drugs found in your

3    apartment, true?

4        A.  Yes.

5        Q.  And under paragraph one of your plea agreement, you

6    only pled guilty to Count 3 of the indictment, which was

7    possession of cocaine with intent to distribute, correct?

8        A.  Yes.

9        Q.  And so when he had you reading these other parts of the

10   plea agreement, that was just recounting all of the drugs that

11   the police seized from your apartment, true?

12       A.  Yes.

13            MS. MEYERS BUTH:  I don't have anything else.

14   Thanks a lot, Ms. Dietrich.

15            THE COURT:  Thanks, Ms. Meyers Buth.

16            Ms. Dietrich, you can step down.

17            THE WITNESS:  Thank you.

18            THE COURT:  All right.  Ladies and gentlemen, why

19   don't we take a break and we'll plan on a 15-minute break.  And

20   I'll see you back here in 15 minutes.  Do not talk about the

21   case among yourselves or with anyone else and we'll see you

22   back here shortly.  Thank you.

23            (Whereupon, the jury is escorted from the

24   courtroom.)

25            THE COURT:  Is Schultz next?

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2              MR. TRIPI:  Yes.

3              THE COURT:  So why don't we take a quick break and

4    then we need to maybe have further discussion before he

5    testifies, maybe not.  Just so the record is clear, I'm going

6    to overrule objections where the defense is getting into the

7    specifics of the underlying criminal conduct because, as far as

8    I'm concerned, that goes to bias.  The fact that she was facing

9    criminal liability for the amount of drugs she had in the

10   apartment, it might not go to truthfulness in and of itself it

11   goes to her motivation to cooperate.  You're welcome to make

12   the objections.

13             MR. TRIPI:  We felt it that one was appropriate to

14   make and when we saw your ruling, we didn't make any more.

15             THE COURT:  So you understand where I'm coming

16   from, getting into the underlying facts of offense for which

17   the plea has been entered into and which they are cooperating,

18   to me --

19             MR. TRIPI:  I understand and I agree.  The only

20   reason we made the next objection was, and it was artfully

21   done, don't take offense, but the drug equivalency tables and

22   the converse making it sound like she had 2000 kilograms of

23   marijuana in her apartment.  I don't think that was her

24   conduct.

25             THE COURT:  I don't think that was her conduct,

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2      but it was certainly her potential criminal exposure.

3                    MR. TRIPI:  Without being able to re-re-direct,

4      we're in a tough spot to not explain that the recross went

5      beyond the redirect so.

6                    THE COURT:  I don't think it went beyond, though.

7                    MR. TRIPI:  That was why we objected there.  So I

8      wanted the Court to understand.

9                    THE COURT:  The one thing that we -- two issues I

10     wanted to talk about.  One is the witness and the -- we haven't

11     nailed down the extent to which I should be advising witnesses

12     about their potential criminal liability and that is a relevant

13     inquiry for purposes of Mr. Schultz.  Second of all, the truth

14     telling provisions of the plea agreement.  We were going to

15     talk about that tomorrow.  And I know Mr. Cullinane got into it

16     with Ms. Dietrich on direct, and we haven't nailed that down,

17     either.

18                   So, does Mr. Schultz have a plea agreement.

19                   MR. TRIPI:  He does not, he does not.  We can hold

20     off the discussion if the Court is not ready.

21                   THE COURT:  Well, I think so.  The only thing we

22     need to talk about before Schultz gets on the stand is whether

23     or not I have some responsibility to advise him as to his

24     potential -- well, as to his Fifth Amendment rights if he is

25     going to be asked questions about the fact that he possesses

1            USA VS. D. PIRK, A. JENKINS & T. ENIX

2      firearms and that is a violation of federal law.

3            MR. TRIPI:  I admittedly haven't read the *Valdez*

4      case.  I was preparing for Wednesday.  So take within what I

5      say with that and a grain of salt, but, Judge, our position is

6      that the Court's role and function is not to be necessarily

7      advising people of their Fifth Amendment rights.  My view of it

8      is our obligation is to advise you if we're calling a witness

9      who we believe is going to assert their Fifth Amendment rights

10     so you can take appropriate action.  Any filings to this point

11     in time should have tied up issues for everyone on each side

12     who are calling these witnesses to be aware of what that

13     witness is likely to do.  Now, we all know surprises happen and

14     things like that without reading *Valez*.

15           THE COURT:  It basically says I have the

16     discretion to do it if I want to.

17           MR. TRIPI:  That is my sense of it.  And that is

18     what I would submit.  Obviously, Fifth Amendment rights, they

19     are very personal rights.  And by this point in time,

20     particularly where people have been reporting information for a

21     number of years or testified in grand jury and in state

22     proceedings, you know, it's going to take a lot of them out of

23     left field to now be advised of their rights on the stand.

24     They've been reporting on this information.  They've made a

25     logical decision as to where they fall in the continuum of this

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2     investigation and they chose the path of the witness.

3     Obviously that is going to be explored, the motives of doing

4     so, on cross, but we don't think that that, especially, there

5     is nothing that the government is unaware of, you know, in

6     terms of prior testimony reports that is going to be elicited

7     from the stand such that if something was going to happen, it

8     would have happened, you know.  So, obviously, that is

9     appropriate cross examination, but I don't want to be in a

10    position where every witness who is a member of the club that

11    we call is being advised of their rights.

12             THE COURT:  Well, the balance that I was proposing

13    be struck is if somebody who does not have counsel is going to

14    be getting on the witness stand and testifying that they've

15    perjured themselves.

16             MR. TRIPI:  And that I think I agreed to the other

17    day and I don't think that will repeat itself because everybody

18    else who has done so has pled guilty to it or is at least under

19    a proffer agreement with counsel.

20             THE COURT:  Okay.  Mr. Connors or Mr. Covert or

21    Mr. Easton or any other defense counsel, I mean, do you have a

22    view as to what -- I did want your feedback before I chart the

23    course that I'm going to take throughout the rest of this trial

24    in terms of whether or not I'm advising witnesses on their

25    Fifth Amendment rights and the right to counsel.

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX
 2              MR. DEAL:  Judge, I take a more expansive view of
 3    the whole issue.  It's not a decision that is made knowingly,
 4    intelligently and voluntarily.  If you don't know you have the
 5    right to assert it.  And while I understand the government's
 6    position having every KMC member or former member come in and
 7    be advised of their Fifth Amendment right on the stand, I
 8    understand their perspective.  But if they've never been told
 9    they have that right and they are going to be talking about
10    things that subject them to criminal liability then they need
11    to be told that.  That is my position.
12              THE COURT:  Including defense witnesses.
13              MR. DEAL:  Sure.  And if they haven't been told
14    that by a defense attorney, shame on the defense attorney.  If
15    they haven't been told that by a government attorney, and I
16    understand this is a fact specific circumstance, and I know
17    that Mr. Tripi said the other day that in response to the first
18    witness that this became an issue with there were times in one
19    of the proceedings that he advised them, et cetera, and that is
20    fine.  But they should be advised.  In my opinion, if you are
21    expecting sworn testimony, if you're expecting truthful
22    interrogation questioning of witnesses, much less sworn
23    testimony, that could subject them to criminal charges, except
24    for the fact that they are helping your case out or your
25    investigation out and you don't advise them that they have the
```

1            USA VS. D. PIRK, A. JENKINS & T. ENIX

2     right not to incriminate themselves, then for them to decide to

3     cooperate, much less testify under oath, that if they don't

4     know that and they haven't been formally advised of that, then

5     they are not waiving their right in any type of knowingly,

6     intelligent manner and it could become important for us to do

7     it in court.

8            THE COURT:  That could apply if they are

9     prosecuted then for what they testify on the witness stand.

10    Mr. Easton and Ms. Meyers Buth?

11           MR. EASTON:  I join in Mr. Deal's comments and

12    defer to the Court's discretion.

13           THE COURT:  Are you asking for every, including

14    defense witnesses, for every witness that is getting up on the

15    stand and doesn't have counsel and is going to be testifying

16    about something that may potentially be incriminating

17    themselves that I advise them of their right to remain silent

18    and I advise them of their right to have counsel appointed to

19    represent them.

20           MR. EASTON:  I suppose what sauce is for the goose

21    and is for the gander and we would concur that that would apply

22    to our defense witnesses as well.

23           THE COURT:  Mr. Connors, do you agree with that?

24           MR. CONNORS:  I take it your Honor would be

25    planning to provide any of these instructions outside of the

```
1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2    presence of the jury?

3                THE COURT:  Oh, sure, of course.

4                MR. CONNORS:  It leads us to whether there is a

5    dichotomy between unrepresented and represented.  The way I've

6    seen this done in the past, when the issue arrives, the judge,

7    outside of the presence of the jury, will advise the individual

8    without counsel that they have the right to counsel and they

9    can consult with counsel and if they qualify, counsel can be

10   appointed for them and then the person makes that decision.  On

11   the occasion when a witness has that potential and they are

12   represented, I've seen judges offer them an opportunity to

13   consult with counsel on that topic.  And I think that is a

14   satisfactory approach from our standpoint.

15               THE COURT:  With the latter, I mean, if they have

16   counsel, I'm assuming they are going to be -- if they have

17   counsel, my area of inquiry is are they going to be asserting

18   their Fifth Amendment privilege on the witness stand.  And if

19   so, I need to explore that before they testify so they're not

20   doing that in front of the jury.  I don't view I have any

21   obligation to advise them of their Fifth Amendment rights, if

22   they have counsel who have been representing them throughout

23   the course of their either involvement with the government or

24   involvement with the defense.  But your view is that I should

25   be for those do not have counsel and potentially are
```

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2    incriminating themselves with respect to any kind of testimony,

3    not just perjury before the grand jury that I should be

4    advising them of their right to counsel if they wanted to

5    consult counsel and if they qualify, they have the right to

6    have counsel appointed to represent them, including defense

7    witnesses.

8                MR. CONNORS:  I certainly agree with that, but I

9    do think it also applies to represented.  And this is why, for

10   example, if a defendant decides to take a stand, usually there

11   is a colloquy between the judge and the defendant.  You

12   understand you don't have to take the stand.  It's something,

13   you're asserting and waiving privileges and defendants are

14   represented by counsel.  I see the same inquiry go to witnesses

15   who might be exposed just to see if they.

16                THE COURT:  Have you ever seen it in federal

17   court?

18                MR. CONNORS:  I have.

19                MR. TRIPI:  No.

20                MR. CONNORS:  Before the defendant takes the

21   witness stand.

22                THE COURT:  Before, absolutely, the defendant, no

23   question about it, there will be a colloquy, regardless, with

24   each defendant when they make that determination, but did you

25   ever see a federal judge do that with witnesses?

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX
 2              MR. CONNORS:  I can't recall the answer to that.
 3              THE COURT:  I don't think so.
 4              MR. CONNORS:  I think it's a similar situation.
 5              THE COURT:  Okay.  Let me give it some thought and
 6      we'll deal with it before -- Mr. Schultz, I take it, does not
 7      have an attorney?
 8              MR. TRIPI:  No.  And I looked at his grand jury
 9      testimony.  He was, I think, the only one not advised of his
10      rights because he was a cooperator.  He was actively signed up,
11      eventually signed up.
12              THE COURT:  Does he have immunity?
13              MR. TRIPI:  No.  He was treated as many people who
14      are reporting to law enforcement who become an acting
15      confidential informant and things like that, they are people
16      who are signed up and previously engaged in criminal activity.
17              THE COURT:  But he doesn't have any kind of formal
18      immunity agreement or anything like that.
19              MR. TRIPI:  No.
20              THE COURT:  Let's take a five-minute break.  That
21      is a no coffee, Mr. Deal, break.
22              MR. DEAL:  I will not get coffee, Judge.
23              (Whereupon, there was a break in the proceeding.)
24              THE COURT:  Here is what I'm going to do in terms
25      of advising the witnesses about their right to counsel.
```

1                  USA VS. D. PIRK, A. JENKINS & T. ENIX

2       Clearly, under the case law, it's within my discretion how to

3       handle this.  And the way I have decided to balance that

4       discretion is I'm not going to do it for every witness who

5       comes in here and testifies about some illegal activity that

6       they were involved in, whether it be drug use or involvement

7       with the Kingsmen motorcycle club in one way or the other.  At

8       this rate, pretty much, that would have required me to advise

9       every civilian witness who testified so far.  But I am going to

10      do it where there is a particular unique circumstance with

11      respect to the witness' testimony, and that would include where

12      they are going to be testifying that they perjured themselves

13      before the grand jury, not if they have counsel already and

14      represented by counsel, but situations like Ms. Monica Brown

15      where she didn't have counsel and getting on the witness stand

16      to testify about the fact she testified falsely before the

17      grand jury.  I'll advise under those circumstances that they

18      have the right to counsel.  And I'll advise Mr. Schultz as

19      well.  His circumstances are unique in the sense that there is

20      a potential firearm possession that has arisen then he is just

21      different than his involvement with the Kingsmen Motorcycle

22      Club.  So that is how I decided to balance it.  Anybody have

23      any questions about that?

24                  MR. TRIPI:  No, your Honor.

25                  MR. COVERT:  No, your Honor.

 1                USA VS. D. PIRK, A. JENKINS & T. ENIX

 2                THE COURT:  And in that regard, let's have Mr.

 3     Schultz come in here so I can talk to him.

 4                MR. TRIPI:  Judge, he is not privy to a lot of

 5     this, just so you're aware.

 6                THE COURT:  Mr. Schultz, come on in.  I'm going to

 7     have you actually come up on the witness stand and you're our

 8     next witness.  So, we'll have you stay up there.  We'll have

 9     you sworn in once the jury gets in here.  Morning.

10                THE WITNESS:  Morning.

11                THE COURT:  Have a seat.  My name is Judge Wolford

12     and I wanted to talk to you before we bring the jury out here,

13     because I understand you're going to be testifying on behalf of

14     the government as to some involvement that you had with regard

15     to the Kingsmen Motorcycle Club.  I also anticipate, as you may

16     be somewhat aware of it, that it will be brought out in the

17     direct testimony when the government is asking you questions or

18     on cross examination about this certificate of disabilities

19     that you received and whether or not you currently possess any

20     firearms pursuant to that certificate of disabilities, and,

21     potentially, whether or not that is a violation of federal law.

22     So I anticipate you're going to be asked questions about that.

23     And there is a possibility that you could be subjecting

24     yourself to potential criminal liability.  And I say that in

25     the sense that you, as all citizens, have a Fifth Amendment

```
 1                    USA VS. D. PIRK, A. JENKINS & T. ENIX
 2      right to remain silent.  In other words, if you're asked
 3      questions that could incriminate yourself, you have the right
 4      to assert your Fifth Amendment privilege.  And I understand you
 5      do not have an attorney to represent you.  And you certainly
 6      have the right to have an attorney.  And if you can't afford an
 7      attorney, you have the right to have an attorney appointed to
 8      represent you.  I wanted to advise you of those rights before
 9      you start testifying, because if you did want to exercise any
10      of those rights, I want to know that so that we can explore
11      whether or not you qualify for counsel and whether or not we
12      should have counsel appointed to represent you.  Do you
13      understand what I'm saying?
14                    THE WITNESS:  Yes.
15                    THE COURT:  Do you want to go forward and testify
16      or would you like to explore having an attorney appointed to
17      represent you?
18                    THE WITNESS:  I will go forward.
19                    THE COURT:  You want to go forward?
20                    THE WITNESS:  Yes, ma'am.
21                    THE COURT:  Do you have any questions for me?
22                    THE WITNESS:  No, ma'am.
23                    THE COURT:  Okay.  Let's -- everybody ready to
24      bring the jury in?  Okay.  Let's bring in our jury in.
25                    (Whereupon, the jury is escorted into the
```

1           USA VS. D. PIRK, A. JENKINS & T. ENIX

2     courtroom.)

3           THE COURT:  Welcome back, ladies and gentlemen.

4     You can see I have our witness on the witness stand, but we

5     weren't going to start without you.  Don't worry.  All right.

6     Have a seat, everybody.

7           Mr. Schultz, actually, if you could stay standing

8     and we're going to have you sworn in before you start

9     testifying.  So my courtroom deputy will swear you in.

10    (C. Schultz was called to the witness stand and sworn.)

11          THE CLERK:  Okay.  Please be seated, sir.  Please

12    state and spell your name for the record.

13          THE WITNESS:  Chester Schultz, C-h-e-s-t-e-r,

14    S-h-u-l-t-z.

15          THE COURT:  Mr. Schultz, I have instructions for

16    you before you get started.  First of all, you're here to

17    testify for the ladies and gentlemen of the jury.  And I want

18    you to direct your answers towards them.  Only answer the

19    question you're asked.  In other words, it's up to the attorney

20    that is asking the question to ask the question that seeks

21    whatever information they want to have you testify about.  If

22    you don't understand the question, let the attorney know that

23    and don't guess or speculate.  And only answer the question

24    that you're asked.  If there is an objection to a question, you

25    need to wait until I rule on the objection and then I'll let

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2      you know whether or not you can answer it.  And speak slowly
 3      and clearly and speak into the microphone so that everybody can
 4      hear you and so that my court reporter can take down your
 5      testimony.  Do you understand?
 6                    THE WITNESS:  Yes.
 7                    THE COURT:  Okay.  You may proceed whenever you're
 8      ready, Ms. Shelvey.
 9                    MS. SHELVEY:  Thank you, your Honor.
10      DIRECT EXAMINATION BY MS. SHELVEY:
11           Q.  Morning, sir.
12           A.  Morning.
13           Q.  Could you introduce yourself to the jury and tell them
14      how old you are?
15           A.  My name is Chester Schultz and I'm 51 years old.
16           Q.  And what city or town do you live in?
17           A.  Orleans.
18           Q.  Are you currently employed?
19           A.  No.
20           Q.  Why not?
21           A.  Disability.
22           Q.  Were you employed that led to a disability?
23           A.  Yes.
24           Q.  Can you please describe that to the jury?
25           A.  I was a supervisor and lead mechanic at AmeriPride and
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2     I fell off the machine.
 3        Q.   How long did you hold that position before the
 4     accident?
 5        A.   About seven years.
 6        Q.   Sir, are you familiar with the Kingsmen Motorcycle
 7     Club?
 8        A.   Yes, ma'am.
 9        Q.   How?
10        A.   I was one.
11        Q.   You were one.  You mean you were a Kingsmen?
12        A.   Yes.
13        Q.   Do you remember about when you joined?
14        A.   Early '90s.
15        Q.   Who was the President when you joined the Kingsmen
16     Motorcycle Club?
17        A.   Skeet Spry.
18        Q.   When did you leave?
19        A.   2013.
20        Q.   Who was the national president when you left?
21        A.   David Pirk.
22        Q.   Do you see Mr. Pirk here in the courtroom today?
23        A.   Yes, ma'am.
24        Q.   And can you please identify him for the record?
25        A.   He is sitting with the tan shirt, gray hair, bald.
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2                    MS. SHELVEY:  May the record reflect the

3      identification of Mr. Pirk?

4                    THE COURT:  Any objection?

5                    MR. EASTON:  No, your Honor.

6                    THE COURT:  The record should reflect the witness

7      has identified Mr. Pirk.

8         Q.   Mr. Schultz, in 1998, were you convicted of two felony

9      charges; reckless endangerment in the first degree and criminal

10     possession of a weapon in the third degree here in New York

11     State?

12        A.   Yes, ma'am.

13        Q.   And did you receive an, approximately, six-month jail

14     sentence and five years of probation?

15        A.   Yes.

16        Q.   Was that your sentence?

17        A.   That was my sentence.

18        Q.   Were you also convicted in February 5th of 2014 for two

19     misdemeanors of assault in the third degree and criminal

20     mischief in the fourth degree for conduct occurring on August

21     31st of 2013?

22        A.   Yes.

23        Q.   And is that in the State of New York as well?

24        A.   Yes.

25        Q.   After your arrest in August of 2013, did you make a

```
1                    C. SHULTZ - DX BY MS. SHELVEY

2    decision to speak to law enforcement?

3        A.   Yes.

4        Q.   When did you do that in relation to the arrest that we

5    just discussed?

6        A.   What do you mean?

7        Q.   How long after you were arrested in August of 2013 did

8    you decide that you wanted to speak to law enforcement?

9        A.   Maybe a month, maybe less.

10        Q.   Did you speak to law enforcement within a short period

11    of time after you were arrested?

12        A.   Yes.

13        Q.   Did you ever ask law enforcement to help you with any

14    of your criminal charges?

15        A.   No.

16        Q.   Do you know who you spoke to?

17        A.   Yes.

18        Q.   Who was that?

19        A.   Greg and Chris.

20        Q.   Do you know their last names?

21        A.   No.

22        Q.   Do you know what agencies they work for?

23        A.   Greg I do.

24        Q.   What is that?

25        A.   FBI.
```

1                   C. SHULTZ - DX BY MS. SHELVEY

2        Q.   And what types of information, just generally, were you

3    providing to law enforcement starting in 2013?

4        A.   I can't quite -- can you explain that a little better?

5        Q.   Were you telling law enforcement about certain

6    incidents or certain groups of people?

7        A.   Yes.

8        Q.   Who was that or what was that?

9        A.   It was about everything.

10                  THE COURT:  You got to slow down and just speak as

11   clearly as you can.

12       A.   It was about the motorcycle club and when the new guys

13   took over.

14       Q.   You say it was about the motorcycle club.  What club

15   were you referring to?

16       A.   Kingsmen.

17       Q.   And when the new guys took over, what were you

18   referring to?

19       A.   Pirk.

20       Q.   The defendant?

21       A.   Yes.

22       Q.   And from that day in 2013 up through when you sit here

23   and testify today, have you continued to provide law

24   enforcement information on the Kingsmen Motorcycle Club?

25       A.   Yes.

1                    C. SHULTZ - DX BY MS. SHELVEY

2       Q.   How many times over the last four years do you think

3    you've spoken to law enforcement about the Kingsmen?

4       A.   Quite a few.

5       Q.   Now, as a result of that 1998 felony conviction that we

6    just mentioned, did you lose your ability to possess firearms?

7       A.   Yes.

8       Q.   And in 2016, did you attempt to get your firearms back?

9       A.   Yes.

10      Q.   Why did you want to get your guns back?

11      A.   I am almost 70 years old, and I live in Orleans County

12   and my 16-year-old boy lives with me and he wants to hunt.

13      Q.   What types of guns did you attempt to get back?

14      A.   Shotguns and rifles.

15      Q.   And can you tell the jury the steps you took to get

16   back your ability to have shotguns or rifles?

17      A.   I applied three or four times.

18      Q.   I'm sorry?

19      A.   I applied three or four times before 2016.  You have to

20   get your police record.  After your police record, you have to

21   pay another fee and then you got to fill an application out and

22   more or less plead to the judge to have your firearms back.

23      Q.   Now, did you have to wait a certain amount of time

24   after your felony conviction before you could make the

25   application to the court?

1                      C. SHULTZ - DX BY MS. SHELVEY

2          A.   I heard it was 10 years.

3          Q.   And how long did you wait before you made your first

4     application to the court?

5          A.   A little bit after 10 years.

6          Q.   In 2016 when you made your application to the court,

7     did you speak to any members of law enforcement about what you

8     were doing?

9          A.   Yes.

10         Q.   Who did you speak to?

11         A.   Greg and Chris.

12         Q.   Did you have discussions with them about contacting the

13    Court on your behalf to help you get your guns back?

14         A.   No.

15         Q.   Do you know if Detective DePasquale contacted the court

16    to speak on your behalf?

17         A.   No.

18         Q.   And did you have to go to court and appear in front of

19    a judge to get your guns back?

20         A.   No.

21         Q.   At some point in time, did something happen as it

22    relates to your ability in New York State to get your guns?

23         A.   I got a letter in the mail.

24         Q.   And who was that letter from?

25         A.   It was signed by the judge.

1               C. SHULTZ - DX BY MS. SHELVEY

2       Q.   And can you tell the members of the jury what that

3    letter said?

4       A.   It's a conditional, I think, release that I can have

5    shotguns and rifles in my possession.

6       Q.   Do you remember when the court in New York -- and this

7    was a New York State Court?

8       A.   Yes.

9       Q.   And was this the same judge that had sentenced you back

10   in 1998?

11      A.   Yes.

12      Q.   And do you recall, approximately, how long after you

13   petitioned this last time that the guns were -- that you

14   received the -- excuse me -- that you received the ability to

15   have guns, long guns?

16      A.   I don't quite understand.

17      Q.   How long between the time you filed your application

18   and the time the Court said you could have your guns?

19      A.   Two months.

20      Q.   I want to talk to you about your involvement with the

21   Kingsmen Motorcycle Club.  Can you describe how you first

22   learned about the Kingsmen?

23      A.   I ran into a guy in a bar that was a motorcycle

24   Kingsmen and got to know him and started being a hang around.

25      Q.   Did you discuss, prior to becoming a hang around, a

1                    C. SHULTZ - DX BY MS. SHELVEY

2    little bit about the lifestyle?

3        A.   Yep.

4        Q.   And where was this bar located?

5        A.   That was at Cracker Barrel.

6        Q.   Now, at some point when you mentioned being a hang

7    around, can you tell the members of the jury what a hang around

8    is?

9        A.   A hang around means that you're allowed to come in the

10   clubhouse with a member there.  And, eventually, the more and

11   more people you get to meet, they will give you a courtesy card

12   and you're a hang around.

13       Q.   And what is a courtesy card?

14       A.   That you can come into the club without the person that

15   you know is there.  If they are not there, you can come in.

16       Q.   Like you have access, as you would, like to be able to

17   go to a normal bar if you are a card carrying member?

18       A.   After you get through the fence, the gate.

19       Q.   How long did you have to go be a hang around before you

20   decided this is something I'm interested and I want to become a

21   member?

22       A.   I believe it was maybe a month or two.

23       Q.   Now, is there a process that you need to go through to

24   become a member?

25       A.   Yes.

```
 1                   C. SHULTZ - DX BY MS. SHELVEY

 2        Q.   What is that process called?

 3        A.   You're a striker.

 4        Q.   What does that mean?

 5        A.   Well, you get voted in that you can come in to join the

 6   club and you get a top rocker you get a bottom rocker and a top

 7   rocker and then you do all your duties of any full patch member

 8   asks you to do, that includes bartend, clean clubhouses, go out

 9   for late rides, whatever the case may be, you have to do it.

10        Q.   So you're at the complete bottom of the barrel?

11        A.   Yes.

12        Q.   And how else do strikers differ from full members and

13   full patches members?

14        A.   Strikers don't have the say so.

15        Q.   What do you mean?

16        A.   They don't have the say so.  If a full patch member

17   tells them to do it, they have to do it.

18        Q.   You mentioned the term "rockers."  Can you describe for

19   the members of the jury what a rocker is?

20        A.   On the back of your vest, you got your top rocker, the

21   name of your club and the bottom rocker is what New York State,

22   Florida, side would be MC, and then you got your center.

23        Q.   And does a striker have all three of those immediately?

24        A.   No.

25        Q.   What is the sequence of the order that a striker would
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2     get those patches?

3         A.   Usually it's your bottom first.

4         Q.   And that is the state where the club is located?

5         A.   Yes.

6         Q.   Is it?  Okay.

7         A.   And then if you got a motorcycle, you're the MC of the

8     club.

9         Q.   And where is the MC patch placed on the vest?

10        A.   Lower right side.

11        Q.   Front or back?

12        A.   Back.

13        Q.   And what is the next sequence?

14        A.   The top rocker, that is the Kingsmen.

15        Q.   And that is the club?

16        A.   Yes.

17        Q.   And what is the final?

18        A.   Your center, after you get voted in to be a full

19     patched member.

20        Q.   And so the term "full patch" means you have your

21     complete set on the back of your vest?

22        A.   Yes.

23        Q.   And who gives a striker his initial vest?

24        A.   He buys his own vest.

25        Q.   You're saying "he."  Are there any female Kingsmen

737

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2      members?
 3           A.   No, old ladies.
 4           Q.   Are females allowed to be full-patch Kingsmen members?
 5           A.   No.
 6           Q.   You buy your own vest?
 7           A.   Yes.
 8           Q.   How about the patches?
 9           A.   You buy those, too.
10           Q.   Who sells the vests and the patches to you?
11           A.   You bring your own vest from a store, unless we have
12      one laying around.  The patches, usually the secretary or the
13      treasurer gets them.
14           Q.   How much were they for your patches?
15           A.   Mine was 150.
16           Q.   What did that include?
17           A.   The bottom and MC center and couple small patches on my
18      front, "LKDK" and so on.
19           Q.   LKDK, what does that mean?
20           A.   Live a Kingsman, die a Kingsman.
21           Q.   Is that something that is sewn onto your vest?
22           A.   Yes.
23           Q.   Does it have to be like the others in the back?
24           A.   No.
25           Q.   Are there any other phrases like that that are
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2    associated or you might sew onto your vest?

3        A.   "LKDK" and "live a Kingsman, die a Kingsman," and I

4    forgot the other one, I'm sorry.

5        Q.   That's all right.  How long were you a striker?

6        A.   Six months.

7        Q.   And tell the members of the jury about the day that you

8    became a full patched member?

9        A.   Well, we had a monthly meeting and all of the

10   presidents and all of the club members and everything were at a

11   party for the club meeting and it was voted if I was going to

12   be a full-patch member.  I had to know all of the presidents

13   and all vice presidents and I had to know all officers' names.

14   And I had, six months later at this party, I got voted in to be

15   a full-patch member.

16       Q.   Is there a ceremony, what goes on?

17       A.   It's just a party.  It's like if we have a meeting, a

18   monthly meeting.

19       Q.   And as a striker, were you allowed to go to monthly

20   meetings?

21       A.   Yes.

22       Q.   Who calls the monthly meeting?

23       A.   Usually the National will call it.  If not done by

24   National, it would be done by regional.

25       Q.   I'm sorry, I didn't hear the beginning.

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   The National or the regional.

3        Q.   The National what?

4        A.   Presidents.

5        Q.   Or the Regional Presidents?

6        A.   Yes.

7        Q.   Now, do the Kingsmen Motorcycle Club have any rules?

8        A.   Yes.

9        Q.   What are those rules called?

10       A.   Bylaws.

11       Q.   Now are you familiar with the bylaws?

12       A.   Yes.

13       Q.   What type of information is contained in the bylaws?

14       A.   Dos and don'ts of the club of the Kingsmen Motorcycle

15  Club.

16       Q.   And what happened if a member does not follow the

17  bylaws?

18       A.   They get smacked up or thrown out.

19       Q.   Smacked up, what do you mean?

20       A.   Beat up.

21       Q.   And do strikers get copies of the bylaws or do they

22  have to wait until they are full patched?

23       A.   They get them.  They don't get to keep them.  They get

24  to read them and know them.

25       Q.   They get to read them and who?

740

1                    C. SHULTZ - DX BY MS. SHELVEY

2       A.   Read them and know them, but you can't keep them.

3       Q.   Why not?

4       A.   Because you're not a full-patch member; you're not

5   trusted yet.

6       Q.   You said trust.  Is trust important to the Kingsmen?

7       A.   Yes.

8       Q.   And at some point in time after 2013, you began

9   cooperating.  Did you provide law enforcement with a copy of

10  the bylaws?

11      A.   Yes, yes, I did.

12      Q.   I'll show you what's been marked Government's 42.  Do

13  you recognize those?

14      A.   Yes.

15      Q.   What do you recognize that to be?

16      A.   It's the national bylaws for the Kingsmen Motorcycle

17  Club.

18      Q.   Is there a year on those bylaws?

19      A.   Yes, December 1st, 2009.

20      Q.   Is this the packet the bylaws that you turned over to

21  law enforcement?

22      A.   Yes.

23      Q.   And at this time I move to admit Government's Exhibit

24  42?

25                    THE COURT:  Any objection?

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2              MR. EASTON:  None from Mr. Pirk, your Honor.
 3              MR. COVERT:  No, your Honor.
 4              MR. GRABLE:  Brief voir dire, your Honor?
 5              THE COURT:  Sure.
 6    VOIR DIRE BY MR. GRABLE:
 7         Q.  Government Exhibit 42 are the bylaws that applied as of
 8    December 1st, 2009?
 9         A.  Yes.
10         Q.  And you left the Kingsmen at some point in time?
11         A.  2013.
12         Q.  And you have no idea whether these were the bylaws that
13    were in effect after you left the club?
14         A.  No.
15              MR. GRABLE:  I don't have any objection to the
16    bylaws as of 2009 subject to the clarification.
17              THE COURT:  Okay.  Exhibit 42 will come into
18    evidence.
19              MS. SHELVEY:  Thank you, your Honor.
20         Q.  Now, as it relates to the bylaws from 2009, you
21    mentioned you began in 1994?
22         A.  Yes.
23         Q.  And you left in about 2013?
24         A.  Yes.
25         Q.  As a member of the Kingsmen, did you have to
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2    familiarize yourself with the bylaws?

3        A.   Yes.

4        Q.   How frequently did the bylaws come out with a new

5    packet?

6        A.   All the way to 2009, as far as I know, from the day I

7    started to the day I left, they were almost the same; not much

8    changed.

9        Q.   So from that time period, the 1994 to 2013, the bylaws

10   were almost always the same?

11       A.   Almost exact.

12       Q.   Can you remember any of the changes that were made

13   during the 20-year period?

14       A.   No.  It was just petty stuff.

15       Q.   What do you mean by petty stuff?

16       A.   Maybe they changed a date higher on your striking.  It

17   was nothing major, it was mostly all the same.

18       Q.   Did any of the core requirements as a member of the

19   club change?

20       A.   What do you mean?

21       Q.   Within the bylaws, did anything that as a member you

22   had to do or how to behave change over those 20 years?

23       A.   No.

24       Q.   Are you familiar with the a club called Knight Riders?

25       A.   Yes.

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2        Q.   Can you describe who the Knight Riders are?

 3        A.   They are an offspring of the Kingsmen.

 4        Q.   Are you familiar with the term "support club"?

 5        A.   Yes.

 6        Q.   And can you describe what a support club is?

 7        A.   It's just another club that supports another club

 8   basically a bigger club so they ride with them and --

 9        Q.   And do they have bylaws as well?

10        A.   Yes.

11        Q.   And who writes the bylaws for the Knight Riders?

12        A.   The Kingsmen.

13        Q.   Why would the Kingsmen write the bylaws for the Knight

14   Riders?

15        A.   Because they are our support club, they are under us.

16        Q.   And as a member of the Knight Riders, does that mean

17   they are lower than strikers?

18        A.   Yeah, you could say so.

19        Q.   Do they have to follow and do anything a Kingsmen says?

20        A.   Not quite.  They had their own, you know, their own

21   club, you know.  And I wouldn't say they are a little bit

22   higher than a striker, but they are to listen to a full-patch

23   Kingsmen if they are in a bar or something.

24        Q.   Okay.  What I want to do is talk about these bylaws.

25                    MS. SHELVEY:  And, Ms. Prawel, can you pull up
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2     Government's Exhibit 42, please?

3          Q.   Sir, looking at -- is that the front page of 42 that

4     you've just seen in the packet?

5          A.   Yes.

6          Q.   And can you see that screen okay or would you like me

7     to provide a hard copy?

8          A.   No, it's fine.

9          Q.   I want to direct your attention to the second paragraph

10    of page one of the document.  And ask you to take a look and

11    read this.  Where it says, "available for a potential member to

12    read," who are they referring to in that statement?

13         A.   The strikers.

14         Q.   And to be assured they agree to the bylaws prior to

15    saying the final yes, what is the final yes?

16         A.   That they are going to join the club.

17              MS. SHELVEY:  Ms. Prawel, page two, please.  The

18    top paragraph.

19         Q.   I'll ask you to read that briefly and I'll ask you some

20    questions.  Okay?  Assets of the club.  What types of assets

21    does each clubhouse have?  What does the assets and equity all

22    clubhouses belong to the club as a whole, what are they talking

23    about?

24         A.   All of property in the clubhouses, all of the property

25    is the Kingsmen.  It ain't an officer, it ain't president.

        1                    C. SHULTZ - DX BY MS. SHELVEY

        2       Q.   What is the highest rank you achieved?

        3       A.   President.

        4       Q.   Of which club?

        5       A.   Lockport.

        6       Q.   And how long did you hold that position?

        7       A.   About three years.

        8       Q.   And as a president of the chapter, were you required to

        9   know what was contained in the bylaws?

       10       A.   I was president and made sure everything was followed

       11   right.

       12       Q.   You're required to enforce the rules?

       13       A.   Make sure it was done right.

       14            MS. SHELVEY:  Ms. Prawel, if we can have the

       15   second paragraph, one line.  Where it says "we are one club not

       16   separate clubs divided by cities or states."  How many

       17   different chapters were there and we'll talk about the time you

       18   were president.  I don't want to go back the whole time from so

       19   say 2010 to 2013, how many different chapters were there in New

       20   York.

       21       A.   New York, about five.

       22       Q.   And what were they?

       23       A.   Niagara Falls, NT, North Tonawanda, Buffalo and Attica

       24   Lockport and Springville.

       25       Q.   And again as you're sitting here, is it possible that

1                    C. SHULTZ - DX BY MS. SHELVEY

2    you've forgotten a few more over the years?

3         A.   There was some in Pennsylvania if you count them.

4         Q.   An that is the next were they in other states as well?

5         A.   Yes.

6         Q.   And what other states from 2010 to 2013 were you aware

7    that the Kingsmen had a presence?

8         A.   That would be Pennsylvania and Florida.

9         Q.   Were these clubs run independent of each other?

10        A.   Yes.

11        Q.   Did they all have to answer to the same people?

12        A.   Yes.

13        Q.   Did they all have -- are the bylaws the same for every

14   club?

15        A.   Yes.

16             MS. SHELVEY:  Ms. Prawel, if we can get the second

17   page, fifth paragraph.  Starting "new chapters."

18        Q.   Are there rules for setting up a new chapter?

19        A.   Yes.

20        Q.   Can you describe and tell the members of the jury a

21   little bit about that?

22        A.   You have to figure out the location.  After the

23   location, you have to have seven members at least.  If you

24   don't have seven members, you can't open it, a clubhouse, and

25   it goes down from, like it says in there, with the national

         1                    C. SHULTZ - DX BY MS. SHELVEY

         2    president's decision.

         3         Q.   And once you find a suitable property, is it purchased

         4    or rented?

         5         A.   It depends.

         6         Q.   How so?

         7         A.   How much they want for it.

         8         Q.   Okay.  And if it's purchased, who would be responsible

         9    for buying or paying for the mortgage?

        10         A.   The treasurer.

        11         Q.   And if it's leased or rented, who is responsible?

        12         A.   The treasurer.

        13         Q.   And what about property taxes?

        14         A.   Usually the national treasurer takes care of all of

        15    that.

        16         Q.   Does that go back to the we are one club, not separate

        17    clubs divided by cities?

        18         A.   Yes.

        19         Q.   And is that across the board that the national

        20    treasurer will be responsible for paying property taxes on all

        21    Kingsmen properties?

        22         A.   Correct.  I'm sorry about that.  It's not the national,

        23    the regional, the treasurer would take care of everything.

        24         Q.   Can you explain a little bit about the filtering down

        25    of orders?

1              C. SHULTZ - DX BY MS. SHELVEY

2       A.   You got the national president, and the national

3    treasurer and then you got a regional president and regional

4    treasurer, and then you have the chapter president, vice

5    president, Sergeant-of-Arms and secretary and your full patch

6    and your striker.

7       Q.   How do you verify to the national president when you

8    want to open up a new club that you have seven members?  Is

9    there a process this requires that you have seven members

10   minimum?

11      A.   You go to the regional president, the regional reaches

12   out to the national president.

13      Q.   If we can go to, first of all, when you started up to

14   2013, during the time frame of these bylaws, who was the

15   national president?

16      A.   Skeet.

17      Q.   What is Skeet's full name?

18      A.   Skeet Spry.

19      Q.   Begin to highlight that last paragraph, please.  If you

20   can read that to yourself.

21      A.   All right.

22      Q.   Can you explain to the members of the jury what that

23   means?

24      A.   In -- the bylaws don't have all of the rules.

25      Q.   Are there some rules that are intentionally not written

1                    C. SHULTZ - DX BY MS. SHELVEY

2    down?

3        A.   Yes.

4        Q.   Can you explain to the jury why the Kingsmen

5    intentionally don't write some laws down?

6        A.   So the book don't get in the law officers' hands.

7        Q.   Does -- I'm sorry.  Repeat that?

8        A.   The book doesn't get in officers' hands.

9        Q.   What book are you talking about?

10       A.   The national bylaw book.

11       Q.   Government's Exhibit 42?

12       A.   Yes.

13       Q.   Wouldn't get into whose hands?

14       A.   The officer, the law.

15       Q.   Police?

16       A.   Exactly.

17       Q.   Then how do you know what these rules are if they are

18   not written down in the bylaws?

19       A.   You were told.

20       Q.   By who?

21       A.   Either a person that brought you into the club or the

22   president, one of the officers will tell you.

23       Q.   Is it your responsibility to know not only all of these

24   rules in Government's 42, but to know the other group of rules

25   that aren't written down?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Yes.

3        Q.   What happens if you screw up and you miss one of the

4    unwritten rules?

5        A.   You can get smacked, punched in the chest or fined.

6        Q.   Can you tell the members of the jury what some of the

7    unwritten rules, based on your own personal experience as the

8    president, what are some of the rules?

9        A.   One, you don't talk to law enforcement no matter what.

10       Q.   What are some others?

11       A.   You keep your mouth shut, no matter what happens.  That

12   is not written in there.  Right off the bat, I can't think too

13   much more.

14       Q.   Okay.  Have you ever seen individuals, based on your

15   own personal knowledge, be violated in some manner for not

16   following those two rules that you discussed?

17       A.   Yes.

18       Q.   What happened to them?

19       A.   They get smacked up.

20            MS. SHELVEY:  Now, if we can go to, please, page

21   3.  And highlight the first grouping there under "officers and

22   local positions."  Thank you.

23       Q.   Is this the chain of command we were talking about

24   previously?

25       A.   Yes.

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   And so for as long as you've known the Kingsmen since

3    1994, how many national presidents have there been?

4        A.   Two.

5        Q.   Skeet Spry and who?

6        A.   David Pirk.

7             MS. SHELVEY:   We can go to the second paragraph,

8    please, Ms. Prawel.

9        Q.   National officers are listed here.   How many national

10   officers are there?

11       A.   Just one.

12       Q.   What do you mean?

13       A.   There is only one officer, national, I'm sorry,

14   national officer, and there is only one.

15       Q.   Here it says president, Nomad president and treasurer.

16   Can you explain what those are?

17       A.   You got your Nomad president and your treasurer to tell

18   you the truth.

19       Q.   So the president would be who, the national president?

20       A.   National president is the top man and he gets the final

21   call on everything.

22       Q.   What do you mean final call on everything?

23       A.   Anything that has to be done comes from the national

24   president.

25       Q.   What is a Nomad?

1                    C. SHULTZ - DX BY MS. SHELVEY

2       A.    Demolition, they take care of the problems with other

3    clubs, citizens, your own club members.

4       Q.    Are the Nomads the enforcement branch of the Kingsmen

5    Motorcycle Club?

6       A.    Yes.

7       Q.    Who do the Nomads get their orders from?

8       A.    The regional president or the national.

9       Q.    And if a Nomad violates any of the rules, either

10   written or not written, who is responsible for punishing the

11   Nomads?

12      A.    Usually the president of the Nomads, between the

13   president of the Nomads or the national or regional.

14      Q.    You, as a chapter president, could you punish a Nomad?

15      A.    No.

16      Q.    What would happen if you tried to punish and/or

17   reprimand a Nomad?

18      A.    I could get beat up or thrown out.

19      Q.    Could you lose your position as president?

20      A.    Yes.

21      Q.    Could we go to the second?  Regional officers.  So in

22   the chain of command, the top is the national then goes

23   regional?

24      A.    Your national is first and your regional is second and

25   treasurer or then your president, your treasurer and then after

                        C. SHULTZ - DX BY MS. SHELVEY

1  that you got your Sergeant-of-Arms.

2      Q.   Okay.  And now as it relates to the different regions

3  that the Kingsmen Motorcycle Club have, and again, this is up

4  until 2013, was New York split into multiple regions?

5      A.   No.

6      Q.   Did you have a north and south region in New York?

7      A.   Yes, but it wasn't at our events.

8      Q.   What does that mean?  Can you explain that differential

9  difference?

10     A.   Well, you got a clubhouse in the north town and one in

11 south towns, but it was still New York.

12     Q.   So in terms of separating north and south regions, that

13 was purely to make it easier on the members?

14     A.   Yes.

15     Q.   But you were all one unit in New York?

16     A.   No matter what.

17     Q.   And there was actually one point in time a Central New

18 York as well?

19     A.   Yes.

20     Q.   Now Pennsylvania is by itself as a region?

21     A.   Yes.

22     Q.   And Florida was, by itself, as another region?

23     A.   Yes.

24     Q.   What does this mean that a couple of chapters may

1                    C. SHULTZ - DX BY MS. SHELVEY

2    belong to a region that is not in their actual state location.

3    Can you think of any examples from 2010 to 2013?

4         A.   No.

5              MS. SHELVEY:  Ms. Prawel, can we have the fourth

6    section, please?

7         Q.   And is this what a local chapter lineup would look

8    like?

9         A.   Yes.

10        Q.   The top, you have president and that would be someone

11   like yourself?

12        A.   Yes.

13        Q.   And who appoints chapter president?

14        A.   The regional president.

15        Q.   Does the regional president need to get approval from

16   anyone before he can appoint a regional president?

17        A.   He'll talk it over with the national.

18        Q.   And now in terms of the chain of command under the

19   president within a chapter, who gets to pick his cabinet, for

20   lack of a better term?  So who gets to pick the vice president,

21   Sergeant-of-Arms, and treasurer for each chapter?

22        A.   Your president.

23        Q.   So someone like you?

24        A.   Yes, president for your chapter.

25        Q.   And do you have to get approval as a president for

755

```
 1                     C. SHULTZ - DX BY MS. SHELVEY
 2    anyone else before you can make these appointments?
 3         A.   No.
 4                    MS. SHELVEY:  Ms. Prawel, if we can go to page
 5    four, Sergeant-of-Arms.
 6         Q.   Are you familiar with a Sergeant-of-Arms in a
 7    clubhouse?
 8         A.   Yes.
 9         Q.   And can you tell the members of the jury a little bit
10    about what a Sergeant-of-Arms does?
11         A.   He takes control of the chapter to make sure it's
12    running smooth.  If you messed up and he might be sent out to
13    smack you a few times or take your vest and throw you out.  He
14    was more enforcement.
15         Q.   What is the difference then between a Sergeant-of-Arms
16    and a Nomad?
17         A.   Enforce within his chapter or Sergeant-of-Arms, Nomad
18    does it all over.
19         Q.   Does the Nomad have a home base or home chapter?
20         A.   They didn't.
21         Q.   I mean while you were president.  As far
22    Sergeant-of-Arms, did you ever hold that position?
23         A.   Yes.
24         Q.   And where?
25         A.   Buffalo and Springville.
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   Are there any unwritten rules as it relates to

3    Sergeant-of-Arms or their responsibility is just what's listed

4    in the bylaws?

5        A.   That is about it.

6        Q.   Okay.

7             MS. SHELVEY:   Now, if we can go, Ms. Prawel, to

8    chapter secretary.

9        Q.   Can you explain to the members of the jury what a

10   chapter secretary is?

11       A.   Chapter secretary is the one that collects your dues,

12   to get supplies for the clubhouse to keep it running, take care

13   of all bills, your electric and gas.

14       Q.   Secretary.   Then what does the treasurer do?

15       A.   It's a side the secretary -- some clubhouses some have

16   secretary/treasurers as one.   They are really no different.

17       Q.   Does the secretary have specific role or duty during

18   meetings?

19       A.   Yes, to write everything down.

20       Q.   And you say "write everything down," is that the role

21   on paper that the secretary writes everything down?

22       A.   No, writes everything down.   It's happening at your

23   monthly meetings and your national meetings in your own

24   clubhouse that write it down plus who paid and who didn't pay

25   and he kept his own book.

1                    C. SHULTZ - DX BY MS. SHELVEY

2       Q.   Where was that book kept?

3       A.   With the secretary or treasurer, one of them.

4       Q.   Are there certain things discussed at the meeting that

5    Kingsmen don't want law enforcement to find out about like

6    criminal activity?

7               MR. COVERT:  Your Honor, I object to the leading.

8               THE COURT:  Sustained.

9       Q.   Are there times -- are there some things that a

10   secretary will not write in the book?

11      A.   Yes.

12      Q.   Can you tell the members of the jury what a secretary

13   will not write in a book?

14      A.   Basically about what were supplies, the supplies we're

15   going to buy cigarettes, beer and where we getting it from.

16      Q.   In terms of any disciplinary action, is that all

17   recorded in the secretary's book?

18      A.   It should be.

19      Q.   What do you mean it should be?

20      A.   It should be written down in a book that somebody got

21   fined or somebody was got smacked up because of what they did

22   or their center got taken, they have to wait 30 days to get it

23   back if their center was taken.

24      Q.   Does anybody else look at the secretary's book to make

25   sure all of that information is contained there?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Yes and no.

3        Q.   What do you mean?

4        A.   It means the president, I ask to look at it just make

5    sure it goes in, but I try to stay away from it.

6        Q.   So you have the act as president to look at it?

7        A.   Yes.

8        Q.   But you don't do that generally?

9        A.   No.

10             MS. SHELVEY:  Ms. Prawel, if we can go to page

11   five at the top.

12       Q.   Now, sir, this is under the title of "bar captain."

13   This is the second page of that.

14             MS. SHELVEY:  If you can highlight the top

15   paragraph, please.

16       Q.   Can you explain to the members of the jury what a bar

17   captain is?

18       A.   Bar captain, secretary and treasurer, to me, they were

19   all the same.

20       Q.   And does it vary depending on the size of the club?

21       A.   Yes.

22       Q.   Now, in this description says "works with the treasurer

23   to be sure money is transferred to him."  What money is being

24   discussed?  What bar captain -- what money does a bar captain

25   have access to?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Usually the secretary or the treasurer is the one that

3    gives the bar captain the money to buy supplies.

4        Q.   And what types of supplies would those be?

5        A.   Beer, whiskey, cigarettes, toilet paper.

6        Q.   Once the bar captain purchases those supplies, does the

7    bar captain have to keep a record of what he purchased?

8        A.   He should write it down and then hand in the receipts.

9        Q.   And what happens if he doesn't write it down and/or

10   hand in receipts?

11       A.   He swallows the money that is missing.

12       Q.   He what?

13       A.   He swallows the money that is missing.

14       Q.   What does that mean?

15       A.   He has to pay the money back.

16       Q.   And what happens if he don't pay it back?

17       A.   If you don't pay it back, you get thrown out; you ain't

18   trustworthy.

19       Q.   You mentioned buying alcohol and cigarettes.  I'm going

20   to talk a little bit more about this later, but does the club

21   sell both of those?

22       A.   Yes.

23       Q.   And based on your experience in the last 20 or so

24   years, have you ever been to a Kingsmen Motorcycle Club that

25   did not serve or sell alcohol?

1                  C. SHULTZ - DX BY MS. SHELVEY

2        A.   No.

3        Q.   And as it relates to New York, do you know whether or

4   not all of the Kingsmen Motorcycle Clubs sell cigarettes?

5        A.   Yes.

6        Q.   How do you know that?

7        A.   I've been to them all.

8        Q.   Do you smoke?

9        A.   Yes, I do.

10       Q.   Have you ever purchased cigarettes at those -- the

11   clubs while you're there?

12       A.   Yes.

13            MS. SHELVEY:  Ms. Prawel, if we can go to the

14   bottom of page five.  Thank you.

15       Q.   Within the bylaws, are there specific rules that the

16   Nomads must follow?

17       A.   All right that I read it?

18       Q.   Where it says "they aren't to interfere with the

19   workings of other chapters," can you explain to the members of

20   the jury what that means?

21       A.   No other chapter's Nomads can interfere for another

22   club chapter.  So if I'm Lockport, Nomads or presidents from

23   just say Buffalo can't interfere with what I'm doing in

24   Lockport.

25       Q.   And so the Nomads can't interfere with the day-to-day

1                    C. SHULTZ - DX BY MS. SHELVEY

2      operations of any club or any chapter?  Excuse me.

3          A.   Yes.

4                    MS. SHELVEY:  Go to page six, please.

5          Q.   And looking at the top, what does this section of the

6      bylaws refer to?

7          A.   What is that, ma'am?

8          Q.   Does this refresh -- what portion of the process does

9      this page refer to?

10         A.   It's when you join the club and you're a striker.

11         Q.   And does it lay out specifically what strikers can and

12     cannot do?

13         A.   Yes.

14                   MS. SHELVEY:  If we can turn to page 7, please,

15     paragraph one.

16         Q.   As a member of the Kingsmen, are you required to pay

17     dues?

18         A.   Yes.

19         Q.   And as even a striker required to do the same thing?

20         A.   Yes.

21         Q.   And what is this to pay to the national fund, $50 plus

22     the cost of all patches?

23         A.   Paperwork plus the patches.

24         Q.   So you have to pay $50 for paperwork?

25         A.   Yes.

```
 1                  C. SHULTZ - DX BY MS. SHELVEY

 2      Q.   And where does that $50 go?

 3      A.   The money?

 4      Q.   Yes.

 5      A.   Ends up going to the national treasurer.

 6      Q.   Will pay to the national fund, what is that?

 7      A.   It's a fund assigned in case we need help.

 8      Q.   And who has access to the national fund?

 9      A.   The national president.

10      Q.   Do you as a chapter president in New York or did you

11   have access to the national fund?

12      A.   I didn't see it.

13           MS. SHELVEY:  If you could go to paragraph three,

14   please.

15      Q.   There are very specific rules about things that

16   strikers can and cannot do.  I'll repeat.  Are there -- I'm

17   sorry.  I didn't give you a chance to read that.  Are there

18   very specific rules that a striker can and cannot do?

19      A.   Yes.

20      Q.   And one of them not going alone in public wearing their

21   colors.  What does that mean?

22      A.   You're a striker, you don't have your center yet, you

23   cannot be walking around with the Kingsmen name on you.

24      Q.   When is a striker allowed to wear their colors then?

25      A.   In the clubhouse or with a full-patch member.
```

                    C. SHULTZ - DX BY MS. SHELVEY

1

2      Q.   If a striker was with a full-patch member and they went

3   to say, Betty's Bar, would that be okay?

4      A.   Yes.

5      Q.   And paragraph four, please.

6      A.   Okay.

7      Q.   Can you tell the members of the jury what full member

8   clothing is?

9      A.   Your shirts with the -- you have your shirts with the

10  crest on it and your rocker, bottom rocker, top rocker.

11     Q.   Are these T-shirts, where would you get a Kingsmen full

12  crest t-shirt?

13     A.   We have them made up.

14     Q.   And are they given out to members?

15     A.   Sold.

16     Q.   Who sells them?

17     A.   Your treasurer of that chapter, each one from the

18  chapter has them made up for the chapter.

19     Q.   And what happens to the money and proceedings from this

20  type of proceeding?

21     A.   It should all go out to the regional treasurer.

22     Q.   You say it should go out to the regional treasurer,

23  does that always happen?

24     A.   No.

25     Q.   Why not?

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2        A.   Because you keep some for your own house.
 3             MS. SHELVEY:   Page 8, please.   The first half
 4   page, please.
 5        A.   Okay.
 6        Q.   Can you tell the members of the jury what this is
 7   highlighted?   What does it mean?
 8        A.   You pay dues once a month to your secretary of your
 9   chapter.
10        Q.   Does the secretary then pay dues on behalf of the
11   chapter to someone?
12        A.   Yeah, to the -- it usually goes to the national
13   treasurer or regional treasurer.
14        Q.   Who sets the dues amount?
15        A.   National treasurer, or the national president.
16        Q.   And over the time of the last 24 or so years, no, 20
17   years that you were doing that, you have been a -- that you
18   were a member of the Kingsmen club, did the dues change?
19        A.   Just to $10 a week.
20        Q.   And how much were you paying when you started?
21        A.   Maybe $30 a week.
22        Q.   And at some point, it went to up to $40 a week?
23        A.   Thirty a month went up to $40 a month.
24        Q.   As a president, are you required to pay dues?
25        A.   No.
```

1               C. SHULTZ - DX BY MS. SHELVEY

2        Q.   And is that in the bylaws?

3        A.   No.

4               MS. SHELVEY:  Ms. Prawel, if you could go to the

5    next line on that for all dues.

6        Q.   Can you explain to the members of the jury what the

7    travel fund is?

8        A.   It's the travel fund on this was for the Nomads if they

9    had to travel.

10       Q.   So as part of the dues, it's specifically carved out

11   money for the Nomads to travel?

12       A.   Yes.

13       Q.   For business or pleasure?

14       A.   Business.

15       Q.   Page nine, please.  If we can go to the first

16   paragraph.  No one is basically allowed behind the bar except

17   but certain exceptions apply.  What kind of exception would

18   permit a non member or striker to go behind the bar?

19       A.   Usually if you're not a member, you're not going behind

20   the bar.  And if there is a striker behind the bar visiting,

21   you can have them go behind the bar to bartend.

22       Q.   That would be an exception, someone from another club

23   another chapter of the Kingsmen coming to your club to bartend?

24       A.   Yes.

25       Q.   Second paragraph, please.  You mentioned courtesy cards

1                        C. SHULTZ - DX BY MS. SHELVEY

2       when you first started talking about, is this what you're

3       making reference to?

4           A.   Yes.

5           Q.   What happens if you give a courtesy card to a non

6       member and then they act up inside?

7           A.   They get beat up and thrown out and their card gets

8       ripped up.

9           Q.   And what happens to you?

10          A.   You get smacked up for signing that card over to them.

11          Q.   Paragraph three, please.

12                    THE COURT:  Ladies and gentlemen, if you want to

13      stand up and stretch.  I do.  Mr. Connors got us all going.  Go

14      ahead, whenever you're ready.

15                    MS. SHELVEY:  I've been pacing.

16                    THE COURT:  You're stretching.

17          Q.   Are old ladies or girlfriends of members considered

18      guests or are they considered part of the club?

19          A.   Little of everything, I guess.

20          Q.   Do they have any rights like a normal Kingsmen or a

21      striker would?

22          A.   No.

23          Q.   And if an old lady or a girlfriend acts up, who is

24      responsible for her behavior?

25          A.   The man she is with.

767

1                C. SHULTZ - DX BY MS. SHELVEY

2       Q.   And you mean the member she is with?

3       A.   Yeah.

4       Q.   And is that written in the bylaws?

5       A.   No.

6            MS. SHELVEY:  If we can go to the meetings

7    chapters and highlight that paragraph, please.

8       Q.   I'll ask you to take a quick look at that.  There are

9    very specific rules about when and how club business is to be

10   addressed?

11      A.   Yes.

12      Q.   Can you tell the members of the jury a little bit about

13   those rules?

14      A.   How the business is, I don't know, like, can you

15   explain just a little bit better?

16      Q.   Sure.  Where it says that all club business will be

17   discussed at meetings only not in public bars or other places.

18   What does that mean?

19      A.   It means the only time you can talk about club business

20   is in a clubhouse.  You can't be out in public where there are

21   citizens in listening.

22      Q.   And so as long as you're physically in a clubhouse, you

23   can talk about whatever you want?

24      A.   Not quite.  You should go in a back room and talk.

25      Q.   Why is that?

```
 1                  C. SHULTZ - DX BY MS. SHELVEY
 2       A.   So the citizens that is in your clubhouse doesn't hear
 3   it.
 4       Q.   Go to page 10, please, the top paragraph.  As a member
 5   of the Kingsmen, are there certain parties that you're required
 6   to go to?
 7       A.   Yes.
 8       Q.   And what happens if you don't go to the required
 9   parties?
10       A.   You strike for 30 days and you get fined.
11       Q.   Means you lose your full patch for 30 days?
12       A.   Your center or if you don't have a center, your top
13   rocker.
14       Q.   Why are the certain parties that are listed out here,
15   why are these mandatory?
16       A.   Because they are so far away and far and few members.
17       Q.   And do all members nationally have to go to these
18   parties?
19       A.   They should.
20       Q.   Are there times when you can get a pass for certain
21   reasons?
22       A.   Yes.
23       Q.   Who do you have to clear that with?
24       A.   Your president.
25                  MS. SHELVEY:  If we can go to the 5th paragraph
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2    starting "there is."

3        Q.   If it's a Kingsmen sponsored function, are you allowed

4    to speak and talk about Kingsmen business?

5        A.   Not if there are citizens there.

6        Q.   Page 11.  If we can do the second paragraph.  Are there

7    certain trips as a Kingsmen you're expected to take?

8        A.   Yes.

9        Q.   Certain places you're expected to be?

10       A.   Yes.

11       Q.   What are some of those?

12       A.   It's usually Florida, the main one.

13       Q.   What goes on in Florida?

14       A.   It's bike week and it's a big party for the Florida

15   chapter to make money.

16       Q.   And while you were within and a member of the Kingsmen,

17   did you ever attend bike week?

18       A.   Yes.

19       Q.   How many times?

20       A.   Maybe five, eight.

21       Q.   Somewhere in that?

22       A.   Yes.

23       Q.   Are there any other trips that you're expected as a

24   member of the Kingsmen that you're expected to take at least

25   once or twice during your tenure?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   You have Pennsylvania, that was the next furthest and

3    then you go down the line.

4        Q.   If we can go to paragraphs three and four.  How many

5    Kingsmen clubhouses do you think you've been in in 20 years?

6        A.   From 2013, all of them at that time.

7        Q.   In the year 2013, you were in all of them?

8        A.   Yes.

9        Q.   And do you know whether there are any weapons in the

10   clubhouses?

11       A.   Yes.

12       Q.   Can you think of any of the clubhouses that you

13   attended in 2013 that did not have weapons?

14       A.   No.

15       Q.   Are you familiar with whether or not the Lockport

16   chapter, as president, your members carried firearms?

17       A.   Did they carry firearms?

18       Q.   Yes.

19       A.   Yes.

20       Q.   Some, all, a few?

21       A.   A few.

22       Q.   Why did this need to be put in the bylaws, do you know?

23            MR. COVERT:  Objection, calls for speculation.

24            THE COURT:  Overruled.  He was asked if he knows.

25   You can answer it if you know.

```
 1                  C. SHULTZ - DX BY MS. SHELVEY
 2        A.    People get drunk and stupid and you, they got a
 3   firearm, they think they are a kid and they pull out a gun and
 4   point it at somebody and don't realize that it's going to go
 5   off.
 6        Q.    And were you present in a situation similar to this
 7   when this occurred?
 8        A.    Yes.
 9        Q.    And if we go to page 12, please.  Sir, can you tell the
10   members of the jury what "Up Day" is?
11        A.    It's when everybody has to have their bike up and
12   running, inspected, insured.
13        Q.    And as a member of the Kingsmen, what happens if your
14   bike is not up and running by "Up Day"?
15        A.    You're striking for 30 days.  Well, you're striking
16   until you get your bike up and running.
17        Q.    Does it matter what your rank is, you're still demoted
18   to striker?
19        A.    Yes.
20        Q.    If your bike wasn't ready for that Saturday in May,
21   would you lose your patch?
22        A.    I gave my patch up.
23        Q.    What do you mean?
24        A.    I gave my patch up.  I didn't have my bike up and
25   running and I was the president.
```

                    C. SHULTZ - DX BY MS. SHELVEY

1

2    Q.   And when were you able to get it back?

3    A.   As soon as my bike was up and running the next day.

4    Q.   Why did you do that?

5    A.   It's the rules.

6    Q.   And as president, if you gave your patch up, who takes

7    over for you?

8    A.   Your vice president.

9    Q.   If we go to paragraph six, the first paragraph of

10   section six.  Okay.  Are there -- we talked about the vests and

11   patches and T-shirts.  Are there other types of merchandise

12   that the club sells?

13   A.   Club patches, old lady has their patches.

14   Q.   And as a requirement, are you actually purchasing them

15   and you get to keep them forever?

16   A.   No.

17   Q.   Turn to page 13, please.  If we could do the top

18   paragraph.  What does it mean for a member that loses his

19   colors due to negligence?  Are you familiar with any instances

20   where this happened?

21   A.   That lost their colors?

22   Q.   Yes.

23   A.   One time.

24   Q.   Can you tell the members of the jury a little bit about

25   that?

                    C. SHULTZ - DX BY MS. SHELVEY

1

2     A.   You lose your colors from the Sergeant-of-Arms and the

3   Nomad has to go get them, but you get punished.  Sever means

4   you're going to get beat down real good.

5     Q.   And based on the experience, was it you that took the

6   colors?

7     A.   Yes.

8     Q.   And what happened?

9     A.   I took 17 shots in the chest, but they didn't have to

10  go back and get them, I came and got them back myself.

11    Q.   And were you present?

12    A.   I was a Sergeant-of-Arms.

13    Q.   So even Sergeant-of-Arms, you're not exempt from

14  punishment?

15    A.   Nope.

16    Q.   And who punished you?

17    A.   The president of Springville.

18    Q.   And who was that at the time?

19    A.   Turk.

20    Q.   And if we can go to fifth paragraph down, please.  Mr.

21  Schultz, are you familiar with an incident in 2012?

22    A.   Yes.

23    Q.   Where this was put into effect?

24    A.   Yes.

25    Q.   And tell the members of the jury about it.

1                    C. SHULTZ - DX BY MS. SHELVEY

2         A.    One of the club managers quit and he had a club tattoo

3    and it was burnt off because he wouldn't take it off.

4         Q.    And who was involved in that?

5         A.    That was between Special Ed and I can't think right

6    now.

7         Q.    Okay.  It's all right.  Is it only the Nomads that are

8    responsible for handling this portion or can a Sergeant-of-Arms

9    do it?

10        A.    If a Sergeant-of-Arms sees them at that time, they have

11   the right to do it.

12        Q.    Does anyone else in the club have the right to do it

13   between a Sergeant-of-Arms or a Nomad?

14        A.    No.

15              MS. SHELVEY:  Ms. Prawel, if we can go through the

16   old lady patch and through -- okay.  Thank you.

17        Q.    We talked about old ladies.  Are there very specific

18   rules about old ladies' behavior within a clubhouse?

19        A.    Yes.

20        Q.    Are there certain rules before a woman can be

21   considered an old lady?

22        A.    Yes.

23        Q.    What happens if a member discusses club business with

24   their old lady?

25        A.    They would be smacked down, striked, fine.

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2                    MS. SHELVEY:  I apologize.  If we could get No. 4

 3       under "tattoos."  Somehow I skipped over that.

 4           Q.   Are there certain tattoos that Kingsmen are permitted

 5       to wear on their body?

 6           A.   Yes.

 7           Q.   And can you describe to the members of the jury what

 8       some of those are?

 9           A.   One can go on the forearm or back, full patch on your

10       back.  You have to have more time on your full patch on the

11       back.

12           Q.   How long do you have to be a Kingsman before you get

13       the full patch on the back?

14           A.   Ten years.

15           Q.   Are there any other rules?

16           A.   Seven years if you want one on the arm.

17           Q.   An do the tattoos have to be on certain parts of the

18       body or anywhere?

19           A.   No, it doesn't matter.

20           Q.   And do you have any?

21           A.   No.

22           Q.   Now, page 14, please, the first three paragraphs.  Did

23       there come a time when you left the club for a little bit?

24           A.   Yes.

25           Q.   And during that time, were you considered retired?
```

```
 1                 C. SHULTZ - DX BY MS. SHELVEY

 2      A.   Yes.

 3      Q.   So were you permitted to keep your patches?

 4      A.   Yes.

 5      Q.   When you came back, were you permitted to wear them

 6 just as you normally would?

 7      A.   Yes.

 8      Q.   There are specific rules about when you could wear your

 9 patches while you were, quote, "in retirement"?

10      A.   Yes.

11      Q.   And what were those?

12      A.   Just specific club functions.

13           MS. SHELVEY:  Ms. Prawel, if we can go to the

14 fourth paragraph starting "any member."

15      Q.   Are you familiar with that rule?

16      A.   Yes.

17      Q.   Is there a personal reason why you're so familiar with

18 the rule?

19      A.   Yes.

20      Q.   Can you describe it for the members of the jury?

21      A.   I was running the Buffalo Chapter and I met a girl out

22 in Springville, so I decided to start out in Springville

23 without telling the president in Buffalo and the president in

24 Springville thought I talked to my president, so he thought I

25 was part of the Springville until Buffalo Chapter president got
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2      ahold of him and asked him where I was.  And he said I was part

3      of Springville now and I didn't tell nobody.  By the time I got

4      back and was told to go back to Buffalo and I got smacked up

5      for it.

6          Q.   And how long were you in Springville with this young

7      lady before you got sent back to Buffalo?

8          A.   About a month, maybe a little longer.

9          Q.   And did you have rank in the Buffalo Chapter at that

10     point?

11         A.   Just a full patch.

12              MS. SHELVEY:  Ms. Prawel, can we go to the last

13     paragraph, please?

14         Q.   As it relates to the -- this is a rule on the books as

15     part of the bylaws that an incarcerated member gets a $50 a

16     month stipend?

17         A.   Yes.

18         Q.   From the club?

19         A.   Yes.

20         Q.   Where does that money go?

21         A.   What do you mean where it goes?

22         Q.   If a person is incarcerated, how do they know they are

23     getting the money?

24         A.   It goes in the some commissary.

25         Q.   What is a commissary?

```
 1                   C. SHULTZ - DX BY MS. SHELVEY
 2        A.   It's a money that goes into your bank account in jail
 3    so you can buy whatever you want that is in jail for sale.
 4        Q.   Now, are all clubs required to have this fund?
 5        A.   Yes.
 6        Q.   And is each individual club then responsible for paying
 7    the commissary the $50 a month for any incarcerated members?
 8        A.   Yes.
 9        Q.   So it doesn't come from regional or national?
10        A.   Well, it should come from the regional, but mine was
11    always sent from my chapter.
12        Q.   And you said "mine," were you on the beneficial end of
13    this?
14        A.   Yes.
15        Q.   Use the term loosely, can you tell the members of the
16    jury how?
17        A.   I believe earlier you said I was arrested for firearms.
18                   MS. SHELVEY:  Your Honor, may I lead him in this?
19    We'll talk about a brief period of time of his incarceration.
20                   THE COURT:  Any objection?
21                   MS. SHELVEY:  Just to lead him briefly to get to
22    the incarceration.
23                   MR. EASTON:  No objection to the form of the
24    question.
25                   MR. COVERT:  I guess I'll know what when I hear
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2      the question.
 3                    MR. GRABLE:  I guess I'll go question by question,
 4      but in order to keep things moving along.
 5         Q.   As a result of your conviction in 1998, did you spend
 6      time in jail?
 7         A.   Yes.
 8         Q.   And how long?
 9         A.   I believe three months.
10         Q.   And during those three months, did you receive money
11      from the club?
12         A.   Yes.
13         Q.   How much did you receive?
14         A.   Fifty dollars a month.
15         Q.   How do did you know it was from the club?
16         A.   You get a paper saying it.
17         Q.   What do you mean a paper saying it?
18         A.   When you get money coming in, it tells you who it's
19      from.
20         Q.   And the paper said who?
21         A.   One of the guys, whoever delivered it, usually
22      secretary or treasurer delivers it, so you know it's from the
23      club.
24         Q.   And while you were within the club, did you ever see
25      specific collections at individual clubs for a specifically
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2     incarcerated individual?
 3          A.   Yes.
 4          Q.   Did that bother you?
 5          A.   Yes.
 6          Q.   Why?
 7          A.   Because they ain't special.
 8          Q.   What do you mean?
 9          A.   The money that you get the $50 a month is for
10     everybody, why should somebody get more, they are not special.
11                    MS. SHELVEY:  If we can go to page 15, please.
12     Can you highlight the first three lines?
13          Q.   Know who you are letting in, what does that refer to?
14          A.   Any citizen being in the bar or clubhouse.
15          Q.   You said bar, why did you refer to the clubhouse there
16     as a bar?
17          A.   Because it's basically a bar.
18          Q.   Never disgrace your colors in public.  What does that
19     refer to?
20          A.   Being drunk, stupid, acting like a fool.
21          Q.   Where?
22          A.   In public and other bars.
23          Q.   Donations only.  What is a donation?
24          A.   Donation is just nothing is for sale, it's donated.
25          Q.   What's not for sale?
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   If you want a beer, it's donations.  You can have a

3    beer, but donate.

4        Q.   Is there a certain donation that is required?

5        A.   Yes.

6        Q.   And how do individuals know what the donation is

7    supposed to be for, say, a beer?

8        A.   Usually from the people that brought you in from

9    whatever member brought you in the club.

10       Q.   And what happens if you ask for a beer and then you

11   don't give a donation?

12       A.   They won't get you a beer and you get asked to leave.

13       Q.   Where, based on your personal experience, is it called

14   a donation?

15       A.   No liquor license.

16            MS. SHELVEY:  Ms. Prawel, if you can do the bolded

17   capital in the middle, I apologize.  Starting with "remember."

18       Q.   I'll draw your attention to the last two lines.  What

19   is, "this is not a one-percent club, no one percent patches"?

20   You familiar with that?

21       A.   Yes.

22       Q.   And again, these were written in 2009?

23       A.   Yes.

24       Q.   Sometime after 2009, did you see one percent patches?

25       A.   Yes.

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2        Q.   About what year?

 3        A.   That would be at least 2014, maybe a little bit longer.

 4        Q.   And while you were still a member of the Kingsmen

 5   Motorcycle Club, did you have discussion with other Kingsmen

 6   about the club switching to a one-percent club?

 7        A.   Yes.

 8             MS. SHELVEY:  Thank you, Ms. Prawel.

 9        Q.   Now, I want to talk a little bit more about your

10   personal experiences.  What was the first position of rank that

11   you held?

12        A.   Sergeant-of-Arms.

13        Q.   And can you tell the members of the jury,

14   approximately, when that was?

15        A.   That was '94, '95, in between there, 1994, '95, it was

16   six months after I got my center.

17        Q.   Okay.  And we talked a little bit about going through

18   the bylaws, rules relating to the bar, I think it says "watch

19   who comes in"?

20        A.   Yes.

21        Q.   Are there other rules about the doors within the

22   clubhouses?

23        A.   Yes.

24        Q.   And does that rule remain the same whether you're in

25   South Buffalo, Lockport, anyplace else?
```

                    C. SHULTZ - DX BY MS. SHELVEY

1

2        A.  Yes.

3        Q.  And what is the rule as it relates to the doors of

4    these clubhouses?

5        A.  No citizen can touch that door.

6        Q.  What happens if a citizen touches the door?

7        A.  They get smacked up.  No citizens can touch the door to

8    go in or out.

9        Q.  Is entry into the clubhouse guarded?

10       A.  Yes.

11       Q.  By who?

12       A.  By your Sergeant-of-Arms or full patch.

13       Q.  Are the doors themselves locked or restricted in any

14   way?

15       A.  Yes.

16       Q.  Can you tell the members of the jury about that?

17       A.  They are usually, as soon as somebody walks in, they

18   lock the doors behind you.

19       Q.  Who unlocks the door if an individual wants to leave?

20       A.  A full patch member or a striker if he was told.

21       Q.  If he was told by who?

22       A.  A full-patch member.

23       Q.  As Sergeant-of-Arms, were you required to have a

24   weapon?

25       A.  No.

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   I want to talk about South Buffalo specifically.  Do

3   you know whether or not South Buffalo, the clubhouse

4   themselves, stores and maintains any types of weapons?

5        A.   Yes.

6        Q.   Can you tell the members of the jury about them,

7   please?

8        A.   You got a shorty that is underneath the bar.

9        Q.   A what?

10       A.   A shorty a 12-gauge shotgun with the barrel cut off and

11   then you got rifles and pistols.

12       Q.   And based on your time, have you personally seen this

13   shorty or the rifle or pistol within the South Buffalo

14   clubhouse?

15       A.   Yes.

16       Q.   Who has access to these guns?

17       A.   Anybody.

18       Q.   So is a civilian?

19       A.   Not a civilian, any club member, sorry.

20       Q.   How do Kingsmen coming from other chapters know where

21   the weapons are?

22       A.   In case something happens, they know where to go.

23       Q.   Are weapons stored in these same places at all

24   clubhouses?

25       A.   No.

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   And how would, say, someone from Lockport know where

3    the weapon was in Springville if they needed it?

4        A.   You come to the clubhouse, you come to all clubhouses,

5    you know where they are.  People tell you where they are.

6        Q.   Is this a common discussion?

7        A.   Once, like Lockport, it will always be in that spot or

8    Buffalo, it will always be in that spot.  You know where it is,

9    it don't get changed.

10       Q.   So the spot in the clubhouse is chosen by the president

11   or someone in the clubhouse?

12       A.   Yes.

13       Q.   But it stays there and it's always there?

14       A.   Yes.

15                    THE COURT:  That water is for you.  Help yourself.

16       Q.   From between to 2013, while you were the president of

17   the Lockport chapter, were there weapons stored at the Lockport

18   clubhouse?

19       A.   Yes.

20       Q.   And did you know where they are?

21       A.   Yes.

22       Q.   Did you have access to them?

23       A.   Yes.

24       Q.   And at that time, you were a convicted felon?

25       A.   Yes.

1                C. SHULTZ - DX BY MS. SHELVEY

2        Q.   And did anyone try to restrict your access because you

3    were a convicted felon?

4        A.   Yes.

5        Q.   Who?

6        A.   Sergeant-of-Arms.

7        Q.   Did you make a decision to leave the Kingsmen for a

8    period of time?

9        A.   Yes.

10       Q.   About how long were you out?

11       A.   The first or the last?

12       Q.   The first time.

13       A.   Few years.

14       Q.   And about when was that?

15       A.   I believe maybe in '98, somewhere around there.

16       Q.   Can you explain to the members of the jury why you

17   decided to come back?

18       A.   Skeet called me up and asked me, needed help for the

19   Lockport clubhouse.

20       Q.   And when you left, what was your rank when you retired?

21   In the late '90s what was your rank when you retired?

22       A.   Sergeant-of-Arms.

23       Q.   And upon returning at the request of Skeet, Skeet

24   Spry --

25       A.   Yes.

```
 1                  C. SHULTZ - DX BY MS. SHELVEY
 2      Q.   -- was he the national president at this time?
 3      A.   Yes.
 4      Q.   And did you go back immediately to being a
 5  Sergeant-of-Arms?
 6      A.   No.
 7      Q.   Did you have to be a striker?
 8      A.   No.
 9      Q.   Tell the members of the jury a little bit about your
10  transition back in?
11      A.   All I had to do when I came back, commit full patch and
12  I went straight and I didn't want the Sergeant-of-Arms
13  position.
14      Q.   Did you then gain your rank at Lockport?
15      A.   Yes.
16      Q.   How long were you at Lockport before you started going
17  up in rank?
18      A.   I believe a few months.
19      Q.   And what was the first rank you achieved?
20      A.   Vice president.
21      Q.   How long were you vice president before you became
22  president?
23      A.   Four to six months.
24      Q.   So in less than a year, you had come back and you were
25  now the president of Lockport?
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2        A.   Yes.

 3        Q.   Why -- did you have discussions with the national

 4   president, Skeet Spry, about why you were coming back in?

 5        A.   Just to help him build the clubhouse back up the way it

 6   should be.

 7        Q.   What do you mean the way it should be?

 8        A.   Well, they weren't making no money, plus there were

 9   idiots there and it was time to clean up house.

10        Q.   And but how does a Kingsmen Motorcycle Club chapter

11   clubhouses make money?

12        A.   Selling merchandise, striker with patches, beer,

13   cigarettes, mixed drinks, whatever.

14        Q.   And did any clubhouses have any type of gaming or games

15   within the clubhouses?

16        A.   Yes.

17        Q.   And would that be a profit-making enterprise for each

18   clubhouse?

19        A.   Yes.

20        Q.   And what about dues?

21        A.   Yes, everybody had to pay dues but the president.

22        Q.   I'm going to talk specifically about Lockport and we're

23   talking about the 2010 to 2013 time period.  Did Lockport serve

24   alcohol?

25        A.   Yes.
```

```
 1                  C. SHULTZ - DX BY MS. SHELVEY
 2      Q.   Was it licensed to serve alcohol?
 3      A.   No.
 4      Q.   How did the alcohol get to the Lockport chapter?
 5      A.   Bought it at the liquor stores.
 6      Q.   And who would be responsible for purchasing it?
 7      A.   Treasurer, secretary, they are all the same.
 8      Q.   Where would the money come from?
 9      A.   From the club itself, that chapter.
10      Q.   Have you personally purchased alcohol for the Kingsmen
11   Motorcycle Club?
12      A.   Yes.
13      Q.   Can you tell us a little bit about that?
14      A.   I was going past a liquor store and they called me up
15   and asked me if I could pick up a couple of bottles for them
16   and I'll give you the money when I get there, so I picked it
17   up.
18      Q.   At what clubhouse were you purchasing the alcohol for?
19      A.   Lockport.
20      Q.   Are there certain rules at Lockport about any money
21   that ends up on the bar?
22      A.   Yes.
23      Q.   Can you explain what those are?
24      A.   You put your money on the bar, it gets taken for the
25   jail fund or the Florida fund.  You don't get it back, there
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2    ain't no money put on the bar.

3        Q.   Why don't Kingsmen Motorcycle Club want money on bars?

4        A.   Donations, you don't buy nothing there, it's all

5    donated.

6        Q.   Why is there a concern then about money on the bar?

7        A.   Cop comes in it looks like you're selling.

8        Q.   Are all these rules put in place to circumvent law

9    enforcement?

10       A.   Pardon me?

11       Q.   Are these rules put in place to get around law

12   enforcement?

13       A.   Yes.

14                    MR. GRABLE:  Objection.

15                    THE COURT:  Sustained.  Ladies and gentlemen, I'll

16   direct you to disregard the last answer.

17       Q.   Why did Kingsmen Motorcycle Club houses have these

18   rules?

19       A.   About the money on the bar.

20       Q.   Yes.

21       A.   Law enforcement comes in, we don't have a liquor

22   license, there is money on the bar, it looks like we're selling

23   something instead of donating.

24       Q.   Were alcohol bottles kept out in the open at Lockport?

25       A.   Yes.

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   Where were they kept?

3        A.   Right behind the bar like a regular bar or behind the

4    bar like any bar you walk into, you have them stacked up.

5        Q.   How were they displayed?

6        A.   Stacking shelves.

7        Q.   Did the members of the club do anything with those

8    bottles?

9        A.   Yes.

10       Q.   Can you describe what that is?

11       A.   Each bottle, it had your name on it or somebody's name

12   on it from that chapter.

13       Q.   And who would put the names on the bottle?

14       A.   Usually your secretary or treasurer.

15       Q.   Did that mean whoever's name on the bottle got to keep

16   that bottle?

17       A.   No, in case somebody came in, they could say it was

18   theirs.

19       Q.   Who somebody's?

20       A.   Law enforcement.

21       Q.   And based on your personal experiences, was the bar

22   situation consistent with the other clubhouses that you had

23   been in during that time period?

24       A.   Yes.

25       Q.   Are you familiar with cigarettes?

                    C. SHULTZ - DX BY MS. SHELVEY

 1    A.   Yes.

 2    Q.   Were cigarettes sold at Lockport?

 3    A.   Yes.

 4    Q.   And can you describe a little bit about the cigarettes,

 5    please?

 6    A.   Non menthol or menthol.

 7    Q.   Where did they come from?

 8    A.   A reservation.

 9    Q.   Why were they bought from the reservation?

10    A.   Don't pay taxes.

11    Q.   How do you know that you don't pay taxes?

12    A.   I smoke, I buy it for myself.

13    Q.   What happens once the cigarettes are brought to the

14    clubhouse?

15    A.   They get sold.

16    Q.   For how much?

17    A.   Five to seven dollars a pack.

18    Q.   And how much would a pack cost at the reservation?

19    A.   You buy a carton for 20 dollars and that is 10 packs.

20    Q.   Did you personally ever purchase cigarettes for the

21    Kingsmen Motorcycle Club?

22    A.   Yes.

23    Q.   How many times?

24    A.   A few.

```
  1                    C. SHULTZ - DX BY MS. SHELVEY

  2        Q.   Where did the money come from?

  3        A.   My pocket.

  4        Q.   And did you get reimbursed?

  5        A.   Yes.

  6        Q.   Who reimbursed you?

  7        A.   The secretary or treasurer.

  8        Q.   Did you have to turn in a receipt?

  9        A.   Yes.

 10        Q.   What happens to the profits that are made from the sale

 11   of the cigarettes?

 12        A.   You use them to restock.

 13        Q.   What do you mean to restock?

 14        A.   More alcohol, more cigarettes, help to pay bills.

 15        Q.   Does it have to be turned into any higher regional or

 16   national funds?

 17        A.   It should, but not all of it.

 18        Q.   I'm going to show you just for identification

 19   Government's Exhibit 110.60.  Do you recognize that?

 20        A.   Yes.

 21        Q.   What do you recognize that to be?

 22        A.   Cigarettes from a reservation.

 23        Q.   I'm sorry.  Can you say that again?

 24        A.   Cigarettes from the reservation.

 25        Q.   You mentioned there were two kinds of cigarettes sold
```

794

1                    C. SHULTZ - DX BY MS. SHELVEY

2    at the clubhouses?

3        A.   Yes.

4        Q.   And what they were?

5        A.   Menthol and non menthol.

6        Q.   Thank you.  Let's talk a little bit about gaming

7    machines in the clubhouses.  Did all clubhouses have gaming

8    machines?

9        A.   Most of them.

10       Q.   What types of machines, when you say gaming, what are

11   you talking about?

12       A.   Could be slot machine, could be poker, some big game on

13   the bar.

14       Q.   Did Lockport have one?

15       A.   Yes.

16       Q.   As the president of Lockport during the 2010 and 2013

17   time period, approximately how much money would that machine

18   make for the club?

19       A.   In a month?

20       Q.   Yes.

21       A.   Four to $500.

22       Q.   In terms of the size of the various clubs, was Lockport

23   a larger, smaller, in the middle in terms of membership?

24       A.   We were a smaller.

25       Q.   How many members during that time period when you were

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2    president did you have?
 3        A.   Eight or nine.
 4        Q.   We talked a little bit about dues, but around 2013,
 5    there was a change in the way finances were paid?
 6        A.   Yes.
 7        Q.   Can you describe that, please?
 8                    MR. EASTON:  Objection.  Anything after 2013, your
 9    Honor.
10                    THE COURT:  All right.  So you want to limit the
11    answer to prior to 2013?
12                    MR. EASTON:  Yes.
13                    THE COURT:  I guess I'm confused.  Are you asking
14    about what happened after 2013?
15                    MS. SHELVEY:  No.  In 2013, while he was still a
16    member.
17                    THE COURT:  I think the question was a little
18    confusing, maybe rephrase it.
19                    MS. SHELVEY:  Sure.
20        Q.   Was there a change in the way that the finances were
21    paid in 2013?
22        A.   No.
23        Q.   Are you aware of any drug use in the Kingsmen
24    clubhouses?
25        A.   Pardon.
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.   Are you aware of drug use in the Kingsman clubhouses?

3        A.   Yes.

4        Q.   How are you aware?

5        A.   I saw it.

6        Q.   Was it acceptable for Kingsmen members to use drugs in

7    the clubhouses?

8        A.   You didn't have to.

9        Q.   But could you?

10       A.   Yes.

11       Q.   And during the time when you were president 2010 to

12   2013, did you see drug use in the clubhouses?

13       A.   Yes.

14       Q.   In all of the clubhouses you went to?

15       A.   Yes.

16       Q.   Specifically I want to talk about Lockport.  First, do

17   you use drugs?

18       A.   No.

19       Q.   Have you ever used drugs?

20       A.   No.

21       Q.   Did members within your clubhouse at Lockport use

22   drugs?

23       A.   A couple.

24       Q.   And did you allow that?

25       A.   I stopped it.

1              C. SHULTZ - DX BY MS. SHELVEY

2     Q.   Why did you stop it?

3     A.   I wasn't taking the blame for drugs in my clubhouse.  I

4     wasn't falling for it.  Guys are going to get arrested for it.

5     Q.   Were there any members of your clubhouse who tried to

6     convince you otherwise?

7     A.   Yes.

8     Q.   Who was it?

9     A.   The Sergeant-of-Arms and there was a Nomad.

10    Q.   Do you remember their names?

11    A.   Rahoo and Special Ed.

12    Q.   And did you ever change your rules for them?

13    A.   No.  I told them to go outside and use it.

14    Q.   Go outside the clubhouse, but stay on Kingsmen

15    property?

16    A.   Yes.

17    Q.   Did you have the opportunity to ever go to South

18    Buffalo during that 2010, 2013 time frame?

19    A.   Yes.

20    Q.   How often did you go there?

21    A.   Not much, but I went there a few times.

22    Q.   Why didn't you go there often?

23    A.   I guess our chapter was more like older people, so we

24    didn't, I guess, we weren't hip for the young guys.  We stayed

25    in our own chapter.

                     C. SHULTZ - DX BY MS. SHELVEY

1

2      Q.   When would you go to the South Buffalo Chapter?

3      A.   If we had a meeting, officer's meeting, and if

4    everybody wants to go to a ride, we'll go.

5      Q.   Did you have the opportunity in the three-year period

6    to be in the clubhouse?

7      A.   Yes.

8      Q.   While you were there, did you see any drug use?

9      A.   Yes.

10     Q.   And can you tell the members of the jury where it

11   occurred?

12     A.   Upstairs.

13     Q.   How was the Buffalo clubhouse laid out?

14     A.   If you walk through the front door, as soon as you walk

15   in, you're in a hallway.  Then you go through another door and

16   it opens up into a bar.  The bar will be on the right side.  If

17   you go straight, it's where there are stairs, you go upstairs.

18   If you bear to the right a little bit, there is a bathroom, the

19   ladies' bathroom and a men's bathroom.  And then on the side,

20   here is a fire pit or a fireplace.  I was there, it was not my

21   chapter.

22     Q.   Is that the only thing that was upstairs, the fireplace

23   area?

24     A.   That is downstairs.

25     Q.   If you go upstairs, what is upstairs?

1                    C. SHULTZ - DX BY MS. SHELVEY

2       A.   As soon as you get up the door, go up the stairs and go

3   down a hallway and bathroom is on the right and then you walk

4   in a big room, a bar and bedroom there and turn to the right

5   and bedroom there and bedroom there and an open big room.

6       Q.   And did -- what occurred in the big room?

7       A.   That is where they usually did drugs.

8       Q.   Why?

9       A.   Keep it away from the people downstairs.

10      Q.   What was the point of keeping the drugs away from the

11  people downstairs?

12      A.   I hate to say it, but a lot of them were scabs.  They

13  didn't have money and wanted something for nothing, so they did

14  it upstairs.  But it was easier if they wanted to sell

15  something, it was upstairs; out of sight and out of mind.

16      Q.   Did you ever have the opportunity to be up in the

17  upstairs room when drug dealing happened?

18      A.   Yeah.

19      Q.   Why were you up there?

20      A.   I had to use the bathroom and the downstairs bathroom

21  was full.

22      Q.   And can you describe to the members of the jury what

23  you saw?

24      A.   Just money transferred from one club member to another.

25      Q.   And do you know who the club members were?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Yes.

3        Q.   Can you tell the members of the jury?

4        A.   Special Ed and Woody.

5        Q.   And Woody?

6        A.   Yes.  And there was a couple other ones in there to.

7        Q.   And as it relates to the drug dealing in South Buffalo,

8    did you see other members selling drugs?

9        A.   Yes.

10       Q.   Who?

11       A.   Flip and Happy Matt.

12                 THE COURT:  Happy Matt?

13                 THE WITNESS:  Yeah.

14                 THE COURT:  He is making everybody happy.

15       Q.   Do you know who Flip is?

16       A.   Yes, I do.

17       Q.   And what is his name?

18       A.   Willson or something like that.

19       Q.   Do you know a lot of these individuals by their full

20   names?

21       A.   No, I don't.  I know Edgar Dekay, II, I believe Flip is

22   Willson and then Woody is Woody.

23       Q.   So a lot of them, you know by their nicknames?

24       A.   Or face.

25       Q.   Or face, okay.  But Special Ed, you knew him as, what?

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2      What is his full name?
 3      A.   Ed DeKay the second.
 4      Q.   And do you know who Happy Matt is?
 5      A.   Yes, I do.
 6      Q.   And do you know his name?
 7      A.   No, I don't.
 8      Q.   And Woody you know as Woody?
 9      A.   Yeah.  And he was the regional president at one time.
10      Q.   Where was he the regional president of?
11      A.   New York.
12      Q.   And Happy Matt did he have any rank?
13      A.   As far as I know, no.
14      Q.   What about Special Ed?
15      A.   Yes.
16      Q.   What was his rank?
17      A.   President of Nomads.
18      Q.   Do you know when he became president of the Nomads?
19      A.   I believe it was 2012.
20      Q.   And what about Flip or Mr. Willson?
21      A.   He was a Nomad.
22      Q.   Do you know when he became a Nomad?
23      A.   Just a little bit after Ed.
24      Q.   And within the Kingsmen Motorcycle Club world, did
25      South Buffalo have a reputation?
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2        A.   Yes.

 3        Q.   And can you describe to the members of the jury what

 4    that reputation was?

 5        A.   It was just a big party house.

 6                  MR. GRABLE:  Object to the word "reputation" and

 7    eliciting reputation.

 8                  THE COURT:  I guess I'm not sure where you're

 9    going with this.  Why don't you approach for a second?

10                  (Whereupon, there was a sidebar discussion on the

11    record.)

12                  THE COURT:  Your objection?

13                  MR. GRABLE:  I understand your objection.  What is

14    the basis for bringing in the reputation of the clubhouse?

15                  MS. SHELVEY:  Where you can get drugs if you

16    wanted to, it's known by members you can buy drugs.

17                  THE COURT:  That seems very vague.  It is one

18    thing to have the reputation of an individual, but the --

19                  MS. SHELVEY:  The reputation, it's a party house

20    and young club and if you want drugs, you go to South Buffalo

21    or NT.

22                  MR. COVERT:  There are other things.

23                  MR. GRABLE:  That may be his sense, he shouldn't

24    be allowed to comment.

25                  THE COURT:  You can ask him how he viewed the
```

 1                    C. SHULTZ - DX BY MS. SHELVEY
 2      South Buffalo clubhouse.
 3                    MR. COVERT:  Or what he observed.
 4                    THE COURT:  She asked what he observed, but I
 5      think you can ask what he knew the South Buffalo clubhouse in
 6      comparison to the Lockport clubhouse where he was president.
 7                    MS. SHELVEY:  Sure.
 8                    (Whereupon, the proceeding continued.)
 9                    THE COURT:  Thank you.  All right.  Ladies and
10      gentlemen, I sustained the objection.  Ms. Shelvey, why don't
11      you rephrase it?
12                    MS. SHELVEY:  Yes, your Honor.
13      Q.   How did you personally view the South Buffalo clubhouse
14      in relation to Lockport?
15      A.   Party house.
16      Q.   Why did you personally view it as a party house?
17      A.   Drugs, bar was almost open 24/7, and some girls there.
18      Q.   Okay.  How did the drug scene at South Buffalo differ
19      from Lockport?
20      A.   I don't let them sell or bring drugs in my house.
21                    MR. COVERT:  I wasn't able to make that out.
22                    THE COURT:  He said, "I don't let them sell or
23      bring drugs in my house."
24      Q.   And at South Buffalo, did you personally observe any
25      restrictions as it relates to the sale or use of drugs?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   No, as long as it was upstairs.

3        Q.   Were you familiar with the North Tonawanda clubhouse?

4        A.   Yes.

5        Q.   And how are you familiar with that clubhouse?

6        A.   I was around for so long, I had been in the clubhouse

7   plenty of times.

8        Q.   While you were in the clubhouse, did you see any drug

9   use there?

10       A.   Yes.

11       Q.   Where would drug use occur at the North Tonawanda

12  clubhouse?

13       A.   Upstairs.

14       Q.   Did you see any drug dealing going on in the North

15  Tonawanda clubhouse?

16       A.   Yes.

17       Q.   Were Kingsmen involved in the dealing in the North

18  Tonawanda clubhouse?

19       A.   Yes.

20       Q.   Which Kingsmen did you observe dealing drugs in North

21  Tonawanda?

22       A.   Flip, Woody, Special Ed, I don't know, I can't think of

23  the other guy's name.

24       Q.   Okay.  But Flip, Woody, Special Ed, are they the same

25  individuals that you just spoke of dealing at South Buffalo?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Yeah, they are the three amigos.

3        Q.   When you saw these individuals dealing, were they

4    dealing with club members?

5        A.   And citizens.

6        Q.   What types of drugs, I'm going to go through the ones

7    you talked about individually.  What type of drugs did you see

8    Flip, Mr. Willson, dealing?

9        A.   Coke.

10       Q.   How did you know it was coke?

11       A.   Powder, it's white.

12       Q.   What about Woody?  You don't know his name, correct?

13       A.   Mm-mm.

14                 THE COURT:  You need to say yes or no.

15                 THE WITNESS:  I'm sorry, yes.

16       Q.   What did you see Woody dealing?

17       A.   Coke.

18       Q.   And Special Ed, what did you see him dealing?

19       A.   He was coke and pills.

20       Q.   Do you know what kind of pills?

21       A.   No, I don't.

22       Q.   And what types of drugs did you see predominantly being

23   dealt in both South Buffalo and North Tonawanda?

24       A.   Coke.

25       Q.   Did you observe any other types of drugs being dealt?

1                    C. SHULTZ - DX BY MS. SHELVEY

2        A.   Marijuana.

3        Q.   Within the clubhouses themselves, and within the

4    Kingsmen Motorcycle Club, were there certain drugs that could

5    not be used and/or dealt in any clubhouse?

6        A.   Yes.

7        Q.   What are those drugs?

8        A.   Crack, heroin, anything with a needle.

9        Q.   Well, how did you know that?  Is it written in the

10   bylaws?

11       A.   Nope.

12       Q.   How do you know what you can deal or can't deal?

13       A.   It was no member can deal it or touch it, it's that

14   private rule.

15       Q.   Are there any other clubhouses in New York during the

16   2010, 2013 time frame that you personally observed drug dealing

17   occur?

18       A.   Attica.

19       Q.   What drug did you see?

20       A.   It was pot.

21       Q.   And who was dealing?

22       A.   Joe, Happy Matt's brother.

23       Q.   And had you had the opportunity to be down in Florida

24   at the Florida clubhouses?

25       A.   Yes.

1                  C. SHULTZ - DX BY MS. SHELVEY

2      Q.   How many times did you get to go down to Florida?

3      A.   Eight, about eight times, five to eight times.

4      Q.   And while you were president from 2010 to 2013, how

5   many of those times did you go to Florida?

6      A.   I believe once, once or twice.

7      Q.   While you mention clubhouses, did you go in Florida?

8      A.   Volusia County and Deland.

9      Q.   Did you observe any drug dealing in those clubhouses?

10     A.   Oh, yeah.

11     Q.   And can you tell us a little bit, first, Volusia

12  County?

13     A.   Main things, pot and coke.

14     Q.   I'm sorry.  I didn't hear you?

15     A.   Pot and coke, marijuana and coke.

16     Q.   And was it being consumed by Kingsmen?

17     A.   Yes.

18     Q.   And was it being sold by Kingsmen?

19     A.   I don't know about the sold part on that, wasn't my

20  chapter, wasn't nothing that, wasn't that buddy buddy with them

21  like I was with the other ones in New York.

22     Q.   In Volusia County Clubhouse, Kingsmen clubhouse.  Where

23  did you see drugs being consumed?

24     A.   At the bar.

25     Q.   They did it in public?

1                    C. SHULTZ - DX BY MS. SHELVEY

2       A.   In the morning, it was at the bar.  Other than that, it

3   would be outside.  There was a trailer outside in the back,

4   too.

5       Q.   About how many times did you see drugs being used while

6   in Volusia County while you were down there?

7       A.   Few times when I was down there, an apartment next door

8   still connected to the building but next door.

9       Q.   And the other clubhouse you were in in Florida?

10      A.   Deland.

11      Q.   When were you in Deland?

12      A.   Had to be about 2010, 9, somewhere in there.

13      Q.   And when were you in Deland?

14      A.   Excuse me.  The last time I went down, when I went to

15  Volusia County was the same time I went to Deland.

16      Q.   And you were president at this point?

17      A.   Yes.

18      Q.   So sometime 2010 or further to 2013.  When you went to

19  Deland, did you see any drug dealing?

20      A.   Just pot.

21      Q.   Did you see it being sold or being used?

22      A.   Used.

23      Q.   We talked about a couple of individuals, Woody, Flip,

24  Special Ed, dealing in a couple of clubhouses.  While they were

25  dealing, did you ever see them in possession of firearms?

```
 1                  C. SHULTZ - DX BY MS. SHELVEY

 2       A.   Yes.

 3       Q.   Who?

 4       A.   All three.

 5       Q.   Did you ever have the opportunity to observe violence

 6   in the clubhouses?

 7       A.   Among each other?

 8       Q.   Yes.

 9       A.   Or citizens?

10       Q.   We'll start among each other, did you see Kingsmen

11   fighting with each other?

12       A.   Yes.

13       Q.   And did you see Kingsmen fighting with citizens?

14       A.   Yes.

15       Q.   I'm going to talk about an incident in late 9 into 10,

16   were you aware what of a beating of a member of Sammy D?

17       A.   Yes.

18       Q.   And can you tell the members of the jury, first of all,

19   who was Sammy D?

20       A.   He was a president of Black Rock chapter.

21       Q.   Where is Black Rock?

22       A.   Riverside, Black Rock?

23       Q.   Here in New York?

24       A.   Yes.

25       Q.   And can you tell the members of the jury what you know
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2     about the incident that occurred?
 3                    MR. EASTON:  Objection, basis of knowledge.
 4                    THE COURT:  I'm going to sustain that objection
 5     you have to lay more of a foundation.
 6                    MS. SHELVEY:  I will lay more of a foundation.
 7          Q.  Can you tell the members of the jury how are you aware
 8     of the incident involving Sammy D?
 9          A.  I was there.
10          Q.  Who were you there with?
11          A.  Bunch of presidents, Nomads.
12          Q.  Why were a bunch of presidents in one location at that
13     time?
14          A.  There was like a meeting.
15          Q.  What kind of meeting?
16          A.  Just regular monthly meeting.
17          Q.  Okay.  Can you explain to the members of the jury what
18     you personally observed at this meeting?
19          A.  Well, Sammy D and another club member that was a Nomad
20     was arguing and with Woody was involved in it, too, and it got
21     heated up or Woody told everybody to jump Sammy D.
22          Q.  I want to stop.  Can you tell the members of the jury
23     what the fight was about or what the argument was about?
24          A.  About talking to law enforcement that Sammy D was.
25          Q.  And who did this Nomad believe was speaking to law
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2    enforcement?

 3                    MR. EASTON:  Objection.

 4                    THE COURT:  Well, why don't you -- what did the

 5    Nomad say about speaking to law enforcement?

 6        Q.   We'll step back.  Were you able to hear what the

 7    argument was about?

 8        A.   Yes.

 9        Q.   And how close were you to Sammy D and this Nomad?

10        A.   Maybe from me to you away.

11        Q.   Do you know who the Nomad was?

12        A.   Yes.

13        Q.   Who was that?

14        A.   Morris.

15        Q.   Do you know Morris' full name.

16                    THE COURT:  Like the cat, Morris the cat?  Bet you

17    haven't heard that name in a while.

18        Q.   And this was during a regular club meeting?

19        A.   Yes.

20        Q.   Was this argument occurring in front of the club?

21        A.   The members.

22        Q.   The members?

23        A.   Yes.

24        Q.   And were there any civilians?

25        A.   No.
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2        Q.    Tell the members of the jury what you personally saw

3    who started the argument?

4        A.    It started off with Woody and Morris toward Sammy D.

5        Q.    What did you hear either Woody or Morris say to Sammy

6    D?

7        A.    About somebody's being a snitch, I guess Sammy D was

8    being called a snitch.

9        Q.    And how did Sammy D react to that statement?

10       A.    He argued back with them because there was something

11   about something on Morris, but I don't know what it was.

12       Q.    Were you listening to them, go back and forth?

13       A.    Going back and forth for a couple of minutes.

14       Q.    What happened after the arguing?

15       A.    Woody and Morris and Sammy D started fighting.

16       Q.    You used the term "snitch," what do you know the word

17   "snitch" to mean?

18       A.    Telling law enforcement things that is going on in the

19   club.

20       Q.    Did are there specific Kingsmen rules about speaking to

21   law enforcement?

22       A.    Yes.

23       Q.    What is the rule?

24       A.    You don't talk to them?

25       Q.    Is there a punishment if you speak to law enforcement?

```
1                    C. SHULTZ - DX BY MS. SHELVEY
2         A.   Yeah, you get your ass beat or sometimes even be worse
3    than that.
4         Q.   So as Sammy D was arguing with Woody what happened
5    next?
6         A.   Morris and Sammy D started fighting.
7         Q.   Was any order given to the other Kingsmen that were
8    there?
9         A.   Yes, by Woody.
10        Q.   And what was Woody's rank at this point?
11        A.   Regional president.
12        Q.   And as regional president, was he the highest ranking
13   individual in the room?
14        A.   Yes.
15        Q.   What was the order given by Woody?
16        A.   He wanted everyone to jump Sammy D.
17        Q.   Why did he want everybody to jump Sammy D?
18        A.   Because he must be the one that was the snitch.
19        Q.   And was Sammy D beaten that day?
20        A.   Yes.
21        Q.   How bad?
22        A.   Pretty bad.
23        Q.   Can you describe what his condition to be?
24        A.   You couldn't see his face.  There was a lot of blood.
25   He could barely walk, basically he crawled to the bike.
```

1                  C. SHULTZ - DX BY MS. SHELVEY

2      Q.   Did you physically assault Sammy D?

3      A.   Me and one other member didn't.

4      Q.   Why not?

5      A.   I don't believe in it.

6      Q.   What do you mean?

7      A.   There is one guy and 20 other guys beating on him.

8      Q.   Did you face any punishment or repercussion because you

9   didn't follow the order of the regional president?

10     A.   I got smacked and so did the other guy.

11     Q.   Who carried out the punishment on you and the other

12  individual?

13     A.   Well, Special Ed.

14     Q.   Do you remember who the other individual that didn't

15  attack Sammy D?

16     A.   Frank Banks.

17     Q.   Who?

18     A.   Frank.

19     Q.   Frank?

20     A.   Yes.

21     Q.   Do you know an individual by the name of Chef?

22     A.   Yes, I do.

23     Q.   Was Chef a member of your club?

24     A.   Yes.

25     Q.   Was there an incident that you were involved with

```
 1                  C. SHULTZ - DX BY MS. SHELVEY

 2     relating to Chef?

 3        A.   Yes.

 4        Q.   Can you tell the members of the jury what that was?

 5        A.   Well, I heard he was buying crack in Lockport.

 6        Q.   And is crack a drug that is not allowed within the

 7     clubs?

 8        A.   You cannot take it, use it, sell it nothing.

 9        Q.   Did you confront him on it?

10        A.   Yes, I did.

11        Q.   And what happened?

12        A.   He was talking, he got thrown out of the club and got

13     smacked up.

14        Q.   Who threw him out of the club?

15        A.   I did.

16        Q.   And who smacked him up?

17        A.   I did.

18        Q.   Why?

19        A.   That drug is not allowed, I don't want drugs.

20        Q.   Some of the clubs utilize strippers?

21        A.   Couple.

22        Q.   Why was it beneficial to have strippers in a couple of

23     the clubs?

24        A.   That was their thing to make money.

25        Q.   To your knowledge, which clubs utilized strippers?
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY
 2        A.   NT and Buffalo.
 3        Q.   North Tonawanda, NT, and Buffalo?
 4        A.   Yes.
 5        Q.   While you were president in Lockport, did you ever have
 6   strippers?
 7        A.   No.
 8        Q.   While you were in South Buffalo, did you have ever --
 9   were you ever aware of strippers having sex with members?
10        A.   Yes.
11        Q.   Do you know on any occasions how those strippers were
12   paid after sex?
13        A.   I couldn't tell you, that wasn't my chapter, so I don't
14   know.  I know I could have had sex if I wanted to but, nah.
15        Q.   What do you mean they told you who told you?
16        A.   The president at that time.
17        Q.   You could have had sex with who?
18        A.   With one of the strippers there, but they said, "go
19   ahead and have sex, you're the president."  I didn't know what
20   that meant, but I wasn't touching it.
21        Q.   Are you aware of any Kingsmen that brought strippers to
22   the club?
23        A.   Yes.
24        Q.   Who was that?
25        A.   Ryan and Special Ed.
```

```
 1                    C. SHULTZ - DX BY MS. SHELVEY

 2       Q.   You say Ryan?

 3       A.   Yes.

 4       Q.   Who is Ryan?

 5       A.   He was the president of NT.

 6       Q.   And then Special Ed?

 7       A.   Special Ed.

 8       Q.   And I think you called him Ed DeKay previously?

 9       A.   Yes.

10       Q.   What was Ed DeKay's position at the time?

11       A.   He wasn't president of the Nomads, but he was a Nomad.

12       Q.   And how did you know that they were in charge of

13   bringing strippers into clubs?

14       A.   Everybody knew what they were doing it was out there.

15       Q.   Did there come a time that -- do you know an individual

16   by the name of Bootsy?

17       A.   Yes.

18       Q.   Who is Bootsy?

19       A.   He is a retired Nomad.

20       Q.   And how do you know him?

21       A.   I knew him ever since I joined the club.

22       Q.   And did there come a time when Bootsy gave you some

23   guns from him?

24       A.   Yes.

25       Q.   Can you tell the members of the jury about that?
```

```
 1                 C. SHULTZ - DX BY MS. SHELVEY
 2     A.   He was going to jail and he gave me the guns.
 3     Q.   When was this approximately?
 4     A.   It was like a couple of days before he went to jail
 5   maybe in 2011, maybe, '12, I ain't good at dates.
 6     Q.   Was it before you were cooperating with law
 7   enforcement?
 8     A.   Yes.
 9     Q.   And did you know you weren't supposed to have guns
10   because you were a convicted felon?
11     A.   Yes.
12     Q.   Did you care?
13     A.   No.
14     Q.   At some point in time, did Bootsy ask for his guns
15   back?
16     A.   Yes.
17     Q.   By then had something changed with you?
18     A.   Yes.
19     Q.   What was that?
20     A.   I was out of the club.
21     Q.   And when was that?
22     A.   2013, I was retired by Skeet.
23     Q.   You got retired from the club by Skeet?
24     A.   Yes.
25     Q.   Now, at the time that Bootsy wanted his guns back, were
```

1                    C. SHULTZ - DX BY MS. SHELVEY

2      you cooperating with law enforcement?

3          A.  Yes.

4          Q.  Did you have discussions with law enforcement about

5      this?

6          A.  Yes.

7          Q.  And did you ever give Bootsy his guns back?

8          A.  No.

9          Q.  What did you do with them?

10         A.  They were buried for a while and then I called Greg to

11     come pick them up.

12         Q.  You say Greg, you are making reference to someone in

13     the courtroom, Special Agent Mango?

14         A.  Yes.

15         Q.  Where were they buried?

16         A.  In the backyard.

17         Q.  Why were they buried?

18         A.  I didn't want nobody to have his guns, I didn't want

19     them out on the street.

20         Q.  And why did you contact law enforcement?

21         A.  What else am I going to do with them?  I don't want

22     them.

23         Q.  When we first started, you identified the defendant,

24     David Pirk?

25         A.  Yes.

                        C. SHULTZ - DX BY MS. SHELVEY

1

2       Q.   I want to talk to you a little bit about him.  When did

3   you first meet him?

4       A.   I don't know, maybe within a year a year or two of when

5   I first joined the club.

6       Q.   So sometime after 1994?

7       A.   Somewhere around there.

8       Q.   Mid to late 90s?

9       A.   Yes.

10      Q.   When you first met him, do you remember what his

11  position was?

12      A.   He was the president in Florida.

13      Q.   And when you came back out of retirement in 2010, did

14  you know what his rank was, if he had any?

15      A.   He wasn't in the club.

16      Q.   Was he retired?

17      A.   I guess so.  You can say so, I guess.

18      Q.   I want to talk about bike week, Daytona, 2013, did you

19  go down to bike week that year?

20      A.   Yes.

21      Q.   Who was still the national president when you went down

22  to bike week?

23      A.   Skeet Spry.

24      Q.   Who did you go down to bike week with?

25      A.   My girlfriend and one of the club members.

1                    C. SHULTZ - DX BY MS. SHELVEY

2       Q.   Who was that?

3       A.   Tony Perez.

4       Q.   From the Lockport chapter?

5       A.   Yes.

6       Q.   And were there other Kingsmen members from other New

7    York chapters going down as well?

8       A.   Yes.

9       Q.   How did you know they were going down?

10      A.   We all hook up and see if anybody needs a ride or if

11   they got room on the trailer for a bike, we usually all talk

12   before we go down there.

13      Q.   And to your recollection, who went down to Daytona in

14   2013, from the New York region?

15      A.   Me, Tony, a few people from Springville, Special Ed,

16   DeKay, Woody, quite a few people.

17      Q.   Where did you stay when you went down there?

18      A.   We had a trailer in the back of the clubhouse.

19      Q.   In the back of which clubhouse?

20      A.   Volusia County.

21      Q.   And when you were testifying earlier about seeing drugs

22   in the clubhouse in Volusia County is it when you were down in

23   bike week?

24      A.   Yes.

25      Q.   So that was 2013?

1                    C. SHULTZ - DX BY MS. SHELVEY

2       A.   Yes.

3       Q.   Had you been to Volusia County clubhouse in the past?

4       A.   Yes.

5       Q.   How did you know where you were going to stay?  How did

6    you make the arrangements?

7       A.   That is where we stayed last time, so we call it.

8       Q.   Did Special Ed travel down with you?

9       A.   No.

10      Q.   Was that contrary to plans that you had?

11      A.   Everybody shows up at the clubhouse and in bike week

12   like within a week's difference maybe a day, couple days, he

13   came down a few weeks early.

14      Q.   And did that -- why do you remember that?

15      A.   Because it was weird that he came down early.

16      Q.   Why was that weird?

17      A.   Because we all show up, we usually try to show up at

18   the last minute, and Professor told me he came down two weeks

19   early to talk about things.

20                    MR. EASTON:  Objection as to what Professor told

21   him.

22                    MS. SHELVEY:  Your Honor, they are going to be

23   coconspirator statements.

24                    THE COURT:  Well, this is a proffer before that is

25   made.

1                    C. SHULTZ - DX BY MS. SHELVEY

2                    MS. SHELVEY:  I do intend to proffer, but these

3          are general.

4                    THE COURT:  There is an objection, we have -- I

5          don't disagree they come under 801(D)(2).

6                    MS. SHELVEY:  Can we address it, perhaps?

7                    THE COURT:  We're not going to.  We're not going

8          to stop right now.  Why don't you, I mean, in other words, are

9          you intending to elicit additional similar statements?

10                   MS. SHELVEY:  Yes, your Honor.

11                   THE COURT:  Okay.  Let's take a five-minute break.

12         I won't keep you past 1:30.  We'll take a five-minute break and

13         see you back here shortly.  Thank you.

14                   (Whereupon, the jury was escorted from the

15         courtroom.)

16                   THE COURT:  Wait for the jury to leave and I'll

17         ask you to step out of the courtroom.

18                   (Defendant Pirk leaves the courtroom.)

19                   (The witness leaves the courtroom.)

20                   THE COURT:  Ms. Shelvey, once our witness is --

21         why don't you go ahead.  If they want to listen, they can.

22                   MR. EASTON:  I'm here.

23                   MS. SHELVEY:  And I apologize, that was not the

24         answer I was expecting.  I figured --

25                   THE COURT:  But as a reminder, we really should

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2     deal with this before the witness gets on the stand.  If we

3     anticipate, there are going to be coconspirator statements.

4                    MS. SHELVEY:  The statements that we are

5     proffering that we believe would be a coconspirator statement

6     is a discussion during this bike week in 2013 between Sean

7     McIndoo also known as the Professor and this witness.  At the

8     time, Mr. McIndoo was a member of the Kingsmen as well, as the

9     Court has heard the defendant is.  During the time frame, they

10    were Mr. McIndoo had a discussion with this witness saying that

11    Pirk wants to take the club to be a one percent.  It was that

12    discussion and that is going to be the nature of the

13    discussion.  This witness did not want to go one percent.  Mr.

14    McIndoo indicated that he had personally spoken to Pirk,

15    Defendant Pirk, about this and was relaying this information

16    then to Mr. Schultz and that is how the conversation took

17    place, that is the sum and substance of it.

18                    THE COURT:  Is there an objection to that?

19                    MR. EASTON:  Yes, your Honor.  We say it doesn't

20    satisfy the in furtherance, doesn't further the conspiracy and,

21    also I believe Mr. McIndoo, the second component is the

22    personal admission from David Pirk to McIndoo.  McIndoo can

23    testify to that, but it's, again, that should come in through

24    McIndoo.

25                    THE COURT:  Say that last part.

1          USA VS. D. PIRK, A. JENKINS & T. ENIX

2          MR. EASTON:  The Pirk to McIndoo statement can

3    come in through McIndoo.  We don't think it's a conspirator

4    statement and should come in as an admission and only come in

5    as an admission through McIndoo.

6          THE COURT:  All defense counsel agree with that?

7          MR. COVERT:  Yes, we agree.

8          MR. GRABLE:  Yes.

9          THE COURT:  I'm going to overrule the objection.

10   I do find, and, granted, I still have to make findings and I

11   will address this, that a conspiracy has been established by a

12   preponderance of the evidence and that the members who are the

13   declarants are, in fact, participants in the conspiracy and I'm

14   not sure we're there yet.  I guess with, particularly, Sean

15   McIndoo, I don't think any evidence has been introduced with

16   respect to him that I recall, at least at this point.  However,

17   I can always admit it, subject to connection, which I'm going

18   to do.  And I do find that the proffered statements would be in

19   furtherance of the conspiracy to promote or facilitate the

20   goals of the conspiracy providing a status update, providing an

21   information on the plans for the conspiracy and that would

22   include both the alleged statement between Mr. McIndoo and to

23   this witness as well as Mr. Pirk's statements to Mr. McIndoo

24   which were relayed to the witness.  Let's take a quick break.

25   Actually, we all ready to go?  Where is Mr. Connors?

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2                    Two minutes, okay?  And we'll -- we can have the

3     witness come back in here.

4                    MR. TRIPI:  Judge, I did tell all of the other

5     three witnesses they can go.

6                    THE COURT:  They can go.

7                    (Whereupon, there was a break in the proceeding.)

8                    THE COURT:  All right.  I think everybody is here,

9     other than Mr. Connors.

10                   How much longer do you anticipate?

11                   MS. SHELVEY:  At least an hour.

12                   THE COURT:  We'll see where we get.  At 1:30 we'll

13    take a break.

14                   MS. SHELVEY:  If it's okay with the Court, a

15    natural break time would be 15 minutes talking about the next

16    portion and then I get into coming back up here.

17                   THE COURT:  As long as it's a quarter after, I'll

18    allow you to break early.

19                   MS. SHELVEY:  Absolutely, your Honor.

20                   (Whereupon, the jury is escorted into the

21    courtroom.)

22                   THE COURT:  Ladies and gentlemen, welcome back.

23    We're going to continue with the examination.  I've overruled

24    the objection.  So go ahead, Ms. Shelvey.

25                   MS. SHELVEY:  Thank you, your Honor.

1            USA VS. D. PIRK, A. JENKINS & T. ENIX

2       Q.   Once you got down to Daytona with the group from New

3  York, did you have the opportunity to meet and talk to other

4  Kingsmen from Florida?

5       A.   Yes.

6       Q.   Do you know an individual by the name of Sean McIndoo?

7  How about this?  Do you know who the Professor is?

8       A.   I know Professor.

9       Q.   Do you know what Professor's name is?

10      A.   Not really.

11      Q.   Okay.  Did you ever discuss the name with him?

12      A.   His name?

13      Q.   Yes.

14      A.   No.

15      Q.   Did you see this individual that you know as the

16  Professor, is he a Kingsmen?

17      A.   Yes.

18      Q.   What club?

19      A.   Volusia County.

20      Q.   How do you know he was at Volusia County?

21      A.   I've been in the club for a while and that is where he

22  has been.

23      Q.   Do you know whether or not he had any rank?

24      A.   No.

25      Q.   Did you see the defendant David Pirk while you were

1                   USA VS. D. PIRK, A. JENKINS & T. ENIX

2      there?

3      A.   Yes.

4      Q.   Where did you see him?

5      A.   In the backyard of the clubhouse.

6      Q.   Again in Volusia County?

7      A.   Yes.

8      Q.   Do you know someone by the name of Little Bear?

9      A.   Yes.

10     Q.   Do you know who Little Bear is?

11     A.   Yes.

12     Q.   Who is that?

13     A.   The gentleman right there with the blue stripe tie and

14     white coat and black jacket.

15               MS. SHELVEY:  Your Honor, may the record reflect

16     identification of the defendant, Andre Jenkins?

17               THE COURT:  Any objection?

18               MR. COVERT:  No.

19               THE COURT:  All right.  The record should reflect

20     that the witness has identified Mr. Jenkins.

21     Q.   When did you first meet Little Bear?

22     A.   2013.

23     Q.   Where?

24     A.   Or yeah.

25     Q.   Okay.  Where did you meet Little Bear?

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2       A.   I believe it was Deland.

3       Q.   In where?

4       A.   The clubhouse in Deland.

5       Q.   When did you go to the Deland clubhouse?

6       A.   It was either Deland or Lake, I wasn't sure which one.

7       Q.   Okay.  Are those, what state are those in?

8       A.   Florida.

9       Q.   Had you been to either of these clubhouses before?

10      A.   Yes.

11      Q.   And in 2013, was that the first time you met the person

12   that you knew as Little Bear?

13      A.   Yes.

14      Q.   How did you come to be at the Deland or Lake clubhouse?

15      A.   We left Volusia clubhouse and went to the other

16   clubhouse and me and Tony took a ride out there.

17      Q.   Who is Tony?  Is he a Kingsmen?

18      A.   Yes.

19      Q.   And going back to the Volusia County clubhouse, is that

20   where you went when you first arrived?

21      A.   Volusia County, yes.

22      Q.   Was the Professor there at the time you arrived?

23      A.   Yes.

24      Q.   And had you had conversations with him in the past?

25      A.   Yes.

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2      Q.   How long do you think you've known him?

3      A.   I don't know, 10, 12 years, I don't know, a long time.

4      Q.   Did you meet him because of your involvement with the

5   Kingsmen?

6      A.   Yes.

7      Q.   Do you know whether or not the Professor had any rank

8   at the time in 2013 when you we're speaking with him?

9      A.   No.

10      Q.   No, rank or no you don't know?

11      A.   I don't know if he had any rank.

12      Q.   Who else do you recall when you first arrived at bike

13   week being at the Volusia County clubhouse?

14      A.   Worm, Pat.

15      Q.   Pat?

16      A.   Pat.  A couple other guys, I wasn't sure who they were.

17      Q.   Did you see Special Ed?

18      A.   Oh, yeah.

19      Q.   Was he there?

20      A.   He came in later on.

21      Q.   Who did he come in later on with?

22      A.   Nine.

23      Q.   Who is Nine?

24      A.   Club member from NT.

25      Q.   Did Nine come down with you?

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX

 2       A.   No.

 3       Q.   Do you know who Ed DeKay, Special Ed, traveled with?

 4       A.   He came with Nine.

 5       Q.   When did you first see Defendant Pirk?

 6       A.   It was a few days later.

 7       Q.   Okay.  At some point in time, did you have a discussion

 8  with the Professor relating to the with where the club was

 9  going?

10       A.   Yes.

11       Q.   And when did this conversation occur?

12       A.   It was maybe a few days or whatever it was, sometime in

13  my visit, we were talking and he was telling me.

14       Q.   I'm going to stop for a second.  Where did the

15  conversation take place?

16       A.   Volusia County's yard, in the backyard.

17       Q.   Were there other Kingsmen there?

18       A.   There were Kingsmen back there, yes.

19       Q.   Do you remember who was back there?

20       A.   There was quite a few people down there.  I couldn't

21  pinpoint exactly who was out there and besides me and Tony

22  Pedro, quite a few people.

23       Q.   Were there any civilians back there?

24       A.   Not where we were talking, not where we were standing,

25  it's a big yard.
```

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2      Q.   And were you speaking privately to Professor?

3      A.   Yeah.

4      Q.   Who began the conversation?

5      A.   I just walked up and asked him how he was doing and

6   haven't seen him in a while and what's going on.

7      Q.   And did he then give you some information about what

8   was going on with the club?

9      A.   Yes.

10     Q.   Do you remember how that conversation started?

11     A.   Actually, I couldn't tell you exactly how it exactly

12  started but it came up to something about one percent.

13     Q.   When you first heard one percent, how did you react to

14  that?

15     A.   I don't want nothing to do with it.

16     Q.   Why not?

17     A.   One percent there is a lot of a lot to it.  We were

18  happy being a little club and be left alone.  When you come to

19  one percent, you got big clubs out there, we'll be a minnow in

20  a shark's pond, so I wasn't going to be sitting and fighting

21  nobody and doing nothing.  I got eight kids of my own, I don't

22  need to be doing all that.

23     Q.   What did Professor tell you specifically about one

24  percent?

25     A.   They were talking with Ed and he was talking with Ed

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2       and Filly.

3            Q.   Okay.  I'm going to stop you there.  He was talking to

4       Ed and Filly, who was he?

5            A.   Professor.

6            Q.   Was speaking to who?

7            A.   Special Ed and Filly.

8            Q.   And who is Filly?

9            A.   Another club member.

10           Q.   And did Filly have any rank?

11           A.   No.

12           Q.   And what club?

13           A.   In Riverside.

14           Q.   New York?

15           A.   Yes.

16           Q.   Okay.

17           A.   And they were coming up with some one percent patch

18      they are going to get made and something, I don't know, I guess

19      it was all between Woody, Professor, Filly, Special Ed, Nine

20      and this other guy.  I can't think of his name, but just a few

21      of them like a whole party of west side.

22           Q.   Who did the Professor told you wanted to take the club

23      to the one percent?

24           A.   Professor?

25           Q.   Yes.

834

```
 1              USA VS. D. PIRK, A. JENKINS & T. ENIX
 2      A.   Okay.  Sorry, Special Ed, Tony -- or not Special Ed.
 3   He talked to Pirk, Dave Pirk that, is where they were getting
 4   their little --
 5      Q.   I'm going to stop.  There is a lot of he's, I'm going
 6   to break it down.
 7      A.   I'm sorry.
 8      Q.   We're speaking with whom, who in the backyard?
 9      A.   Professor.
10      Q.   And was Professor relaying a conversation he had had to
11   you?
12      A.   Yes.
13      Q.   Who was Professor speaking to?
14      A.   Special Ed.
15      Q.   What was the nature of that conversation?
16      A.   About going one percent and Special Ed and then Woody
17   and Pirk were and West Side was talking about going one
18   percent.
19      Q.   Okay.  And by Pirk you mean Defendant Pirk?
20      A.   Yes.
21      Q.   When Professor told you this information, how did you
22   react?
23      A.   I don't want no part of it.  That's not me.  I didn't
24   join the club.  I joined the club to ride and have cookouts and
25   not fight everybody and worry about another club.
```

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2        Q.    Did you pass this information onto anybody?

3        A.    I passed it out a couple of my buddies in the club.

4        Q.    Who?

5        A.    I passed it out to Rick.  He was my vice president and

6    there was Chef.

7        Q.    Chef?

8        A.    Yes.

9        Q.    Was he back in the club by this point?

10       A.    Yes.

11       Q.    When you were relaying this information to your vice

12   president and to Chef, did you give any indication about what

13   would happen to Lockport if they did go to one percent?

14       A.    No.

15       Q.    How long after this discussion at bike week in 2013,

16   did Defendant Pirk become the national president?

17       A.    In a matter of, I would say, a few months after I got

18   back home.

19       Q.    And while you at bike week in 2013, did you have a

20   chance to observe Defendant Pirk speaking to anybody?

21       A.    No, I don't understand the question.

22       Q.    Did you notice any private conversations while you were

23   there?

24       A.    I noticed people he was talking to.

25       Q.    Who was he speaking to?

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2        A.    Woody, Special Ed, West Side Larry and Professor and

3   Flip.

4        Q.    And Flip?

5        A.    Yes.

6        Q.    Was there anything -- why do you remember those

7   conversations why do you remember, who he was talking to?

8        A.    When we used to go to bike week, it was like a big

9   family thing, but they were too quiet and too hushy hush seemed

10  like something was wrong.

11       Q.    What do you mean hushy hush?

12       A.    They had their own little pow wows in the corner.

13       Q.    And who was that having the pow wows in the corner?

14       A.    Pirk, West Side Larry, Special Ed, Woody.

15       Q.    Did you feel like you were being excluded from the

16  group?

17       A.    Outcast, so did quite a few other people.

18       Q.    So having this feeling, did you decide to leave the

19  Volusia County clubhouse?

20       A.    Yeah, we took off for a ride.

21       Q.    And where did you go?

22       A.    We went to, I believe it was a swap meet down the road

23  and so we just wanted to get out of there.  We didn't feel like

24  we were welcome.

25       Q.    Was Skeet Spry there at bike week in 2013?

1                   USA VS. D. PIRK, A. JENKINS & T. ENIX

2        A.   I believe he was.  He showed up one time.  He didn't

3   stay long.  He was like in and out.

4        Q.   And was that unusual based on past interactions with

5   Skeet Spry?

6        A.   Yes.

7        Q.   How so?

8        A.   Skeet would stay there when he knew us guys were coming

9   down he would stay and have a few drinks, even though he is 76

10  years old and he would stay and have drinks and he loved seeing

11  us guys come down.  He just wasn't there.

12       Q.   Was Skeet Spry based out of Florida?

13       A.   That is where he lived.

14       Q.   Is that where he ran the club from?

15       A.   Yes.

16       Q.   Now, you mentioned being at Deland or the Lake

17  clubhouse and meeting Defendant Jenkins?

18       A.   Yes.

19       Q.   Can you tell the members of the jury a little bit about

20  that?

21       A.   He was the Sergeant-of-Arms at that time and that is

22  where we took our ride and me and Tony and my girlfriend and

23  Trucker took a ride down there and then we started drinking and

24  found out one of the other club members in Buffalo who died, so

25  we started drinking pretty heavy.

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2        Q.   And can you describe the general tone of your

3    conversations with Little Bear?

4                MR. COVERT:  I object.  I don't think this falls

5    in any exception.

6                THE COURT:  You're going to --

7                MS. SHELVEY:  I can rephrase.

8        Q.   Did you enjoy spending your time with Little Bear?

9        A.   He smiled.  He smiled and watched a lot of things.  I

10   can say it that way.  He was more of a loner.

11       Q.   And was that the first time you had met him?

12       A.   Yes.

13               MS. SHELVEY:  Your Honor, given the time, I think.

14               THE COURT:  All right.  Thanks, Ms. Shelvey.  Mr.

15   Schultz, you can step down and you are going to have to come

16   back tomorrow.  So why don't you, Agent Mango, can escort you

17   out of the courtroom.

18               THE WITNESS:  I can't do Thursday.

19               THE COURT:  So, ladies and gentlemen, let me give

20   you an update on our schedule.  As you know, we're going to be

21   half days the rest of this week.  In other words, 9 to 1:30,

22   Monday we're off, Tuesday full days, starting at 9:30, going to

23   five and half days, the rest of that week and I have the full

24   days then that we're going to be meeting for the remainder of

25   March and it could be that we're going to continue with this

1            USA VS. D. PIRK, A. JENKINS & T. ENIX

2       type of schedule into April, I'm going to have to kind of see

3       where things stand with how we're doing with the evidence.  But

4       so for the week of March 12th, the plan will be to have a full

5       day on Tuesday, March 13th and Friday, March 16th, half days

6       Monday, Wednesday, Thursday full days that week Tuesday and

7       Friday.  The following week the plan is to have a full day on

8       Monday, March 19th and a full day on Wednesday March 21st.

9       Half days Tuesday, Thursday, Friday that week and then the last

10      week of March.  We'll have a full day on Monday, March 26th,

11      and a full day on Thursday, March 29th.  So just to go recap.

12      The full days starting the week of March 12th will be March

13      13th, 16th and 19th and 21 and 26 and 29, which again means 9

14      to 5 and we'll take an hour lunch break around 12:30 or so and

15      we'll have a break in the morning and the afternoon and then.

16                 JUROR:  Nine to 5 or 9:30.

17                 THE COURT:  9 to 5.  The only day we're starting

18      at 9:30 is Tuesday, March 6th, but every other day we're

19      starting at 9.  And half days we stop at 1:30 without a lunch

20      break.  Full days we stop at 5 with an hour lunch break.  And

21      trust me, I'll keep telling you as the dates approach, but that

22      way you have the information.  So, plan to be here again at

23      quarter of nine tomorrow and my goal is for us to start on time

24      at 9 o'clock.  I want to thank you for your attention and

25      patience.  And I want to remind you of my admonitions before

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX
2       you go.  And that is:  Please do not discuss the case among
3       yourselves or with anyone else.  In fairness to both sides, you
4       should keep an open mind throughout this trial reaching your
5       conclusion only during your final deliberations.  And this
6       includes discussing anything orally as well as discussing it by
7       social media.  If anyone does try to talk to you about the case
8       or does anything else that you think is not proper, then you
9       should, of course, immediately walk away.  However, you need to
10      let me know about that right away and you can do that by
11      letting our courtroom deputy or one of the court security
12      officers know.  You should not seek advice from anybody else
13      including another juror, though.  If you feel that there is a
14      reason that you need to bring something to my attention.
15      Please do not do any research about this case, do any
16      investigation about the case.  In other words, you're to decide
17      this case based solely on the evidence that comes in in this
18      courtroom through witness testimony, documentary evidence, not
19      based on anything you learn from outside this courtroom.  In
20      addition, do not talk to any of the attorneys, any of the
21      parties or any of the witnesses, even to pass the time of day.
22      That is absolutely critical for us all to be assured of the
23      absolute impartiality everyone is entitled to expect from you
24      as jurors.  And as I said before, these courtrooms are open
25      courtrooms.  That means anyone can come in and watch the

1                USA VS. D. PIRK, A. JENKINS & T. ENIX

2    proceedings, including the media.  So you need to avoid any

3    media accounts about this case.  And even if, inadvertently,

4    you happen to hear, read, see something, you need to let me

5    know about that.  So, again, thank you very much for your time

6    and patience.  I hope you have a wonderful afternoon.  I think

7    it's still a sunny day out there.  Hopefully you enjoy some of

8    that and we'll see you tomorrow morning.  Thanks, everyone.

9                (Whereupon, the jury is escorted from the

10   courtroom.)

11               Have a seat, everyone.  We'll wait for the jury to

12   leave.  Let's talk about witnesses before Mr. Schultz, he'll be

13   a while between continued, direct and cross.

14               MR. TRIPI:  We have Lee Bolsover, Eric Gampp, an

15   EMT.  The people that I cut loose today during Mr. Schultz's

16   testimony included Eric Gampp, an EMT, Lee Bolsover, North

17   Tonawanda Police, one of the officers that responded to the

18   scene and Sean Campas who will probably follow immediately

19   after Mr. Schultz's testimony.

20               MR. COVERT:  Campas first?

21               MR. TRIPI:  Mostly likely.

22               THE COURT:  In other words, Campas, Gampp and

23   Bolsover.

24               MR. TRIPI:  Yeah, they were in the hallway waiting

25   to go next and we'll recall them to come back tomorrow after

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX
2       Mr. Schultz is done.  I was a little -- I don't know how long
3       cross will be with Mr. Schultz, but I was a little reluctant to
4       schedule Todd Faddoul, who is the crime scene guy.  Just
5       because he has been here for a couple of days later and hasn't
6       hit the stand.
7                    THE COURT:  You're estimating that you have at
8       least another 45 minutes on direct?
9                    MS. SHELVEY:  I think that is accurate, your
10      Honor.  About 45 minutes.
11                   THE COURT:  We have a ballpark area as to the
12      length of the cross?
13                   MR. EASTON:  It will be the longest cross so far
14      for Mr. Pirk and I think other teams will be crossing him as
15      well.
16                   THE COURT:  You agree with that, Mr. Covert?
17                   MR. COVERT:  Yeah.  I don't know.  We certainly
18      are not going to want to duplicate.  The more the Pirk team
19      does, the less that we will likely do.  But I do anticipate 20
20      minutes, 25 minutes, really just depends.
21                   THE COURT:  I would imagine a reasonable estimate
22      is that he is not going to get off the stand when all is said
23      and done until 11:30 or later probably.
24                   MR. TRIPI:  So I guess my thought is if everybody
25      thinks this is reasonable is to have Campas, Bolsover and Gampp

1                    USA VS. D. PIRK, A. JENKINS & T. ENIX

2    here to follow Mr. Schultz, and I guess the question I had

3    originally slotted Faddoul and Gilmore for tomorrow, am I safe

4    to push them to Thursday because I think those will be

5    lengthier witnesses.  The plan would be finish Schultz and have

6    sort of three shorter witnesses tomorrow and then Faddoul and

7    Gilmore tomorrow and push back everybody else to Friday.  Does

8    that make sense?

9                    THE COURT:  That works fine with me.

10                   MR. COVERT:  Fine with me.

11                   THE COURT:  Does that make sense?

12                   MR. TRIPI:  That is what I'll do scheduling wise.

13                   MR. COVERT:  I'm confused.  Did we include Faddoul

14   for tomorrow?

15                   MR. TRIPI:  No.

16                   THE COURT:  Campas.

17                   MR. COVERT:  Have Campas, Gampp and Bolsover and

18   Gilmore and Faddoul in that order you think.

19                   MR. TRIPI:  Yes.

20                   THE COURT:  Campas and Gampp and Bolsover

21   tomorrow.

22                   MR. TRIPI:  Yes, to follow Mr. Schultz.

23                   THE COURT:  And then on Thursday, Faddoul and

24   Gilmore.

25                   MR. TRIPI:  I think that would fill that up.

1              USA VS. D. PIRK, A. JENKINS & T. ENIX

2              THE COURT:  That is fine.  We also have slotted,

3    we're going to have legal arguments after tomorrow's court

4    anyways that will work out fine.  Okay.  Anything I don't think

5    we need to deal with any legal issues that I'm aware of, Mr.

6    Tripi?

7              MR. TRIPI:  No, your Honor.

8              THE COURT:  Mr. Easton, anything we need to talk

9    about before we break?

10             MR. EASTON:  No, just could there be a directive

11   that the communication between the agents and Mr. Schultz be

12   not of substantive nature overnight, that they don't speak to

13   him about his testimony.

14             THE COURT:  I don't typically issue that directive

15   I know the U.S. Attorney's Office' practice is, I think to

16   follow that but at least the AUSA in Rochester to do.

17             MR. TRIPI:  We don't plan to get into anything

18   substantive I think we're permitted to while we're still on

19   direct.

20             THE COURT:  I don't typically do that and because

21   my view is it's safe, it's an area of cross examination if, in

22   fact, he has had substantive discussions with the government

23   between one day and the next.  So, anything else, Mr. Easton?

24             MR. EASTON:  No, your Honor.

25             THE COURT:  Mr. Covert.

1

2                    MR. COVERT:  No, your Honor.

3                    THE COURT:  Mr. Connors or Mr. Grable?

4                    MR. GRABLE:  No.

5                    THE COURT:  Have a good afternoon, everyone.

6                              *   *   *

7                    CERTIFICATE OF REPORTER

8

9        I certify that the foregoing is a correct transcript of the

10       record of proceedings in the above-entitled matter.

11

12       S/ Karen J. Bush,  RPR

13
         Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25