UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

v.

TIMOTHY ENIX, a/k/a Blaze,

Defendant.

**DECISION AND ORDER**

1:15-CR-00142 EAW

Defendant Timothy Enix ("Defendant") was convicted after a jury trial of Counts 1, 2, 8 and 9 of the Redacted Indictment, charging criminal acts in connection with the operation of the Kingsmen Motorcycle Club ("KMC"). (Dkt. 1258). Subsequently, the Court granted Defendant's Rule 29 motion directed to Count 2 charging a violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2, based upon the Supreme Court's decision in *United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319 (2019). (Dkt. 1775). As a result, Defendant stands convicted of the following three counts charged in the Redacted Indictment:

| Count 1 | Conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d); |
| Count 8 | Using and Maintaining Premises for Drug Dealing in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and, |
| Count 9 | Possession of Firearms in Furtherance of Count 8 in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 2. |

(Dkt. 1257). Sentencing is scheduled for August 27, 2019. This Decision and Order addresses various objections filed in connection with the presentence investigation reports.

- 1 -

## I.    THE PRESENTENCE INVESTIGATION REPORTS ("PSRs")

The initial PSR was prepared on December 14, 2018. (Dkt. 1487). Thereafter, because of changes mandated as a result of the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, a revised PSR was issued on January 8, 2019. (Dkt. 1511). Defendant filed objections to that revised PSR on January 25, 2019. (Dkt. 1515). A revised PSR was then issued on February 7, 2019. (Dkt. 1525). On February 11, 2019, the Government filed objections to that PSR and responded to Defendant's objections. (Dkt. 1530).[1] On March 4, 2019, a revised PSR was issued. (Dkt. 1584). The Government adopted the statements in the revised PSR (Dkt. 1639), but Defendant filed additional objections (Dkt. 1642). A revised PSR was issued on April 9, 2019. (Dkt. 1690).

On April 13, 2019, the Court contacted counsel by email and advised that further information was needed to resolve the objections. Accordingly, without objection from either party, the sentencing scheduled for April 17, 2019, was converted into a status conference. (Dkt. 1697). At that conference the Court outlined its questions, set a deadline for any further written submissions, and scheduled oral argument for May 29, 2019. (Dkt. 1699). The Government filed its supplemental submission on May 6, 2019 (Dkt. 1707), and Defendant filed his supplemental submission on May 15, 2019 (Dkt. 1715; Dkt. 1716). Oral argument was held on May 29, 2019. (Dkt. 1721).

---

[1]    Defendant moved to strike the Government's objections. (Dkt. 1552). The Court denied the motion to strike but granted Defendant's alternative request to adjourn the sentencing scheduled for February 28, 2019. (Dkt. 1556). At a status conference conducted on that date, the Court set a further schedule for a revised PSR and sentencing submissions, and adjourned sentencing to April 17, 2019. (Dkt. 1577; Dkt. 1578).

On June 11, 2019, the Court held a status conference and announced how it intended to resolve Defendant's objections insofar as they impacted the Sentencing Guidelines calculations. (Dkt. 1737). The Court indicated that its reasoning would be subsequently set forth in further detail, but it announced its rulings so that a revised PSR could be prepared and a new sentencing date set. (*Id.*). A revised PSR was issued on June 21, 2019. (Dkt. 1740).

Then, on June 24, 2019, the Supreme Court issued its decision in *Davis*, prompting Defendant to file a motion for reconsideration of his Rule 29 motion directed to Count 2. (Dkt. 1742). The Government ultimately opted not to oppose the motion for reconsideration (Dkt. 1760), and the Court granted Defendant's Rule 29 motion directed to Count 2 (Dkt. 1775; *see* Dkt. 1777 (Judgment of Acquittal as to Count 2)). At a status conference conducted on July 24, 2019, the Court scheduled sentencing to proceed on August 27, 2019, and set a schedule for any further sentencing submissions. (Dkt. 1764; Dkt. 1765).

A revised PSR was filed on July 31, 2019 (Dkt. 1778), and both parties filed objections on August 12, 2019 (Dkt. 1789; Dkt. 1790). Although the Court provided the parties with an opportunity to file responses to those objections and any further sentencing submissions by August 19, 2019 (Dkt. 1764), neither party filed any further submissions. A final revised PSR ("the FINAL PSR") was filed on August 20, 2019. (Dkt. 1800).

## II.    STANDARD FOR RESOLVING OBJECTIONS

Pursuant to Federal Rule of Criminal Procedure 32, the Court must, prior to sentencing, "for any disputed portion of the presentence report or other controverted

matter . . . rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The Court is not required to "perform a line-by-line review of the PSR," so long as it "resolve[s] the substantive challenges" thereto. *United States v. Reiss*, 186 F.3d 149, 156-57 (2d Cir. 1999).

"At sentencing, disputed factual allegations must be proven by the government by a preponderance of the evidence. . . ." *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003). However, sentencing proceedings are not "second trials," *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979), and the sentencing court may use hearsay statements in determining the sentence, *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987); *see United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) ("The sentencing court's discretion is 'largely unlimited either as to the kind of information he may consider, or the source from which it may come.' Any information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." (citation omitted) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972))).

## III.   SUMMARY OF OBJECTIONS

Defendant's outstanding objections that have not been resolved by the filing of revised PSRs can be summarized as follows:

1.     Defendant objects to the inclusion of various predicate acts within the scope of his relevant conduct for calculating the applicable offense level for his conviction on the RICO conspiracy charged in Count 1 (Dkt. 1515 at 3-12), including the murders on

- 4 -

September 6, 2014, of Paul Maue ("Maue") and Daniel "DJ" Szymanski ("Szymanski") (*id.*; *see also* Dkt. 1716), and correspondingly, Defendant objects to attributing between 60 and 80 kilograms of converted drug weight to him (Dkt. 1790 at 15-17, 25-27; *see also* Dkt. 1515 at 21-23);

2.      Defendant objects to a 2-level adjustment for obstruction of justice under U.S.S.G. § 3C1.1 (Dkt. 1515 at 10-17; *see also* Dkt. 1790 at 20-25), and relatedly, he objects to the grouping of the predicate acts involving obstruction of justice and applying the 2-level adjustment under § 3C1.1 to an underlying predicate act involving obstruction of justice (Dkt. 1790 at 28-32);

3.      Defendant objects to a 4-level aggravating role adjustment under U.S.S.G. § 3B1.1(a), instead contending that he is entitled to a mitigating role adjustment pursuant to § 3B1.2 (Dkt. 1642 at 3-10); and,

4.      Defendant objects to various factual assertions contained in the FINAL PSR (*see* Dkt. 1790).[2]

The Government's outstanding objections that have <u>not</u> been resolved by the filing of revised PSRs can be summarized as follows:

---

[2]      Throughout his filings, Defendant has asserted objections to factual statements contained in the PSRs. In order to clarify which of those objections remained unresolved, the Court requested that Defendant file a submission summarizing the outstanding issues. Defendant filed the submission on August 12, 2019 (Dkt. 1790), and addressed the statements set forth in the revised PSR filed on July 31, 2019 (Dkt. 1778). Thereafter, the FINAL PSR was filed on August 20, 2019. (Dkt. 1800). Since the FINAL PSR did not change the paragraph numbers or factual statements to which Defendant's objections pertained, the Court will address the outstanding factual objections in view of the FINAL PSR.

1.     The Government objects to the drug weight attributable to Defendant, contending that he should be held responsible for the same converted drug weight as co-defendant David Pirk ("Pirk") (*i.e.*, at least 700 but less than 1,000 kilograms of converted drug weight, involving the entire conspiracy) (Dkt. 1530 at 1); and,

2.     The Government objects to the extent that Defendant's offense level does not account for the predicate acts involving the murders of Maue and Szymanski and "other acts of violence committed by others in the enterprise" (Dkt. 1789).

## IV.    § 1B1.3 RELEVANT CONDUCT

The Sentencing Guidelines set the base offense level for a RICO conviction as 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(2). As noted in the FINAL PSR, Defendant was initially held accountable for 23 predicate acts as part of Count 1. (Dkt. 1800 at 31, 58). However, at the status conference on June 11, 2019, the Court advised that it intended to calculate Defendant's offense level based on 13 of the 23 predicate acts: the predicate acts involving obstruction of justice and witness tampering related to a cover-up of the Maue and Szymanski murders; the predicate acts related to the drug trafficking; the predicate act related to the false income tax returns; the predicate act related to the possession and distribution of untaxed cigarettes; and the predicate act related to the conspiracy or solicitation to commit murder of the Pagans Motorcycle Club ("the Pagans"). The Court concluded that it would not calculate Defendant's offense level based on the predicate acts involving the murders of Maue and Szymanski, the robbery of the Springville chapter clubhouse in June 2013, the conspiracy to murder Filip Caruso ("Caruso"), the drive-by shooting at the Springville chapter

- 6 -

clubhouse in August 2013, and other violent assaults occurring prior to the murders of Maue and Szymanski.[3]

## A.    **Meaning of Relevant Conduct**

U.S.S.G. § 1B1.3(a)(1)(B) defines "relevant conduct" in the case of jointly undertaken criminal activity to include "all acts and omissions of others" occurring during the offense of conviction that meet the following criteria: (1) the acts were within the scope of the jointly undertaken criminal activity; (2) the acts were taken in furtherance of that criminal activity; and (3) the acts were reasonably foreseeable in connection with that criminal activity. The Government takes the position that as long as Defendant agreed to conduct the affairs of the KMC through a pattern of racketeering activity that included the type of predicate act at issue, then any such acts committed by other members of the conspiracy are necessarily within the scope of the jointly undertaken activity and may be properly attributable to Defendant for sentencing purposes (so long as they were in furtherance of the criminal activity and reasonably foreseeable). (Dkt. 1707 at 2-3). In other words, according to the Government, because the jury found that Defendant agreed to commit acts involving murder in relation to the Pagans in Florida, "then the scope of the jointly undertaken criminal activity necessarily includes acts involving murder substantively committed by co-defendants David Pirk, Andre Jenkins, and others for the

---

[3]    The assault of KMC member Roger Albright in or around December 2014, occurred after the murders and therefore could have potentially been related to the cover-up of the murders. However, the Government agreed not to argue that Defendant should be held responsible for this assault because further factual findings may have been necessary, and it had no practical impact on the offense level calculation. (Dkt. 1737 at 13).

murders of Paul Maue and Daniel Szymanski." (*Id.* at 3). In contrast, Defendant contends that a "general agreement to a category of offense does not pull any and all acts that fall within that category of offense into the scope of a defendant's relevant conduct." (Dkt. 1715 at 13). Instead, according to Defendant, "particular acts (and not more broadly general categories of conduct) must be within the scope of that defendant's agreement, and the particular acts must have been in furtherance of the jointly undertaken criminal activity and reasonably foreseeable to the defendant." (*Id.* at 13 (footnote omitted)).

"It is well established that a district court may consider the relevant conduct of co-conspirators when sentencing a defendant." *United States v. Johnson*, 378 F.3d 230, 238 (2d Cir. 2004) (holding that mere knowledge of murder committed by co-conspirator not within scope of defendant's relevant conduct, even where it was within scope of overall operation; murder must be within scope of specific conduct and objectives agreed to by defendant). However, "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Getto*, 729 F.3d 221, 234 n.11 (2d Cir. 2013) (quoting *United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991)). "This is because 'the emphasis in substantive conspiracy liability is the scope of the *entire conspiracy*,' while 'the emphasis under the Guidelines is the scope of the *individual defendant's* undertaking.'" *United States v. Rigo*, 13 Cr. 897 (RWS), 2017 WL 213064, at *3 (S.D.N.Y. Jan. 17, 2017) (alteration omitted) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008)); *see* U.S.S.G. § 1B1.3 Application Note 1 ("The principles and limits of sentencing accountability under this guideline are not always the same as the

principles and limits of criminal liability."). "Moreover, 'when the Guidelines allow for punishment of relevant conduct as though it were convicted conduct, the sentencing court has a special obligation to ensure that the evidence of relevant conduct is solid.'" *United States v. Johnson*, No. 98-CR-420 (JG), 2012 WL 4815695, at *4 (E.D.N.Y. Oct. 10, 2012) (alteration omitted) (quoting *United States v. Archer*, 671 F.3d 149, 165 (2d Cir. 2011)).

In the Second Circuit, in order to hold a defendant liable at the sentencing phase for the relevant conduct of a co-conspirator, a district court is required to make two particularized findings: (1) the Court must find that "the scope of the activity to which the defendant agreed was sufficiently broad to include the relevant, co-conspirator conduct in question"; and (2) the Court must also conclude that "the relevant conduct on the part of the co-conspirator was foreseeable to the defendant." *Johnson*, 378 F.3d at 236 (alteration, citation, and quotations omitted).[4] These two findings are referred to as the "*Studley* prongs*," based upon *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

With respect to the first *Studley* prong, it is not sufficient for a court to find that a defendant had knowledge of a co-conspirator's criminal acts, nor is it sufficient for a court to find that a defendant was "aware of the scope of the overall operation and therefore should be held accountable for the activities of the whole operation." *Johnson*, 378 F.3d

---

[4]     The Court recognizes that *Johnson* was not a RICO conspiracy case, and at least one of the out-of-circuit cases relied on by the Government distinguishes *Johnson* on that basis. *See United States v. McKeoun*, Criminal No. 11-20129, Criminal No. 11-20066, 2018 WL 3956491, at *4 (E.D. Mich. Aug. 17, 2018). However, whether a co-conspirator's actions fall within the scope of a defendant's relevant conduct for Guidelines purposes is different than the inquiry for criminal liability. In other words, it is the scope of a defendant's agreement that influences the relevant conduct determination, not the underlying statute that serves as the basis for the charged conspiracy.

at 238 (quotations omitted). Rather, a court must make "a particularized finding" that the co-conspirator's act "was within the scope of the *specific* conduct and objectives embraced by the . . . agreement." *Id.* (alteration in original) (quotation omitted). As explained by Application Note 3(B), "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, App. Note 3(B). The Application Note instructs that a court may "consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* Moreover, even if an act of a co-conspirator was known or reasonably foreseeable to a defendant, if it was not within the scope of the defendant's agreement, then it cannot be considered relevant conduct. *Id.*

With respect to the second *Studley* prong, foreseeability requires more than just general knowledge about the use of violence in other circumstances. *Johnson*, 378 F.3d at 236 n.8, 239. There must be a "closer link." *Id.* at 239.

### B. The Murders

Based upon these principles, the Court disagrees with the Government that simply agreeing to a general category of racketeering activity (such as murder) can cause all such acts undertaken by co-conspirators to fall within the scope of a defendant's relevant conduct. There is no question that Defendant agreed to engage in acts involving solicitation and conspiracy to commit murder related to the Pagans in Florida in or around January 2014. He engaged in these acts personally, and he did so to promote and protect the KMC. However, based upon the Second Circuit's decision in *Johnson*, more is needed in order to

find co-conspirators' other acts involving murder at a different time and place as falling within the scope of Defendant's relevant conduct.

As an initial matter, the Court agrees with the Government that the preponderance of the evidence at trial established that Defendant was a knowing participant in the ruse to put co-defendant Andre Jenkins ("Jenkins") out of the club, but "not out bad," so that he could travel to New York and infiltrate the Nickel City Nomads to investigate KMC members who were "jumping patch" and leaking information.[5] Indeed, that fact was established beyond a reasonable doubt.

However, it was not as clear that Defendant agreed that the plan would involve murdering "the leakers," including Caruso. Defendant communicated his desire to inflict harm (even death) on Caruso after the murders—even revealing so much to the FBI in December 2014. However, Defendant was not physically present in Tennessee with Jenkins and Pirk, where they organized their trip to New York. Moreover, while Timothy Haley testified as to statements Pirk made in Florida after the altercation at the South Buffalo clubhouse in August 2014, expressing his intent to kill Caruso, he equivocated as to whether Defendant was present during Pirk's statements. It is not implausible to believe that Defendant—given his role in the organization and relationship with Pirk—was privy to the full scope of the plans. Likewise, Defendant orchestrated Jenkins' transfer to the Tennessee chapter and then publication of the communication that Jenkins had been put

---

[5]     On August 31, 2014, right after talking to Pirk by telephone and while on vacation, Defendant posted a message to the KMC Facebook private group page stating that "Little Bear" (*i.e.*, Jenkins) was out of the club for owing dues and not having a working motorcycle, but he was "not out bad."

out of the club (a key part of the plan). Similarly, Defendant was in contact with Pirk's burner phone during this time period.

It is a very close call as to whether Defendant's agreement to murder Caruso or any other leakers can be inferred from the credible evidence. The Court's best assessment is that the evidence is evenly balanced on the issue, but it does not tip in favor of a finding that murdering the leakers was within the scope of the specific conduct and objectives embraced by Defendant's agreement.

Additionally, the evidence suggested that the plan to murder Maue and Szymanski more fully evolved during the course of Jenkins' and Pirk's operation into New York to discover the leakers. If, in fact, murdering Caruso or other leakers was within the scope of Defendant's agreement, then the murders of Maue and Szymanski would have fallen within the scope of Defendant's agreement. In other words, if a defendant agrees to a mission to commit murder of a particular individual (or type of individual, *i.e.*, "the leakers"), and during the course of that mission other individuals are murdered consistent with the objectives of that mission, then the first *Studley* prong is satisfied. However, because the Court has determined that the Government did not establish by a preponderance of the evidence that murdering Caruso and the leakers was within the scope of Defendant's agreement, the Court similarly concludes that the murders of Maue and Szymanski were not within the scope of Defendant's agreement.

To be clear, the murders of Maue and Szymanski were certainly foreseeable to Defendant—one cannot engage in the type of violent activity with rival motorcycle gangs being perpetrated by the KMC and with which Defendant was personally involved, and

then be surprised that individuals are murdered. The KMC's conduct was risky, dangerous, and threatening, and the murders of Maue and Szymanski were foreseeable. However, the Court is not able to make particularized findings that Defendant participated in an agreement to murder Maue and Szymanski, or that he planned for the murder of Caruso prior to September 6, 2014. As a result, those predicate acts will not be included within Defendant's relevant conduct for purposes of the Sentencing Guidelines calculation.

Thus, while Defendant agreed to plans involving murder as part of his activities related to the KMC (*i.e.*, the Pagans in Florida in January 2014), and while Defendant agreed to help Jenkins travel to New York in September 2014, under false pretenses to infiltrate the Nickel City Nomads, the Court concludes that Defendant's offense level should not be calculated based upon the predicate acts involving the murders of Maue and Szymanski, or the conspiracy to murder Caruso.

### C.  Other Violent Acts Unrelated to Obstruction of Justice

For similar reasons, the Court concludes that Defendant's offense level should not be calculated based upon the robbery and drive-by shooting related to the Springville chapter clubhouse in 2013, and the other similar violent assaults occurring in the New York area prior to the murders of Maue and Szymanski. The evidence does not support the conclusion that Defendant specifically agreed to the conduct of these activities or activities that are similar enough so as to support a finding by a preponderance of the evidence of an implicit agreement that could be inferred from conduct.

### D.  The Pagans and Drug Trafficking

The jury concluded that Defendant was responsible for the conspiracy/solicitation of murder related to the Pagans, as well as the activities related to drug trafficking. Moreover, the evidence plainly supports the conclusion that the conspiracy/solicitation of murder related to the Pagans falls within the scope of Defendant's relevant conduct—he personally engaged in the activity. Similarly, with respect to the drug trafficking, notwithstanding Defendant's claims of being "anti-drug," the Government established beyond a reasonable doubt that Defendant aided and abetted the maintenance of the South Buffalo chapter clubhouse for the purpose of drug trafficking. Drugs permeated the culture and operation of the KMC, as established by the trial evidence. Defendant's claims of being "anti-drug" ring hollow in the face of the significant evidence of KMC members' drug use and trafficking.

With respect to Defendant's objection to the drug quantity, a finding of at least 60 but less than 80 kilograms of converted drug weight is well supported by not only the evidence at trial, but also by the admissions of other KMC members in their plea agreements in this case and the related case (Case No. 1:17-CR-00189). While the Court acknowledges that there is some merit to the Government's objection that Defendant should be held responsible for a drug quantity similar to that calculated for Pirk, the Court will accept the more conservative amount of at least 60 but less than 80 kilograms as calculated by the FINAL PSR.

### E.    Obstruction of Justice and Witness Tampering Related to Murders

Although the Court cannot conclude that the preponderance of the evidence supports a finding that the murders of Maue and Szymanski were within the scope of the specific conduct and objectives embraced by Defendant's agreement, the same cannot be said of the subsequent efforts to obstruct justice and cover up those murders—Defendant played a critical role in those efforts.

First, there was evidence that Defendant specifically instructed KMC members not to cooperate with law enforcement in their efforts to investigate the murders. For example, Mike Long testified that Defendant told him after the murders not to say anything to law enforcement about the murders or Jenkins borrowing the motorcycle from Tennessee. Similarly, Defendant's Facebook postings demonstrate his instructions to KMC members to stay quiet and not talk to law enforcement.

Second, Defendant's own conversations with law enforcement depict his efforts to obfuscate and mislead agents investigating the murders, incredibly telling the FBI in December 2014, that Caruso should be the focus of their efforts when, at that point, Defendant knew that Jenkins was responsible for the murders. Likewise, Defendant failed to share with the FBI relevant key facts that would have been pertinent to the investigation, such as contact information for "Drifter" and the fact that "Rebel" had witnessed Jenkins fleeing the scene of the murders.

Third, the evidence at trial established that after the murders, the KMC members consistently closed ranks, demonstrating that their allegiance to the KMC was stronger than any desire to obey the law or bring those responsible for the murders to justice. Defendant

was no exception—indeed, he played a key role through his Facebook communications in maintaining that silence and secrecy among club members.

Defendant argues that because there was no specific proof that he engaged in the specific obstruction of justice or witness tampering acts that are set forth in the FINAL PSR, then those predicate acts cannot be included as relevant conduct for his offense level calculation. In other words, Defendant contends that there was no proof that he personally threatened a witness or expressly told a witness to testify falsely before the grand jury. Defendant's argument construes the *Johnson/Studley* standard too narrowly. Defendant's conduct plainly demonstrates at least an implicit agreement—if not an explicit agreement—to ensure that justice was obstructed and witnesses were tampered with in connection with the murder investigation. The KMC went to great lengths to thwart law enforcement's investigative efforts, and Defendant played an integral and lead role with respect to those efforts—issuing instructions to KMC members from Florida to New York as to how they should behave in the face of questions from law enforcement. While Defendant may not have personally threatened a witness, his co-conspirators' witness tampering and other obstruction efforts were within the scope of the specific conduct and objectives embraced by Defendant's agreement. Moreover, all of the obstruction and witness tampering predicate acts contained in the FINAL PSR—all of which related to the cover up of the murders—were reasonably foreseeable to Defendant. Accordingly, the Court concludes that these predicate acts are appropriately included within the scope of Defendant's relevant conduct for Guidelines purposes.

### F. Income Tax Returns and Untaxed Cigarettes

Defendant's objections to the inclusion of the filing of false income tax returns and selling untaxed cigarettes are without merit. The evidence at trial established that after the murders, in an attempt to make the KMC seem legitimate, Defendant arranged for the organization to file tax returns. However, in reporting income streams to the accountants who were hired, Defendant failed to report the actual income that was received by the organization. Moreover, Defendant's attempt to deny knowledge of the sales of untaxed cigarettes within the New York clubhouses—even though he smoked cigarettes and was intimately involved with monitoring the clubhouses' activities—is baseless. The preponderance of the evidence established that the false income tax returns and sales of untaxed cigarettes were within the scope of Defendant's agreement and these acts were foreseeable. Thus, they fall within the scope of his relevant conduct.

### G. Relevant Conduct Versus § 3553(a) Factors

Finally, the Court clarifies that although it has concluded that Defendant's relevant conduct pursuant to § 1B1.3 does not include the murders of Maue and Szymanski, or the conspiracy to murder Caruso and some of the other predicate acts involving violent conduct, this does not mean that the Court may not consider those events in connection with its sentencing of Defendant. "[W]hen a sentencing court turns from calculating a guideline range to determining a sentence, it may consider any information 'concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'" *United States v. Escobar*, 542 F. App'x 38, 40 (2d Cir. 2013) (quoting *United*

*States v. Broxmeyer*, 699 F.3d 265, 268 (2d Cir. 2012) and 18 U.S.C. § 3661). At sentencing, a court <u>must</u> consider, among various factors, "the nature and circumstances of *the offense*" and "the need for the sentence imposed . . . to reflect the seriousness of *the offense*. . . ." 18 U.S.C. § 3553(a)(1) & (2)(A) (emphasis added).

The *offense* that Defendant stands convicted of is not each separate predicate act that constituted the racketeering activity, but rather a RICO conspiracy involving a violent motorcycle gang. That RICO conspiracy led to the murders of Maue and Szymanski, as well as other violent acts. While the Court cannot conclude that those murders were specifically within the scope of Defendant's relevant conduct under § 1B1.3 pursuant to the standard set forth in *Johnson*, the murders and other violent activities are relevant to Defendant's sentencing as among the various considerations the Court must evaluate pursuant to 18 U.S.C. § 3553(a). *See United States v. Wernick*, 691 F.3d 108, 119 (2d Cir. 2012) ("Our conclusion that Wernick's acts against young children are not technically 'relevant conduct' to the specific offense charged in Count Five does not imply that those acts are not highly relevant (in a non-technical sense) to the district court's evaluation."); *see also United States v. Rhine*, 637 F.3d 525, 529 (5th Cir. 2011) (prior determination that defendant's involvement in a drug-trafficking ring was not "relevant conduct to the offense of conviction" did not prohibit the sentencing court from considering it "for a different purpose . . . as part of his 'history' under § 3553(a)(1)"); *United States v. Kulick*, 629 F.3d 165, 174 n.7 (3d Cir. 2010) (finding that extortion offense could be considered under a § 3553(a) analysis notwithstanding the fact that it was not relevant conduct under § 1B1.3(a)(2) because "conduct that is in some way related to the offense conduct need not

be technically covered by the definition of relevant conduct in order to be considered in a § 3553(a) analysis" (quotations omitted)); *United States v. Beasley*, 322 F. App'x 777, 778-79 (11th Cir. 2009) (§ 1B1.3 does not limit court's discretion to consider conduct that was outside the scope of relevant conduct, pursuant to 18 U.S.C. §§ 3553(a) and 3661); *United States v. Amedeo*, 487 F.3d 823, 830 (11th Cir. 2007) (even though district court could not impose a Guidelines departure based on acts that were beyond the scope of relevant conduct under § 1B1.3, the district court could impose a variance based upon those same facts consistent with 18 U.S.C. § 3553(a)).[6]

## V.  § 3C1.1 OBSTRUCTION ADJUSTMENT

The FINAL PSR provides for a 2-level adjustment to the offense level pursuant to § 3C1.1, which states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instance offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense by 2 levels.

U.S.S.G. § 3C1.1. According to Application Note 2:

---

[6]     As a result, the Court rejects Defendant's position that Mr. Szymanski's family members are not victims who may be heard at the time of sentencing. (Dkt. 1790 at 35-37). The RICO conspiracy was the direct and proximate cause of Mr. Szymanski's death. *See* 18 U.S.C. § 3771(e)(2)(A) (a victim is defined under the Crime Victims' Rights Act as "a person directly and proximately harmed as a result of the commission of a Federal offense"). Defendant stands convicted of that RICO conspiracy. Moreover, Defendant's obstruction of justice directly related to the murder investigation. Thus, while the actual murder may not be included within the scope of Defendant's relevant conduct for Guidelines purposes, the Court will allow the victims of that murder to be heard at the time of Defendant's sentencing.

This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

Examples of conduct covered by § 3C1.1 include "providing materially false information to a judge or magistrate judge." U.S.S.G. § 3C1.1 Application Note 4(F).

The FINAL PSR appropriately applies the adjustment pursuant to § 3C1.1 because Defendant committed perjury during his testimony at a detention hearing on July 18, 2016 (*see* Dkt. 242 (transcript of detention hearing testimony)), and then further committed perjury during his trial testimony on May 10 and 11, 2018 (*see* Dkt. 1572 (transcript of trial testimony)). A defendant commits perjury when he testifies under oath and "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). "[B]efore applying an obstruction enhancement based on perjury, the sentencing court must find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 194-95 (quotations omitted). "Although separate and clear findings on each element of perjury are preferred, a general finding of obstruction that tracks those factual predicates necessary to support a finding of perjury will suffice." *United States v. Shonubi*, 998 F.2d 84, 88 (2d Cir. 1993).

Here, the preponderance of the evidence establishes that Defendant committed perjury both at the detention hearing and at trial. This conclusion is not based simply on the fact that Defendant testified at trial and was disbelieved by the jury and convicted. Rather, Defendant willfully gave false testimony under oath concerning material matters. The Court agrees with the perjury findings contained in the FINAL PSR (Dkt. 1800 at ¶¶ 38-41), and it has set forth below additional findings concerning Defendant's perjury.

After the detention hearing on July 18, 2016, the Court granted Defendant's request for pretrial release on conditions, issuing a decision in which it concluded, among other things, that "based on Mr. Enix's demeanor on the witness stand and the substance of his testimony, both on direct and cross examination, Mr. Enix generally appeared to testify credibly." *United States v. Enix*, 209 F. Supp. 3d 557, 573 (W.D.N.Y. 2016). That assessment was wrong.

During Defendant's trial testimony, it became readily apparent that Defendant was testifying falsely <u>and</u> that he had testified falsely during his detention hearing. While it is difficult during the span of a multiple month trial to identify any single piece of evidence or event that was crucial to a conviction, in the Court's estimation the perjurious nature of Defendant's trial testimony was an important consideration for the jury in deciding to convict Defendant on all counts with which he was charged. Defendant's perjury permeated both his testimony at trial and the detention hearing. Indeed, Defendant was not able to provide truthful testimony concerning even innocuous matters—such as whether he drank alcohol. (Dkt. 1572 at 271).

A. **Perjury Examples**

    1.   The Pagans Incident

At both the detention hearing and trial, Defendant testified falsely regarding the Pagans incident. Ultimately, the jury rejected Defendant's version of events, finding that he had engaged in a solicitation and/or conspiracy to commit murder in connection with this incident.

At the detention hearing, Defendant avoided referencing the fact that it was Pirk who went inside the clubhouse to address the issues with the Pagans (Dkt. 242 at 278[7] (testifying that he went into the clubhouse with "another guy")); and Defendant falsely testified that "[t]here was no violence expected before, during or after" the meeting (*id.* at 279), even though he was carrying a firearm and the evidence at trial established that other KMC members who accompanied him to the meeting were heavily armed with plans to use their firearms if necessary.

At the trial, Defendant admitted that he was armed, but he incredibly denied seeing the "big street sweeper shotgun" possessed by co-defendant Sean McIndoo who had travelled to the Pagans clubhouse with Defendant. (Dkt. 1572 at 207). Similarly, Defendant denied staging at the gas station a block or two away in preparation for the meeting with the Pagans, even though the credible evidence at trial suggested this is exactly what occurred. (*Id.* at 207-08). Defendant persisted with his false denials of knowledge

---

[7]    Page references for cites to the detention hearing transcript are to the transcript page number as opposed to the CM/ECF generated page number.

of other guns being possessed by KMC members at the Pagans meeting, testifying as follows:

> Q     Now, so we're clear, there was other guns in the car or there was not, according to your testimony today?
>
> A     I had my gun on me. Are you talking other guns other than mine? I didn't see any other guns.
>
> Q     So you deny any planning of having other Kingsmen be armed. Is that your testimony?
>
> A     I never planned to have any other Kingsmen be armed.
>
> Q     You deny that—I'm not going to pull it out—you deny that street sweeper, big shotgun with an ammo drum, was present at all?
>
> A     I never seen it.
>
> Q     So you deny it was there then, true?
>
> A     Yes.

(*Id.* at 231). Yet, the evidence at trial overwhelmingly established that the KMC members who travelled to the Pagans meeting were fully armed and ready to use those firearms if the meeting with the Pagans did not go smoothly. Defendant was not only aware of this, he was intimately involved in the planning. Just by way of example, Mike Long credibly testified at trial that Defendant told him that they had a van loaded with guns during the Pagans incident, and Defendant had instructed the other KMC members to start shooting if they heard gunfire or did not return in a certain amount of time.

### 2. Contact with Tennessee

At the detention hearing, Defendant perjured himself in describing his role as part of the Tennessee KMC chapter, in an effort to minimize to the Court his leadership role

within the KMC and isolate his activity to only the state of Florida. (Dkt. 242 at 306-307; *see id.* at 380 (referring to Mike Long, Tennessee Chapter President: "I dealt with him very little. I did talk to him occasionally."); *id.* at 274-75 (testifying that the only place he had any authority was in Florida)).

However, at trial, Defendant conceded that he had authority in both Florida and Tennessee. (Dkt. 1572 at 196). Moreover, documentary evidence established that Defendant spoke to Mike Long three times on September 7, the day after the murders, and again on September 8, 9, and 11. (*Id.* at 329-30). During that same time, Defendant was in contact with Pirk's burner phone six times (between September 3 and 7). (*Id.* at 329). This information was particularly incriminating since Jenkins and Pirk staged their trip to New York to commit the murders from Tennessee, with Jenkins acquiring both the firearm and motorcycle that he used during the commission of the murders, and then Jenkins returned to Tennessee after the murders and was confronted by Mike Long and others.

In an attempt to distance himself from that incriminating evidence, Defendant testified at trial that he was in frequent contact with Mike Long right after the murders to simply discuss business matters because Defendant was the Southeast Regional President overseeing activities in Tennessee. (*Id.* at 330). Defendant denied that those contacts with Mike Long had anything to do with Jenkins or the murders that had just occurred. (*Id.*). That testimony was blatantly false and incredible. The egregious nature of this perjury is only compounded by the fact that during the detention hearing—when Defendant was attempting to obtain his release and distance himself from any involvement with

Tennessee—he testified that he rarely spoke to Mike Long and had no authority in Tennessee.

### 3. December 2014 FBI Interview

At the detention hearing, Defendant falsely testified that during the interview conducted by the FBI in December 2014, he "may have made one or two statements" but he "really didn't talk much." (Dkt. 242 at 326). In fact, the trial evidence established that Defendant's conduct during that interview represented his concerted effort with Pirk to attempt to mislead law enforcement concerning the murders.

At the time of the interview, Jenkins had already been arrested for the murders and it was well known within the organization that Jenkins was responsible for killing Maue and Szymanski—indeed, as Thomas Koszuta credibly testified at trial, Pirk told chapter presidents the day following the murders that Jenkins "did what he had to do." Likewise, Defendant admitted that within a day of the murders, he knew that "Rebel" had identified Jenkins fleeing from the scene of the murders. (Dkt. 1572 at 258). Yet, some three months after the murders, Defendant told the FBI agents that the person who was likely responsible was Caruso—a theory that defense counsel attempted to promote during the trial but the jury rightly rejected as Caruso was, in reality, a target. Defendant never bothered to reveal Rebel's identity to the FBI because, as Defendant testified at trial, it "just never occurred" to him. (*Id.* at 373).

To put the December 2014 FBI meeting in context, it is important to recognize that the trial evidence established that KMC members as a rule were not supposed to talk to law enforcement. Indeed, the evidence introduced at trial established that Defendant repeatedly

advised KMC members not to speak to law enforcement. Yet, Defendant and Pirk voluntarily met with FBI agents in December 2014, because, according to Defendant's trial testimony, he "wanted to help them, if I could." (Dkt. 1572 at 99). Nonetheless, Defendant failed to share key information with the FBI. Defendant's testimony at the detention hearing and trial about the purpose of his meeting with the FBI constituted perjury.

### 4. Description of the Role of Nomads

Defendant also committed perjury at the detention hearing in connection with his description of the role of a Nomad in the organization. (Dkt. 242 at 283-285). Similarly, Defendant committed perjury in his description of a Nomad at trial, even going so far as to suggest that they were somehow responsible for conducting "audits" of the clubhouses. (Dkt. 1572 at 129). As the trial evidence established, the Nomads were not recordkeepers or auditors—they were the enforcers of the KMC, who were expected to serve the interests of the KMC enterprise, including fighting other clubs and committing violent acts on behalf of the KMC.

### 5. Putting Jenkins Out

Defendant falsely testified about his Facebook posting on August 31, 2014, about putting Jenkins out of the club. Defendant's version of events was not credible based upon all the other evidence introduced during the trial. In other words, the credible evidence established that Defendant did not post the message because of problems Jenkins encountered with having an operational motorcycle (a problem others encountered with no repercussions). Rather, Pirk telephoned Defendant, who was on vacation, and Defendant immediately went onto Facebook and made the posting. This was part of the ruse to have

Jenkins infiltrate the Nickel City Nomads to root out the leakers, and the credible evidence established that Defendant was well aware of this ruse. It was not credible for Defendant to claim that he conveniently made this unusual decision to put Jenkins out of the club right before Jenkins travelled to New York undercover pretending he was no longer a KMC member. While Defendant may not have been aware of the plan to murder the leakers during Jenkins' undercover excursion, he certainly played a knowing role in facilitating Jenkins' ruse. Defendant's testimony to the contrary constituted perjury.

6. Drug Use

Defendant also perjured himself at trial in denying any familiarity with the rampant drug use within the KMC organization, including denying ever seeing drugs used within the South Buffalo clubhouse, the premises for which he was convicted of maintaining for drug trafficking purposes. (*Id.* at 143-44). Defendant persisted that he was anti-drug, when the trial evidence not only suggested that Defendant had used drugs himself, but it overwhelmingly established that drug trafficking was part and parcel of the KMC business—and Defendant was a leader of the organization.

B. **Objection to Applying § 3C1.1 Enhancement to Obstruction Predicate Acts**

Defendant objects to the § 3C1.1 enhancement being applied to the other obstruction offenses (*i.e.*, the obstruction and witness tampering acts related to the cover-up of the murders). Defendant's objection is misplaced because the enhancement is based upon Defendant's perjured testimony at trial and the detention hearing—a significant further

obstructive act occurring separate and apart from the obstruction/witness tampering predicate acts.

Application Note 7 to § 3C1.1 indicates that if a defendant is convicted of an obstruction of justice offense (or other similar offense), the adjustment should not be applied to the offense level for that underlying obstruction of justice offense "except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." U.S.S.G. § 3C1.1 Application Note 7.

Lying during a trial in an attempt to avoid a conviction for an offense involving obstruction of justice is "precisely the sort of 'significant further obstruction,'" to which Application Note 7 refers. *United States v. McCoy*, 316 F.3d 287, 289 (D.C. Cir. 2003) (Application Note 7 does not give "a defendant license to perjure herself in a criminal proceeding in order to avoid enhanced punishment for, of all things, perjury"); *see also United States v. Johnson*, 812 F.3d 757, 763-64 (9th Cir. 2016) (defendant convicted of making false statements to law enforcement and committing perjury before the grand jury, was subject to 2-level enhancement under § 3C1.1 if he testified falsely at trial, even if that trial testimony repeated some of the false grand jury testimony serving as the basis for the underlying perjury conviction); *United States v. Fernandez*, 389 F. App'x. 194, 203-04 (3d Cir. 2010) (the defendant's "perjury at trial constitutes a 'significant further obstruction' during the prosecution of his perjury before the grand jury" (citing *McCoy*, 316 F.3d at 289)); *United States v. Brewer*, 332 F. App'x 296, 310 n. 9 (6th Cir. 2009) ("[T]he district court properly concluded that the exception to Application Note 7 applied in situations, such as this, where a defendant took the stand in a perjury trial." (citing *McCoy*, 316 F.3d

at 289)); *United States v. Pattan*, 931 F.2d 1035, 1043 (5th Cir. 1991) (affirming under plain-error review enhancing the sentence under a conviction for perjury before the grand jury based on "evidence in the record of [the defendant's] further false statements to the trial jury, to the FBI investigator, and to his attorney after the trial").

As explained by the Supreme Court, "[i]t is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process." *Dunnigan*, 507 U.S. at 97. That conclusion is no less true when the underlying crime relates to obstruction of justice or witness tampering. *Johnson*, 812 F.3d at 764. Thus, it is perfectly appropriate to apply a § 3C1.1 enhancement for perjury committed during a trial, as the FINAL PSR does in this case, even where the underlying predicate act also involved an obstruction offense.

## C.    Grouping Objection

Relying on U.S.S.G. § 3D1.2 and *United States v. Leung*, 360 F.3d 62, 68-70 (2d Cir. 2004), Defendant also objects to separating each underlying obstructive conduct, arguing that all the obstruction predicate acts should be grouped together.

Section 3D1.2 provides that "[a]ll counts involving substantially the same harm shall be grouped together." The guideline describes when counts are considered to fall within the scope of "substantially the same harm": (1) the counts involve the same victim, U.S.S.G. § 3D1.2(a) & (b); (2) one of the counts "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another

of the counts," *id.* § 3D1.2(c); or (3) where "the offense level is determined largely on the basis of the total amount of harm or loss" or other similar aggregate harm, *id.* § 3D1.2(d).

Here, the FINAL PSR appropriately separated the obstruction predicate acts (Count Groups 2, 4, 5, 6, 7, 10, and 11), even though they all constituted obstructive acts that sought to conceal the murders of Maue and Szymanski. None of the obstruction predicate acts serves as a specific offense characteristic or otherwise results in an adjustment or increase to another of the obstruction predicate acts. Moreover, each of the obstruction predicate acts involves a different victim and a separate instance of fear and risk of harm, and thus, the predicate acts do not group together under § 3D1.2.

*Leung* does not stand for any different result—the concern there was that the district court divided the defendant's convictions into two groups, and enhanced one of the groups by two levels for obstruction of justice under § 3C1.1, while at the same time separately grouping an obstruction count predicated on the same underlying behavior in violation of § 3D1.2(c). 360 F.3d at 68-69. That is not the case with the obstruction predicate acts here, and therefore Defendant's grouping objection lacks merit.

## VI.   LEADERSHIP ADJUSTMENT

Defendant objects to a 4-level aggravating role adjustment under U.S.S.G. § 3B1.1(a), instead arguing that he is entitled to a mitigating role adjustment pursuant to § 3B1.2. The Guidelines instruct that factors to consider in assessing whether a defendant served in a leadership or organizational role include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in

planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 Application Note 4. The Guidelines further instruct: "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.* In a RICO case, the applicability of the adjustment should be analyzed based on a defendant's role in the overall RICO enterprise as opposed to his role in each underlying predicate act. *United States v. Ivezaj*, 568 F.3d 88, 99 (2d Cir. 2009) ("[T]he requirement to look at each individual act in a RICO offense is only for the purpose of establishing a base level offense, not for applying Chapter Three adjustments.").

The FINAL PSR appropriately applied a 4-level aggravating role adjustment because Defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The trial evidence established that Defendant was the *de facto* National Vice President of the KMC, serving as Pirk's righthand man. Defendant also served in the roles of National Treasurer and Secretary, one of five members of the National Board, Southeast Regional President, and Nomad. Defendant had his own personal security detail, and he was in charge of Florida and Tennessee. Defendant handled much of the day-to-day affairs of the KMC, and controlled the KMC Facebook group, used to give orders to KMC members nationwide. The trial evidence established that the KMC operated by a strict chain of command, and Defendant was at the top of that chain, second only to Pirk. Thus, the FINAL PSR appropriately includes an enhancement pursuant to § 3B1.1(a).

## VII.  FACTUAL OBJECTIONS

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that, for any disputed portion of a PSR, the Court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." In addition to the Guidelines-related objections set forth above, Defendant asserts various objections to factual portions of the FINAL PSR set forth in paragraphs 1 through 35. (Dkt. 1790). The Government previously responded to many of these objections in an earlier filing. (*See* Dkt. 1530 at 30-39). The Court resolves each specific objection as noted in the chart below, but as a general matter notes that many of the statements to which Defendant objects are taken from the language of Count 1 of the Second Superseding Indictment (Dkt. 33), for which Defendant was found guilty. Moreover, Defendant's specific factual objections persist with theories that he attempted to pursue at trial, such as the notion that he was a "peacemaker" and that the "Florida KMC" was different than New York. However, the jury rightly rejected Defendant's theories. Defendant's continued insistence upon these discredited theories ignores the overwhelming evidence presented by the Government of Defendant's guilt.

| FINAL PSR Paragraph(s) subject to objection | Court's Ruling | Basis for Ruling |
|---|---|---|
| ¶¶ 5, 12 (date Defendant joined KMC) | Overruled | First, the paragraphs simply provide background information about the KMC—not detail about Defendant's personal involvement. Second, the Government correctly points out that Defendant posted a message on Facebook in April 2012, indicating that he was the Sergeant at Arms of a clubhouse (Dkt. 1530 at 30), thus refuting Defendant's claim that he did not join until May 2012. |
| ¶ 6 (regional differences) | Overruled | This defense theory about regional differences within the KMC was rejected by the jury and was not consistent with the evidence. The KMC was one club under one leadership structure, with Defendant at the top of that chain of command. |
| ¶ 9 (description of strikers) | Overruled | The evidence introduced at trial supported the conclusion about the role of strikers set forth in this paragraph. |
| ¶ 10 (description of role of Regional Presidents and other leaders) | Overruled | The evidence introduced at trial established the chain of command was religiously followed within the KMC and strictly enforced. |
| ¶ 12 (role of "Old Ladies") | Overruled | The Court disagrees with Defendant's contention that the trial evidence did not establish criminal activity on the part of many "Old Ladies." The paragraph at issue accurately describes the role of an "Old Lady." On the other hand, the Court agrees that there was no evidence of criminal conduct by Defendant's wife. The paragraph does not suggest otherwise, and therefore the objection is overruled. |
| ¶ 13 (vote to become 1% club) | Overruled | The Court agrees with the Government that Defendant is "playing [a] game of semantics." (Dkt. 1530 at 35). The trial evidence overwhelmingly established that the KMC became a 1% club through |

| | | its conduct, even though its members avoided displaying a 1% patch to avoid possible criminal liability. |
|---|---|---|
| ¶ 17 (Defendant's role as national officer) | Overruled | As discussed during the discussion of § 3B1.1(a), Defendant served as a leader of the organization. This paragraph is accurate. |
| ¶ 18 (stripper parties, untaxed cigarettes, gambling) | Overruled | The paragraph accurately describes the activities within the clubhouses as proved by the Government at trial. The Court acknowledges that not each clubhouse engaged in the same illegal activity, and for instance, the evidence of the untaxed cigarettes dealt with the clubhouses in New York. But again, this was one organization operating in various states, and the fact that some clubhouses were engaged in different illegal activity than another is of no moment—the organization was an enterprise engaged in unlawful racketeering activity throughout its clubhouses. |
| ¶ 21 (firearms/cooperation with law enforcement) | Overruled | The evidence at trial fully supports the factual statements set forth in this paragraph. Firearms were a tool of the trade for KMC members, and every clubhouse had a firearm accessible to all members. Moreover, the code of the KMC required that its members not cooperate with law enforcement—as evidenced by the extensive and organized efforts to cover up the murders of Maue and Szymanski. |
| ¶ 25 (information that is not part of Defendant's relevant conduct) | Overruled | Defendant is not being held accountable under the Guidelines calculation for this activity. However, the information is relevant background information to a full understanding of the operation of the KMC. Moreover, Defendant's continued insistence that he was simply a "peacemaker" was not supported by the credible evidence at trial, nor by the |

| | | jury's verdict specifically finding Defendant to have engaged in activities related to murder pertaining to the Pagans. |
|---|---|---|
| ¶ 25 (bullet point paragraph 13) (meeting at Wood's residence) | Not resolved | The evidence was in conflict as to whether Defendant attended this meeting in the Fall of 2013. Defendant's alleged presence at this meeting will not be considered in connection with sentencing and therefore the Court does not resolve the objection. |
| ¶ 25 (bullet point paragraph 17) (Pagans incident) | Overruled | The trial evidence supported the facts regarding the Pagans incident and the jury concluded that Defendant engaged in murder conspiracy/solicitation with respect to that incident. Defendant's contentions about the Pagans incident (Dkt. 1790 at 12) are not correct. |
| ¶ 25 (bullet point paragraph 21) (Tennessee trip to meet with Outlaws) | Overruled | While Defendant possessed a conceal-carry permit and was permitted to carry a firearm in Florida and Tennessee, this did not authorize him to violate federal law by engaging in a RICO conspiracy involving potentially violent altercations with rival motorcycle gangs in an effort to protect the KMC's turf and power. |
| ¶ 25 (bullet point paragraph 28) (South Buffalo clubhouse confrontation) | Overruled | The paragraph accurately describes the events at the South Buffalo clubhouse during the August 2014 confrontation. While Defendant attempted to portray himself as a "peacemaker" at trial, the reality is that he was the leader of a violent motorcycle gang. |
| ¶ 25 (bullet point paragraph 32) (putting Jenkins out) | Overruled | As discussed above, the trial evidence established that Defendant was part of the plan to put Jenkins out so that he could infiltrate the Nickel City Nomads. |
| ¶ 26 (items seized from KMC members' personal residences) | Overruled | The Court disagrees that the evidence at trial did not establish that the items seized from Defendant's residence were connected to illegal activity. The items were seized in or near the location of other KMC-related materials (*e.g.*, |

| | | |
|---|---|---|
| | | burner phones supplied by the KMC to Defendant). Moreover, the items seized from other KMC members' personal residences is relevant background information. |
| ¶ 28 (drug distribution, murder, obstruction of justice) | Overruled | Defendant was found by the jury to have engaged in acts related to murder (related to the Pagans), and he similarly was found guilty of Count 8 charging maintenance of the South Buffalo clubhouse for drug trafficking purposes. Also, Defendant engaged in obstruction of justice to conceal the murders of Maue and Szymanski. |
| ¶ 29-35 (alleged conduct not involving Defendant) | Overruled | Some of the information set forth in these paragraphs falls within the scope of Defendant's relevant conduct. Moreover, there is a difference between relevant conduct for Guidelines purposes, and criminal liability for a RICO conspiracy. This information is included as a description of the full scope of the conspiracy. The information accurately describes the proof as elicited at trial. |

## VIII.  CONCLUSION

For the foregoing reasons, and with the exception of the objection to paragraph 25, bullet point paragraph 13 of the FINAL PSR which the Court does not resolve and will not consider the information therein in connection with sentencing, the Court overrules the objections and adopts the statements and findings contained in the FINAL PSR.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 26, 2019
       Rochester, New York